IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

JAMAL ABUSAMHADANEH,       )
                          )
     Plaintiff,        )
                          )
       v.            )     1:11cv939 (JCC/TCB)
                          )
SARAH TAYLOR, *et al.*,    )
                          )
     Defendants.       )

**M E M O R A N D U M   O P I N I O N**

Jamal Abusamhadaneh's Petition for Review of Denial of Application for Naturalization Pursuant to 8 U.S.C. § 1421(c) is before the Court following a bench trial held on March 13, 14, and 15, 2012.  After considering the relevant evidence, including exhibits and witness testimony at trial, the Court finds that Mr. Abusamhadaneh is a person of good moral character and meets the requirement for naturalization set out in the Immigration and Nationality Act.  The Court makes the following findings of fact and conclusions of law.

**I.   Findings of Fact**

A.   <u>Mr. Abusamhadaneh's Background</u>

Jamal Abusamhadaneh is a natural born citizen of Jordan. (March 13, 2012 Tr. [Dkt. 49] ("Tr. I") 29:9.)  After visiting the United States as a student in 1994 through a program run by the Department of State, Mr. Abusamhadaneh

1

returned in 1996 on a visitor visa and then remained in the country on a student visa. (Tr. I 29:21-33:13.) While here, he studied English and obtained a masters degree in information systems. (Tr. I 32:22-33:22.) Mr. Abusamhadaneh has been a lawful permanent resident of the United States since July 10, 2002. (Tr. I 37:17-18.)

From 1999 to 2004, Mr. Abusamhadaneh worked for the American Muslim Foundation (AMF), which sponsored his H-1b visa. (Tr. I 33:25-36:18.) He was AMF's director of education and then worked for the organization in information systems. (Tr. I 35:14-37:9.) Mr. Abusamhadaneh also worked for KForce, Inc. and then CoreStaff Technology Group in information technology technical support. (Tr. I 45:14-23.) In 2005, Mr. Abusamhadaneh was hired by the Fairfax County Police Department as a network analyst. (Tr. I 46:1-13.) Mr. Abusamhadaneh resigned from the Fairfax County Police Department on December 11, 2006. (Tr. I 47:5-9.) He then worked for a contractor in the health care industry until July 2008 when he started working for his current employer, the United Health Group. (Tr. I 47:11-25.) He is a senior network consultant. (Tr. I 48:1-2.)

Mr. Abusamhadaneh resides in Falls Church, Virginia with his family. (Tr. I 29:4-7.) Mr. Abusamhadaneh has four children and lives with his wife who obtained citizenship in 2008. (Tr. I 44:17-45:9.) Mr. Abusamhadaneh is a practicing Muslim. (Tr. I 52:19-21; 54:13-21.) He primarily prays at the

2

Dar al-Hijra mosque, as it is the closest mosque to his residence. (*Id.*) Mr. Abusamhadaneh presented two credible witnesses who discussed Mr. Abusamhadaneh's helpful character and his reputation as someone who is very honest and truthful. (*See* March 12, 2012 Tr. [Dkt. 50] ("Tr. II") 85:21-89:13; 95:17-97:5.)

B.   Naturalization Proceedings

On February 13, 2008, Mr. Abusamhadaneh submitted his N-400 Application for Naturalization (the Application) along with appropriate supporting documentation and the required fee. (Appl. [Joint Exhibit (JE) 1] at 10; Stipulation of Uncontested Facts [Dkt. 27] (Stip.) at 1.) In addition to Mr. Abusamhadaneh's signature, the Application contains the signature of his attorney, Ashraf Nubani, as the preparer of the Application. (*Id.*) Mr. Abusamhadaneh retained Mr. Nubani to assist with preparation of the Application and with the ensuing naturalization proceedings. (Tr. I 48:24-51:11.)

i.   October 5, 2009 Interview

The processing of Mr. Abusamhadaneh's Application took much longer than the usual six months, so after contacting United States Citizenship and Immigration Services (USCIS), Mr. Abusamhadaneh threatened to file a writ of mandamus. (Tr. I 231:17-232:7.) On October 5, 2009, Mr. Abusamhadaneh finally attended his N-400 naturalization interview at the USCIS Washington District Office in Fairfax, Virginia. (Stip. at 1.)

He was accompanied by Mr. Nubani. (*Id.*)  The interview was
conducted by Senior District Adjudications Officer Malgorzata
Lutostanski and a portion of it was videotaped.[1] (*Id.*)

At the start of the hearing Officer Lutostanski
stated:

> Please let me know at any time if you need
> to take a break to go to the bathroom or
> have a drink of water or anything like that.
> Also if you don't understand any of the
> questions that I ask please ask me for
> clarification.  Also just so you know if at
> any time you choose to stop the interview or
> you don't want to answer any questions that
> I ask you, a negative inference may be drawn
> from your silence.  Present at this
> interview is your attorney of record, Asraf
> Nubani.  Please understand that your
> attorney's role at this interview is to
> ensure that your legal rights are protected.
> Your attorney may advise you on points of
> law, but he cannot respond to questions that
> are directed at you.  These proceedings will
> be conducted under oath.  And all statements
> you make constitutes (sic) sworn testimony.

(October 5, 2009 N-400 Hearing Partial Tr. [JE 7] (Tr. 2009)
3:17-4:13.)  After asking Mr. Abusamhadaneh a series of
questions, Officer Lutostanski had him verify that everything
stated in the Application was the truth and sign the
Application. (Tr. II 48:4-8.)  Officer Lutostanski signed the
Application herself and conducted a language and civics test.
(March 15, 2012 Partial Tr. [Dkt. 51] ("Tr. IIIA") 48:4-8.)

---

[1] The DVD used to record the interview only covered the first 60 minutes of the
interview.  (Tr. II 233:1-3.)

Officer Lutostanski then asked Mr. Abusamhadaneh numerous additional questions. (Tr. IIIA 48:9-11.) After asking the questions, she informed him that she was going to put in a request for additional evidence. (Tr. I 95:17-19;Tr. IIIA 31:4-9.) A drink of water was requested, and Officer Lutostanski informed Mr. Abusamhadaneh and Mr. Nubani that they could wait in the waiting area. (Tr. IIIA 31:10-15.) This "break" in the interview lasted approximately ten to fifteen minutes. (Tr. I 95:21-24; 245:18-20; Tr. II 233:4-20.)

When Officer Lutostanski returned with the request, Mr. Nubani asked that Mr. Abusamhadaneh have more time to clarify some points. (Tr. I 97:7-98:18; Tr. II 234:5-11.) Officer Lutostanski agreed and reminded Mr. Abusamhadaneh that he was still under oath. (*Id.*) At that point, Mr. Abusamhadaneh provided additional information regarding his response to particular questions. (Tr. I 100:2-6.) During this portion of the interview, Officer Lutostanski took a series of notes, portions of which Mr. Abusamhadaneh initialed at the end of the interview. (Tr. I 143:4; Tr. II 235:13-25.)

On April 30, 2010, USCIS issued a decision denying Mr. Abusamhadaneh's N-400 Application (the 2010 Decision). (JE 11; *see also* JE 2.) The 2010 Decision concludes Mr. Abusamhadaneh lacked the "good moral character" required for naturalization because he provided false testimony for the purpose of obtaining naturalization. (JE 11 at 2.) The 2010 Decision expresses

concern with Mr. Abusamhadaneh's responses to the following topics: membership and association with the Dar al Hijra mosque and the Muslim Brotherhood, association with Abdurahman Alamoudi, and detentions by Jordanian officials.[2]  (JE 11 at 5-7.)

ii. <u>October 5, 2009 Hearing</u>

On June 2, 2010, Mr. Abusamhadaneh filed a Request for a N-336 Hearing on a Decision in Naturalization Proceedings with USCIS.  (Stip. at 2.)  In support, he submitted a sworn affidavit from himself and from Mr. Nubani to explain and rebut the conclusion by USCIS that he provided false testimony during the N-400 interview.  (*Id.*)  On December 29, 2010, Mr. Abusamhadaneh appeared for his N-336 hearing at the USCIS Washington District Office accompanied by Mr. Nubani.  (JE 12.) He was interviewed by Senior District Adjudications Officer June Williams and the interview was videotaped.  (*Id.*)

On July 28, 2011, USCIS issued a decision affirming the prior denial of his Application (the 2011 Decision).  (JE 13.)  The 2011 Decision, drafted by Officer Williams, concludes that "you have failed to overcome the denial of your application dated April 30, 2010, as it pertains to a finding that you are a person of good moral character."  (JE 13 at 5.)  The 2011

---

[2] The 2010 Decision mentions Mr. Abusamhadaneh's testimony about the Muslim American Society, but does make any specific conclusions about it.  The 2010 Decision appears to consider the Muslim American Society only insofar as it assumes the society is the equivalent to the Muslim Brotherhood.  (*See* JE 11 at 5.)

Decision states that during the N-400 interview Mr. Abusamhadaneh was not initially forthcoming about his "associations with Mr. Alamoudi and various organizations." (JE 13 at 4.)  It states that "the reason you came back and asked for the second portion of the interview was because you knew your earlier minimizations of your associations with various groups and persons would not deceive USCIS." (*Id.*)

Mr. Abusamhadaneh disputes the determination that he lacks good moral character for purposes of naturalization as required under 8 U.S.C. § 1427.  On September 2, 2011, he filed with this Court a Petition for Review of Denial of Application for Naturalization Pursuant to 8 U.S.C. § 1421(c) and Request for De Novo Hearing.  [Dkt. 1.]  The Defendants in this case are: Sarah Taylor, District Director, United States Citizenship and Immigration Services (USCIS), Washington District Office; Kimberly Zanotti, Field Office Director, USCIS, Washington District Office; Alejandro Mayorkas, Director, USCIS; Michael Aytes, Acting Deputy Director, USCIS; Janet Napolitano, Secretary of the United States Department of Homeland Security; and Eric H. Holder, Jr., United States Attorney General.  A bench trial was held on March 13, 14, and 15, 2012, and Mr. Abusamhadaneh's Petition is now before the Court.

C.   Preliminary Issues

Before examining Mr. Abusamhadaneh's testimony, it is helpful to first address two overarching issues in this case.

Both created confusion during Mr. Abusamhadaneh's N-400 interview and, through no fault of his own, mistakenly contributed to a perception that Mr. Abusamhadaneh was not forthcoming.

### i. AMF & FBI Memorandum

The first issue is that Officer Lutostanski relied on information in a FBI report that was discredited as inaccurate during the trial.[3]  Mr. Abusamhadaneh's first employer in the United States, the American Muslim Foundation, is no longer in existence.  (Tr. I 38:11-39:13.)  It was dissolved in 2004 after its president, Abdurahman Alamoudi, was convicted of various crimes.  Mr. Alamoudi subsequently gave numerous interviews with the FBI, which resulted in "302 reports" prepared by FBI agents.  (Tr. II 130:9-133:1.)  One of the reports prepared stated that a "source" (i.e., Mr. Alamoudi) identified Mr. Abusamhadaneh as someone who was affiliated with certain organizations, including the Muslim Brotherhood and the Muslim American Society.  (FBI Report [Defendant Exhibit (DE) 1].)  During the trial, Mr. Alamoudi credibly testified that some of the information in the report was inaccurate, particularly the statement that Mr. Abusamhadaneh told Mr. Alamoudi that he was a member of the Muslim Brotherhood.  (Tr. II 132:13-22; 142:19-143:16.)  The

---

[3] Officer Williams submits that she did not rely on the information in the FBI report, but, as discussed below, her testimony was unclear and lacking in credibility.

evidence presented during the trial confirmed that Mr. Abusamhadaneh has never been a member of the Muslim Brotherhood.

Officer Lutostanski obtained the FBI report prior to Mr. Abusamhadaneh's N-400 interview and relied on it as the basis for her questioning. (Tr. II 185:3-5; 222:4-13; 223:4-6.) But she was unaware that the report contained inaccuracies and she never presented it to Mr. Abusamhadaneh for inspection. (Tr. II 183:11-184:22; 215:3-8; Tr. IIIA 43:6-9.)  Officer Lutostanski submits that her general description of the information in the report sufficed for "inspection," but as the Court will address later, her description fell far short of capturing the details and context of the report.  By failing to provide the report to Mr. Abusamhadaneh, Officer Lutostanski's actions appear to conflict with the Adjudicator's Filed Manual, which states that a petitioner must be afforded an opportunity to inspect and rebut adverse information. (Tr. IIIA 41:20-44:20.)  Mr. Abusamhadaneh's interview was the first time Officer Lutostanski handled a complex case with this type of "positive name check" from the FBI. (Tr. IIIA 5:1-7:1; 22-24.) She explained that she did not have much experience with such an atypical case, and was not aware if there were different procedures she should follow.[4]  (Tr. IIIA 5:25-8:21.)  As a

---

[4] Further compounding the problem is the fact that Officer Williams also failed to produce the report for Mr. Abusamhadaneh's inspection. (Tr. IIIA 92:12-15; 93:13-14.)

result, Mr. Abusamhadaneh was never given the opportunity to examine the report and potentially identify the inaccuracies and explain the source of confusion.

Because Officer Lutostanski believed that Mr. Abusamhadaneh was a member of the Muslim Brotherhood, she formed the mistaken impression that Mr. Abusamhadaneh was trying to deceive her when he did not mention the Muslim Brotherhood during the interview and repeatedly denied being a member of any organization.  Officer Lutostanski testified that the information from the FBI report was a significant factor in her decision to deny Mr. Abusamhadaneh's Application.  (Tr. IIIA 45:13-17.)  She concedes she does not know what she would have concluded regarding Mr. Abusamhadaneh's explanations if she was aware that the FBI report was unreliable and inaccurate.  (Tr. IIIA 40:3-9.)

### ii. Mr. Nubani

The second issue is the fact that Mr. Abusamhadaneh's attorney, Mr. Nubani, advised Mr. Abusamhadaneh not to disclose his relationship with religious organizations.  Mr. Abusamhadaneh credibly testified that when preparing his Application his attorney advised him that religious organizations were not responsive to general questions about membership and associations.  More specifically, Mr. Abusamhadaneh understood Mr. Nubani to advise him that he had a right not to list religious organizations, and therefore he was

not supposed to list religious organizations.[5]   (Tr. I 53:1-23.)

Mr. Abusamhadaneh also understood Mr. Nubani's advice to apply

to answers to the interview questions.[6]   (Tr. I 81:23-82:7;

86:18-87:22; 193:23-24; 194:24-195:1.)   Mr. Abusamhadaneh

credibly testified that he was willing to disclose his

relationships with religious organizations and wanted to provide

the information, but that he ultimately relied on his attorney's

advice about how the system works.[7]   (Tr. I 53:4-7; 91:12-15;

92:14-18; 96:3-9; 107:16-108:2; 162:8-9.)

As a result, when questioned about membership and

association with organizations generally, Mr. Abusamhadaneh

narrowly construed the questions in light of his attorney's

advice and excluded all mention of religious organizations in

his answers.   After Mr. Abusamhadaneh had the opportunity to

talk with his attorney during the break in the interview,

---

[5] Mr. Nubani testified that, as a matter of practice, he tells clients that religious organizations are not responsive because the question on the application is a broad question, which the government has never clarified to include religious organizations.  (Tr. I 218:11-12.)  He also believes his clients have a constitutional right not to disclose their religious affiliations.  (Tr. II 42:9-43:7.)  The Court's focus, however, is on Mr. Abusamhadaneh's perspective, and Mr. Nubani corroborated that he told Mr. Abusamhadaneh that religious organizations were not responsive.  (Tr. I 235:3-6; Tr. II 37:20-25.)

[6] Mr. Nubani's advice to Mr. Abusamhadaneh was misleading, if not erroneous. Mr. Nubani concedes he should have done more to clarify his advice regarding religious organizations.  (Tr. I 235:22-24; 237:22-25; 239:14-240:9.)  He testified that he should have told Mr. Abusamhadaneh in advance of the interview how to respond when asked about them. (Tr. I 235:7-14.)  And, that he should have been proactive during the interview to clarify his advice. (Tr. I 240:10-18.)

[7] Mr. Nubani corroborated Mr. Abusamhadaneh's testimony that he was "ready, willing, and able to [list religious organizations]," but that he decided not to in reliance on Mr. Nubani's advice.  (Tr. I 224:12-18.)

11

however, he returned to clarify his answers about his relationships with religious organizations.  Officer Lutostanski did not fully credit his testimony provided after the break, as her perception was shaded by the belief that Mr. Abusamhadaneh had already intentionally provided false testimony by attempting to hide his relationship with the Muslim Brotherhood.  (Tr. IIIA 40:24-41:10; *see also* Tr. IIIA 25:6-26:5.)  Thus, she concluded that Mr. Abusamhadaneh's testimony about his relationship with the mosque, the Muslim American Society, and the Muslim Brotherhood after the break converted his earlier omission of that information into intentionally false testimony.  Yet, in reality Mr. Abusamhadaneh was just correcting for his attorney's mistaken advice and attempting to respond to the government's mistake about the his relationship with the Muslim Brotherhood.

### iii. Break in Testimony

Finally, before turning to the specifics of Mr. Abusamhadaneh's testimony, the Court takes a moment to preliminarily address the break in his testimony during the N-400 interview.  Mr. Abusamhadaneh's testimony was provided in two parts: before and after a ten to fifteen minute break. During the break Mr. Abusamhadaneh and Mr. Nubani conferred outside the presence of Officer Lutostanski.  As mentioned, Officer Lutostanski did not fully credit Mr. Abusamhadaneh's testimony after the break.  She disputes whether the additional testimony operated as "clarification," arguing it was really

"partial clarification or expansion on previous testimony" and "additional testimony." (Tr. IIIA 27:14-29:17.) What is clear is that the testimony was given promptly and voluntarily. (*See* Tr. IIIA 52:15-19.)

After a lengthy initial interview and extensive questioning about memberships, both Mr. Abusamhadaneh and Mr. Nubani had concerns about the interview by the time of the break. Mr. Nubani made a comment to Mr. Abusamhadaneh to the tune of -- "you are coming through this scrutiny because of your [religious] association," and it looks like "they have it out for you or there's something that's not right here." (Tr. I 96:13-17; Tr. I 245:18-24.) Mr. Abusamhadaneh was understandably concerned and confused. The interview had lasted a long time, he was asked questions about his relationship with religious organizations which he understood from his attorney not to be included, and he had been informed that the government had information that he was a member of the Muslim Brotherhood, which he was not. (Tr. I 90:18-91:6; 95:23-96:13.) Thus, Mr. Abusamhadaneh insisted that he was not leaving the building without clarifying his relationship with religious organizations. (Tr. I 96:4-9.)

Mr. Abusamhadaneh's testimony after the break was made on his own volition. Mr. Abusamhadaneh credibly testified that during break he again told his attorney that he did not have an issue with discussing his relationship with religious

13

organizations, and that he thought he should do so before he finished the interview.  (Tr. I 95:23-96:9; 107:16-108:2.)  Mr. Abusamhadaneh also credibly testified that he clarified his attorney's advice on that point, and that Mr. Nubani apologized for the earlier misleading advice, recommending that Mr. Abusamhadaneh discuss his relationship with religious organizations.  (Tr. I 96:12-17.)  He also credibly testified that he sought his attorney's advice on providing additional information on other topics.  (Tr. I 123:13-14; 130:8-11; 246:8-9; Tr. II 5:9-17.)

Mr. Abusamhadaneh returned to continue his testimony in order to fully explain the nature of his relationship with religious organizations, to ensure that Officer Lutostanski understood that he was not linked to Mr. Alamoudi's illegal activities during his time at the AMF, and to provide additional examples of things he had only recently thought out.  The Court credits Mr. Abusamhadaneh's explanation and finds that Mr. Abusamhadaneh's testimony after the break was consistent with, and bolstered, his earlier testimony.

D.   Memberships and Associations in Organizations

Turning to Mr. Abusamhadaneh's testimony, Defendants argue Mr. Abusamhadaneh provided false testimony with an intent to obtain an immigration benefit on the following topics: membership and association with the Dar al-Hijra mosque, the Muslim American Society, and the Muslim Brotherhood; association

14

with Mr. Alamoudi; and, stops by law enforcement.  The Court
will address each topic in turn.

### i. Dar al-Hijra Mosque

The first issue is whether Mr. Abusamhadaneh provided
false testimony regarding his relationship with the Dar al-Hijra
mosque with the intent to obtain an immigration benefit.  The
Court will first review Mr. Abusamhadaneh's N-400 Application,
and then turn to his testimony during the N-400 interview.[8]

### 1. Application

Question 8(a) of the N-400 Application asks, "Have you
ever been a member of or associated with any organization,
association, fund, foundation, party, club, society, or similar
group in the United States or in any other place?"  (Appl.)  Mr.
Abusamhadaneh's Application checks the box for "no."  (*Id.*)  Mr.
Abusamhadaneh submits he did not list the Dar al-Hijra mosque
(or any other mosque where he might have prayed), because he was
unsure about the scope of the question, the meaning of the terms
member and associated, and because he was advised by counsel not
to include relationships with religious organizations.  The
Court finds Mr. Abusamhadaneh's explanation reasonable and
credible.

---

[8] There is no assertion by Defendants that Mr. Abusamhadaneh provided false
testimony during the N-336 interview with Officer Williams.  Having reviewed
that interview, the Court finds that Mr. Abusamhadaneh's testimony is
consistent with his explanations to Officer Lutostanski and his testimony
during the trial, and that he did not intentionally provide false testimony
during that interview.

Question 8(a) does not specify religious organizations or the meaning of the terms member and associated.  Mr. Abusamhadaneh credibly testified that he was unsure about the scope of the organizations he should include in response to this question, and unsure about the Application's intended meaning of the terms member and associated.  He credibly testified that in preparing to fill out the Application, he could not locate a definition of membership or association in the instruction book. (Tr. I 52:4-12.)  As a result, Mr. Abusamhadaneh was unsure about whether to list the Dar al-Hijra mosque in response to Question 8(a).  This confusion is reasonable because Mr. Abusamhadaneh is not formally a member of the Dar al-Hijra mosque, as he has not filled out the form required for membership, nor does he pay the requisite membership dues or vote.  (Tr. I 53:25-55:24; Tr. II 94:10-95:1.)  Nor does Mr. Abusamhadaneh formally associate with the mosque; he associates with it in the sense that he regularly visits the mosque to pray and attends some gatherings.  (Tr. I 54:3-21.)

Recognizing that Question 8(a) was open-ended, Mr. Abusamhadaneh consulted his attorney about what he should include in his response.  (Tr. I 52:9-25.)  As previously discussed, Mr. Abusamhadaneh understood Mr. Nubani to advise him that he had a right not to list religious organizations and, therefore he is not supposed to list religious organizations in response.  (Tr. I 53:1-23.)  Mr. Abusamhadaneh's reliance on

16

this advice was reasonable.  Mr. Nubani was a known attorney in the Muslim community and had a reputation as someone focused on immigration law.  And, Mr. Abusamhadaneh understood him to be someone who was trustworthy.  (Tr. I 49:15-21; Tr. II 27:20-28:7.)  Mr. Nubani reviewed every section of the Application with Mr. Abusamhadaneh.  (Tr. I 226:1-7.)  Not only does Question 8(a) fail to specify religious organizations, but there is also nothing else in the Application asking about religious affiliation that would suggest to Mr. Abusamhadaneh, contrary to Mr. Nubani's advice, that the government had a right to inquire about it.  Finally, the reasonableness of interpreting the question to exclude religious organizations is bolstered by Officer Lutostanski's testimony that she would not generally expect an applicant to answer Question 8(a) listing his church or mosque membership.  (Tr. II 192:8-19.)

Mr. Abusamhadaneh's exclusion of the mosque was not made with the intent to obtain an immigration benefit.  Mr. Abusamhadaneh credibly testified that his rationale for not listing it was twofold.  First, he did not interpret the question to inquire about informal relationships with organizations and he believed his relationship with the mosque was informal.  Second, his attorney advised him that he was not supposed to list religious organizations.  In light of vague terms and his attorney's advice, Mr. Abusamhadaneh reasonably

narrowly construed the question to exclude religious organizations.

It is insufficient to infer intent to deceive from the fact that Mr. Abusamhadaneh had heard in the community that being Muslim or listing the Dar al-Hijra mosque on an N-400 Application could result in delays in the processing of the Application. (Tr. I 156:6-157:22; 159:2-6; 160:24-161:22.) Mr. Abusamhadaneh testified that it came to his mind as a concern that this was a possibility for his Application, but that he did not hold the belief that it would. (Tr. I 159:7-160:8; 162:2-4; 163:1-3.) The Court will not assume everything someone generally hears becomes that person's own personal belief. It is also insufficient to infer intent to deceive from Mr. Nubani's bias. There is evidence that Mr. Nubani is biased against the FBI based on a concern that Muslims are unfairly targeted in the United States. From his perspective, there is a "wink and a nod" between Muslims that they are subject to greater scrutiny in the United States because of their religious affiliation. (Tr. II 38:16-39:1.) There is no evidence, however, that Mr. Abusamhadaneh held this bias.[9]

---

[9] Mr. Nubani testified that he did not know what Mr. Abusamhadaneh expected or was thinking with respect to whether he would be scrutinized for being a Muslim when they discussed the responsiveness of religious organizations to the Application. (Tr. II 39:4-40:11.) He also testified that he did not generally believe that Mr. Abusamhadaneh was biased toward the United States or was biased about the way some people treat Muslims. (Tr. II 78:8-23.)

The Court assesses credibility based on the content of the witness' testimony as well as their demeanor, cadence, tenor, tone, and inflection of voice.  In addition, it looks to the consistency of the witness' testimony with the rest of the evidence presented.  The Court finds that Mr. Abusamhadaneh credibly testified that although it was something he discussed with his attorney in preparing the Application, he did not have an issue with listing his relationship with the mosque on his Application.  (Tr. I 53:4-7; 162:8-9.)  As discussed below, Mr. Abusamhadaneh's testimony during the N-400 interview supports a finding that Mr. Abusamhadaneh was willing to disclose his relationship with religious organizations and was not withholding information with the intent to obtain an immigration benefit.

## 2. N-400 Interview Testimony

The notion that Mr. Abusamhadaneh was willing to disclose his relationship with religious organizations is supported by the degree to which he was forthcoming about his attendance at the mosque during the N-400 interview.  At the outset of the interview, Mr. Abusamhadaneh was asked substantially the same question as Question 8(a) on the Application by Officer Lutostanski.  It was the first time he was asked about membership or association during the N-400 interview.  Officer Lutostanski asked:

Have you ever been a member of or associated
with any organization, association, fund,
foundation, party, club, society or anything
similar to those?  You don't belong to any
organizations?

(Tr. 2009 24:21-25:3.)  Consistent with his Application answer,

Mr. Abusamhadaneh replied "no."  (Tr. 2009 25:4.)  Mr.

Abusamhadaneh's negative response as it pertains to the mosque

was reasonable for the same reasons why it was reasonable when

Mr. Abusamhadaneh did not list the mosque in response to

Question 8(a) on the Application.  And the Court credits his

explanation that his answers resulted from vague questions and

his attorney's advice – not from intent to deceive to obtain an

immigration benefit.  In fact, his response during the interview

was made more reasonable by the way Officer Lutostanski combined

her version of Question 8(a) with the second question of, "you

don't belong to any organizations?"  (Tr. 2009 24:21-25:3.)  It

is sensible to interpret the first question in light of the

second question, and here the second question implied that

Office Lutostanski was asking about something akin to a formal

relationship.  The phrase as "belong to" suggests a meaning that

is closer to "being a member of" than to "informally associate

with."  Mr. Abusamhadaneh had a reasonable impression that the

question pertained to formal membership and association, neither

of which he believed he had with the mosque.  This impression

was also understandable in light of the fact that Officer

Lutostanski never defined the terms member or associated.

Next, Officer Lutostanski asked, "Are you member (sic) of a church or a mosque or anything like that?"  Mr. Abusamhadaneh, not being a formal member, replied "no."  (Tr. 2009 25:5-8.)  Mr. Nubani then asked, "Not a member of any of the mosques?"  Mr. Abusamhadaneh stated, "No. I visit the mosque, but I am not a member."  (Tr. 2009 25:10-13.)  Thus, before any other questions about membership or associations were asked, Mr. Abusamhadaneh was forthcoming with the fact that he visits a mosque.  Far from deceitfully withholding the fact that he had a relationship with the mosque, Mr. Abusamhadaneh disclosed it up front at the beginning of the interview.

Mr. Abusamhadaneh's response also demonstrates that he had a precise interpretation of the meaning of the word member. By disclosing this fact, Mr. Abusamhadaneh demonstrated that he was not attempting to deceive anyone in his responses to Officer Lutostanski's questions.  This response is consistent with Mr. Abusamhadaneh's testimony throughout the interview regarding repeated questions about membership.  And, it is particularly consistent with Mr. Abusamhadaneh's response when Officer Lutostanski asked, "Can you honestly say that you are not a member of any organization?"  Mr. Abusamhadaneh responded that he had already answered that question in the negative.  He went on to explain:

> "I go to the mosque. I participate in the
> community events. I'm a conservative person.
> I do pray. I do any activity that has to do

> with the family. I take my family.  I take
> my kids to the school.  They have picnics.
> They have things.  So I go to all these kind
> of activities like anyone in any other
> community.  But I'm not a member of any
> association or any club.  I'm not even a
> member of the mosque that I go to."

(Tr. 2009 66:15-67:9.)  Mr. Abusamhadaneh's testimony during the

N-400 interview demonstrates he was both willing to discuss his

relationship with the mosque and was careful to make a

distinction about his use of the word member.  In light of all

the evidence presented, the Court finds this testimony

forthright and truthful.

Officer Lutostanski also asked Mr. Abusamhadaneh two

general questions pertaining to association: (1) whether he was

"associated with any organization," and (2) whether the

Jordanian student council (of which he was a formal member) was

"the only thing that you can remember as far as your

associations with any clubs?"  (Tr. 2009 28:12-18.)  Mr.

Abusamhadaneh responded "no" and "yes," respectively.  The Court

finds these responses as they pertain to the mosque reasonable

for the same reasons they were reasonable when Mr. Abusamhadaneh

answered "no" to Officer Lutostanski's version of Question 8(a).

That question included "associated" in the list of relationships

she was inquiring about.  Mr. Abusamhadaneh credibly explained

that he did not include MAS because of the vague question and

his attorney's advice that religious organizations were not

responsive.  The Court also finds that his answers were not made

with any intent to deceive, as he had already disclosed the fact
that he attended a mosque earlier in the interview.  The fact
that these responses were made *after* Mr. Abusamhadaneh had
already revealed that he prays at a mosque, bolsters his
credibility that he interpreted the word associate to imply a
more formal relationship.

Additional testimony from the N-400 interview lends
credibility to Mr. Abusamhadaneh's assertion that he did not
have any issue with disclosing his relationship with the mosque.
When specifically asked, Mr. Abusamhadaneh was forthcoming about
the fact that he is a Muslim who attends a mosque and community
events hosted by it.  For example, when asked how he found his
job with the AMF, he discussed how he located the employment
through the mosque.  (Tr. 2009 50:9-51:18.)  And, when asked
later whether he attended any informal meetings or gatherings,
Mr. Abusamhadaneh stated that he attended picnics and "any
activities that they do on the outside." (Tr. 2009 53:12-
54:12.)  (The "they" appears to be referencing the mosque.)  Mr.
Abusamhadaneh demonstrated that he was willing to discuss his
relationship with the Dar al-Hijra mosque before the break in
testimony and provided truthful answers to questions as he
understood them.

After the break in testimony, Mr. Abusamhadaneh came
back in to clarify that he visits and attends activities at the
mosque, and so if that is the type of association Officer

Lutostanski was interested in, then he did associate with the mosque.  (Tr. I 100:2-18.)  USCIS found this "explanation after the fact [] not believable." (JE 11 at 6.)  The Court disagrees.  Not only is confusion about the term associate reasonable, but his explanation is entirely consistent with, and supported by, his actual testimony during the N-400 interview. A careful review of Mr. Abusamhadaneh's testimony during the N-400 interview strongly bolsters his credibility when he claims that he was willing to discuss his relationship with the mosque, but was narrowly construing his answers in light of vague questions and his attorney's advice about religious organizations.

     The Court finds that the credibility of USCIS's conclusions is undermined by inaccurate descriptions of Mr. Abusamhadaneh's testimony and generalized findings about Mr. Abusamhadaneh's truthfulness.  To start, it is difficult to determine whether the USCIS decisions even conclude that Mr. Abusamhadaneh provided false testimony with respect to the mosque.  The final 2011 Decision does not make any specific determinations, as it provides Mr. Abusamhadaneh's testimony and only concludes "you minimized your associations with Mr. Alamoudi and various organizations in the opening portion of your initial interview" and that such testimony was "deceptive." (JE 13 at 4-5.)  The April 30, 2010 Decision states that his Application was denied "[b]ased on [Mr. Abusamhadaneh's] overall

conduct and testimony during the interview." (JE 11 at 6.)
And, although the 2010 Decision evaluates his testimony about
the mosque, it does so inaccurately.

The 2010 Decision states that Mr. Abusamhadaneh was
"asked numerous times in many different ways whether [he was] a
member, or associated or affiliated, directly or indirectly,
with any organizations, associations, or churches" and that
"only later did you testify, after prodding from your own
attorney, that you and your family attended a mosque of which
you were not a member."[10] (JE 11 at 6.) Yet, Mr. Abusamhadaneh
was up front with the fact that he visited a mosque, but was not
a member, at the outset –- in the exchange that occurred *right*
*after* Officer Lutostanski asked her version of Question 8(a).
To suggest that Mr. Abusamhadaneh withheld his relationship with
the mosque through numerous pertinent questions is inaccurate.
USCIS's determination to group all of the questions throughout
the interview without respect to timing undermines the
credibility of its conclusions. It is also inaccurate to
suggest that he was asked whether he was "indirectly" associated
with any organizations. The only time Officer Lutostanski used
the word indirect is when she asked Mr. Abusamhadaneh if he had
"ever advocated either directly or indirectly the overthrow of

---

[10] The Court does not find anything problematic in the fact that Mr.
Abusamhadaneh stated that he visits a mosque, but is not a member after Mr.
Nubani's attempt to clarify the question. Mr. Abusamhadaneh response was
consistent, as he confirmed that he was not a member.

any government by force."   (Tr. 2009 29:1-3.)  Finally, the

2010 Decision also states that "supposedly" Mr. Abusamhadaneh

does not consider himself a member of the mosque.  The Court

finds there is no basis for doubting the testimony that Mr.

Abusamhadaneh is not a formal member of the mosque.

     The Court notes that Officer Lutostanski did not

testify that she thought he provided false testimony about the

mosque.  In fact, she confirmed that she would *not* expect Mr.

Abusamhadaneh to answer Question 8(a) listing his mosque

membership.  And, to the extent that Officer Williams concluded

that Mr. Abusamhadaneh lacked good moral character on the basis

that he was not forthcoming with Officer Lutostanski about his

relationship with the mosque, the Court gives very little weight

to her determination.  First, her conclusion was based on the N-

400 interview testimony, which, as described above, the Court

finds to be truthful.  Second, she repeatedly mischaracterized

the record of Mr. Abusamhadaneh's testimony during the N-400

interview.  For example, during the N-336 interview, Officer

Williams stated that Mr. Abusamhadaneh testified during the N-

400 interview that he sometimes attended the mosque, but "did

not participate in any other meetings or gatherings." (December

29, 2010 N-336 Hearing Tr. [JE 12] ("Tr. 2010") 8:2-11.)  Mr.

Abusamhadaneh had to object to the misstatement and clarify his

testimony from the N-400 interview for Officer Williams.

Officer Williams' mistakes about the N-400 interview record –

the record that forms the basis for her conclusion that he

provided false testimony to Officer Lutostanski – demonstrates

that she did not undertake a thorough and careful review of it.

>Finally, Defendants submit that

>This case is not about whether or not Mr.
>Abusamhadaneh is a member of or associated
>with the Dar al-Hijra mosque.  This case is
>about that Mr. Abusamhadaneh was not
>forthcoming when he was asked time and time
>and time and time again about his
>memberships and associations, his arrests
>and whether or not he had ever been
>subjected to investigations.

(March 15, 2012 Partial Tr. [Dkt. 48] ("Tr. IIIB") 175:10-16.)

Defendants are correct that this inquiry turns on a

determination of Mr. Abusamhadaneh's subjective intent, but they

err in suggesting that whether Mr. Abusamhadaneh is a member of,

or associated with, the mosque has no bearing on this case.  An

evaluation of Mr. Abusamhadaneh's truthfulness rests very

heavily on a determination of whether he was actually a member

of, or associated with, a mosque.  Simply, if he is not a

member, he cannot be found to be lying or unforthcoming when he

states he is not a member.  And, if he is not reasonably

associated with an organization, he cannot be found to be lying

or unforthcoming when he states he is not associated with an

organization.

## ii. Muslim American Society

The second topic is whether Mr. Abusamhadaneh provided

false testimony regarding his relationship with the Muslim

American Society (MAS) with the intent to obtain an immigration
benefit.  Before reviewing Mr. Abusamhadaneh's Application and
testimony during the N-400 interview, the Court will first
address Mr. Abusamhadaneh's relationship with MAS.

Mr. Abusamhadaneh reasonably understood MAS to be a
non-profit religious organization.[11]  (Tr. I 43:16-18.)  Mr.
Abusamhadaneh is not a formal member of MAS, not on the national
level, not on the chapter level, and not as an affiliate member.
(Tr. I 57:11-58:4; Tr. II 152:16-153:14.)  He did not fill out a
membership form, nor does he pay monthly dues, vote for
leadership, enjoy privileges of membership in the organization,
or participate in member outreach.[12]  (*Id.*)  With respect to
association, Mr. Abusamhadaneh and his family attended community
events sponsored by MAS and his children attended a religious
school run by MAS.  (Tr. I 56:19-57:1.)  And, MAS interacted
with the AMF on some community projects.  (Tr. I 43:16-19.)  The
Court finds that Mr. Abusamhadaneh's determination that his
interactions with MAS amounted to a less formal relationship
with the organization is reasonable.

1. Application Questions

---

[11] Mr. Abusamhadaneh's belief that MAS is predominantly a religious
organization is reasonable in light of its 501(c)(3) status and credible
testimony at the trial about the limited nature of its political activism.
(Tr. II 155:12-156:17.)  Furthermore, Mr. Nubani had the same understanding
as Mr. Abusamhadaneh.  (Tr. I 224:19-225:17.)

[12] Mr. Alamoudi testified that although he had thought Mr. Abusamhadaneh was a
member of MAS, he did not know in fact whether Mr. Abusamhadaneh was a member
of MAS.  (Tr. II 136:12-23.)

Regarding the Application, Mr. Abusamhadaneh credibly testified that as a result of his confusion about the scope of Question 8(a), confusion about the terms member and associated, and advice of counsel not to include religious organizations in response to the question (including MAS, which he discussed with Mr. Nubani), he did not include MAS on the Application. (Tr. I 49:1-13; 56:19-57:3; 58:7-17; 81:23-82:7.) The Court finds this explanation reasonable and credible. And, again, although Mr. Abusamhadaneh was aware that his relationship with MAS, like the mosque, could bring scrutiny on his Application, he credibly testified that he did not have any issue with listing his religious organizations on the Application. (Tr. I 53:1-9; 163:4-18; 165:22-168:4.) Mr. Abusamhadaneh understood that being part of the Muslim community could bring such scrutiny, and so his willingness to establish himself as a person who attends a mosque and its community events during the interview undermines the suggestion that he wanted to hide the fact he was Muslim. (Tr. I 49:1-13; 156:18-23.)

## 2. N-400 Interview Testimony

Regarding the N-400 interview, as a preliminary matter, Defendants place a great deal of weight on the argument that Mr. Abusamhadaneh was repeatedly asked questions about membership and association and thus, they assert, he repeatedly lied during his interview when he did not discuss MAS or other religious organizations. Defendants argue that Mr.

Abusamhadaneh should have mentioned MAS in response to Officer
Lutostanski's membership and association questions.  For
example, Defendants argue that Mr. Abusamhadaneh's most
"egregious" conduct was failing to answer such questions when
they were asked "14 times."  (Tr. IIIB 170:19-24.)  Before
addressing his testimony, the Court notes that it will not be
deceived by that fact that Defendants' counting overlooks the
following points: (1) the terms member and associate can have
distinct meanings and (2) certain questions are pertinent only
for certain topics of Mr. Abusamhadaneh's testimony.[13]
Defendants' attempt to conflate Mr. Abusamhadaneh's testimony
casts doubt on their conclusion about his truthfulness.  In
order to properly inquire into Mr. Abusamhadaneh's subjective
intent and whether his answers to certain questions were

---

[13] For example, Defendants in their closing argument state that, when asked
the question, "five times is not enough to get the truth out of Mr.
Abusamhadaneh."  (Tr. IIIB 171:18-172:7.)  Defendants suggest that the fifth
time is when Officer Lutostanski asked "[h]ave you ever in the past or now
been a member of any organization, including student organizations, including
religious organizations." (Tr. 2009 26:21-27:3.)  The first time was clearly
when Officer Lutostanski asked her version of Question 8(a).  After that, and
before the supposed fifth question, she asked him the following questions:
"Are you a member of a church or mosque or anything like that"; "Have you
ever been a member of the Communist Party"; "Have you ever been a member of
any other totalitarian parties?"; "Have you ever been a member of a terrorist
organization?"; "Have you ever provided any support to any terrorist
organization?;" and, "So you don't belong to any associations or any parties
in the United States.  How about Jordan?  Have you ever?" (Tr. 2009 25:5-
26:20.)  Thus, there were six questions between the first and supposed fifth,
all involving membership and association, and the Government counts three of
these as being relevant.  Yet, none of them are relevant to whether Mr.
Abusamhadaneh was truthful when answering questions potentially involving
MAS.  The Muslim American Society is not a church, not a mosque, not a
Communist Party, not a totalitarian party, not a terrorist organization, and
is not an association or party in Jordan.  And, only Officer Lutostanski's
version of Question 8(a) asked about association, as the vast majority of the
questions were specific to membership.

reasonable, the Court must consider the specific questions, the specific topics, and the specific answers.

a) Questions about Membership

Turning to the questions during the N-400 interview, Mr. Abusamhadaneh is not, and has never been, a formal member of MAS. (Tr. I 57:11-12.)  The Court finds this to be a credible explanation as to why he did not mention MAS in response to Officer Lutostanski's version of Question 8(a) and her statement that, "The question states have you ever in the past or now been a member of any organizations including student organizations, including religious organizations," and question of, "You're not a member of any organizations in the United States or in any other country?" (Tr. 2009 26:21-27:3; 73:14-16.)  And, it is a credible explanation for why when asked by Officer Lutostanski, "So your statement is that you're not a member of any organization other than you were member of student counsel (sic) when you were in college in Jordan?," Mr. Abusamhadaneh replied, "Not as a member at all."[14]  (Tr. 2009 72:13-19.)  When Mr. Abusamhadaneh was asked about membership per se, he answered specifically about membership. (Tr. I 209:16-22.)  Mr. Abusamhadaneh's credibility on this point is bolstered by the fact that he was clear early in the interview that he

---

[14] The Court also notes that he was asked if he "belong[s] to any associations [in] Jordan" and Mr. Abusamhadaneh responded "no."  Since there is no evidence that the Muslim American Society is present in Jordan, the Court finds this to be a reasonable explanation for Mr. Abusamhadaneh's negative response.

distinguished the term member from less formal interactions,
like visiting a mosque.[15]  Defendants' emphasis on the fact that
Mr. Abusamhadaneh is educated and proficient in English (see Tr.
I 169:17-170:16), comports with the fact that Mr. Abusamhadaneh
repeatedly demonstrated himself to be someone who was precise in
his use of words.

### b) Questions about Association

There were also three questions that could potentially
be construed as asking about Mr. Abusamhadaneh's association
with an entity like MAS.  First, as discussed earlier, Officer
Lutostanski's version of Question 8(a) inquired into
associations, although it was shaded by the notion of "belonging
to" organizations.  Mr. Abusamhadaneh's negative answer to this
question regarding MAS is reasonable for the same reasons it was
reasonable when he answered no to Question 8(a) on the
Application.  As already discussed, the scope of Question 8(a),
confusion about the term associated, and advice of counsel not
to include religious organizations were all factors.  The Court
finds that this is a credible explanation for his answers.

Later in the interview, he was asked the other two
questions: (1) whether he was "associated with any
organization," and (2) whether the Jordanian student council (to

---

[15] Officer Lutostanski testified that she did not define the term membership
and that she did not know Mr. Abusamhadaneh's understanding of the term
membership.  (Tr. IIIA 14:18-25.)

which he was a member) was "the only thing that you can remember as far as your associations with any clubs?" (Tr. 2009 28:12-21.)  As already mentioned, Mr. Abusamhadaneh responded "no" and "yes" respectively.  The Court finds Mr. Abusamhadaneh credible in his testimony that he did not have an issue with disclosing his relationship with MAS.  Mr. Abusamhadaneh provided a credible and reasonable explanation that he answered no to these questions because of a lack of clarity about the term association and reliance on his attorney's advice.  (Tr. I 107:16-108:2.)  The Court will now more closely review both of these explanations.

Turning first to the term associated or association, Defendants, relying on Supreme Court precedent, assert the question is not about meaningful association, rather it is about any association.  (Tr. IIIB 172:20-25.)  Yet, there is no evidence that Mr. Abusamhadaneh was made aware of the Supreme Court case Defendants cite.  And Officer Lutostanski, unaware of any specific definition of the term associate, never defined it during the interview.  (Tr. IIIA 15:5-14.)  Instead, she testified that the meaning of it is the commonsense understanding, which is dependent on the applicant's interpretation.  (*Id.*)

Mr. Abusamhadaneh's interpretation that the word associated implied a formal relationship was reasonable in light of Officer Lutostanski's questions during the interview.  Toward

33

the beginning of the interview, when referencing Question 8(a), she stated, "The question says have you ever in the past or now been a member of any organization including student organizations, including religious organizations." (Tr. 2009 26:21-27:3.) Thus, her summarized description of Question 8(a) explicitly stated that the question was interested in membership despite its inclusion of the word associate. And, the only time it can be said that Officer Lutostanski even implied that the term associate was related to informal interactions is much later in the interview when she said, "Did you ever attend any meetings of any organizations like informational meetings, gatherings, anything like that? You said you are not associated at all with any organizations." (Tr. 2009 53:12-17.) But the other time her questioning implied a meaning was when she stated, "But before we do that I just want to ask you again about your association with any organizations in the United States. Can you honestly say that you are not a member of any organization?" (Tr. 2009 66:11-16.) Thus, the first time she potentially indicated that the word associate related to informal interactions and then the next time she suggested it was equivalent to membership.

Mr. Abusamhadaneh's credibility is bolstered by his truthful answers when Officer Lutostanski inquired later about less formal relationships with organizations. She asked, "Did you ever attend any meetings of any organizations like

informational meetings, gatherings, anything like that?"  Mr.
Abusamhadaneh stated that he attended picnics and activities
that "they do on the outside."  (Tr. 2009 53:12-54:12.)  "They"
appears to reference the mosque, but this testimony is
consistent with Mr. Abusamhadaneh's explanation at trial that
the mosque and the Muslim American Society do activities, such
as a prayer time and picnics in the park.  (Tr. I 43:20-25;
169:5-23.)  And it is consistent with his testimony later in the
N-400 interview when Officer Lutostanski asked, "Can you
honestly say that you are not a member of any organization?"
Mr. Abusamhadaneh responded that he had already answered that
question in the negative.  He went on to explain:

> "I go to the mosque. I participate in the
> community events. I'm a conservative person.
> I do pray. I do any activity that has to do
> with the family. I take my family.  I take
> my kids to the school.  They have picnics.
> They have things.  So I go to all these kind
> of activities like anyone in any other
> community.  But I'm not a member of any
> association or any club.  I'm not even a
> member of the mosque that I go to."

(Tr. 2009 66:11-67:9.)  Finally, with respect to the reference
of "the school," toward the end of the interview, but before the
break, Mr. Abusamhadaneh stated that "MAS is governing the
school."  (Tr. 2009 75:4-5.)  Officer Lutostanski testified that
she assumed that MAS was running the school that his daughter
attended.  (Tr. II 231:5-7.)  The Court finds that Mr.
Abusamhadaneh provided an accurate description about the less

formal associations Mr. Abusamhadaneh had in the community
during the N-400 interview.  The fact he provided the
information before the break, although not in direct response to
general questions about associations, bolsters Mr.
Abusamhadaneh's credibility that he was willing to disclose
information about his relationship with MAS.

It is notable that at no point did Officer Lutostanski
follow-up about informal associations, ask him about the
community activities, or ask him about his relationship with
MAS.  Had she attempted to obtain more detail from Mr.
Abusamhadaneh, it is likely he would have overcome his concern
about the advice of his attorney on religious organizations and
more fully detail his activities before the break in testimony.
The absence of detailed answers in the absence of detailed
questions cannot be held against Mr. Abusamhadaneh.

Mr. Abusamhadaneh's testimony to Officer Lutostanski
prior to the break is consistent with his statements when he
returned from break, when he explained that his family
participates in community services offered by MAS and that, if
this the "kind of religious association" that Officer
Lutostanski was talking about, then he does in that sense
"associate" with MAS.  (Tr. I 100:11-18.)  And, Mr. Nubani
explained that if what she meant by "association" was the notion
that he has had contact with people from MAS, then he does in
that sense "associate."  (Tr. II 14:5-8.)  The Court finds Mr.

Abusamhadaneh was accurate when he stated that he was not
changing his testimony after the break, rather he was providing
additional information as a clarification to his earlier
testimony.  (Tr. I 107:8-22.)

c) <u>Advice of Counsel</u>

Turning to the issue of advice of counsel, Mr.
Abusamhadaneh recognized that he had an informal relationship
with MAS, and recognized that Officer Lutostanski was asking
questions about religious organizations.  This led to
understandable confusion on Mr. Abusamhadaneh's behalf, in light
of Mr. Nubani's advice that he was not supposed to include
religious organizations in his responses.  (Tr. I 90:14-92:18.)
In response to a question from Mr. Nubani as to whether Question
8(a) included churches and mosques, Officer Lutostanski stated
that it included "pretty much everything including PTA and all
organizations." (Tr. 2009 25:15-19.)  Defendants argue that
this should have dispelled any doubt that Mr. Abusamhadaneh
should rely on the advice of counsel regarding disclosure of
religious organizations.  (Tr. IIIB 171:12-17.)  The Court finds
it reasonable, however, that this exchange only added to Mr.
Abusamhadaneh's confusion about the role of his attorney and
answers about religious organizations.

First, Mr. Abusamhadaneh points out that he did not
understand Mr. Nubani to agree with Officer Lutostanski's
interpretation of the question.  (Tr. I 192:6-8.)  Second,

contrary to Defendants' assertion, Officer Lutostanski's
statement at the beginning of the interview did not address Mr.
Abusamhadaneh's predicament.   At the start of the interview, Mr.
Abusamhadaneh had been told that his attorney could "advise
[him] on points of law, but he cannot respond to questions that
are directed at you."  (Tr. 2009 4:11-13.)  Mr. Abusamhadaneh's
confusion as to whether he could, or should, ask his attorney in
the presence of the interviewer about how he should answer a
question, given his attorneys earlier advice, is reasonable.
(Tr. I 91:4-92:18; 169:3-12.)  Defendants argue that Mr.
Abusamhadaneh should have asked Officer Lutostanski for
clarification about the meaning of the word associate.  But Mr.
Abusamhadaneh's confusion was not just about the question, it
was also about how to handle his attorney's advice.  Moreover,
it is reasonable that Mr. Abusamhadaneh was concerned about
interrupting the proceedings given the statement at the
beginning that a negative inference might be drawn from stopping
the interview.  (Tr. I 91:2-4.)  Mr. Abusamhadaneh credibly
testified that despite the exchange between Mr. Nubani and
Officer Lutostanski, he still believed that she should not
include religious organizations in response to general
questions.  (Tr. I 86:18-87:22.)

        Finally, neither USCIS decision makes any specific
conclusion regarding the truthfulness of Mr. Abusamhadaneh's
testimony about MAS.  Officer Williams' did not provide any

specific testimony on this point and there are substantial concerns about the credibility of Officer Lutostanski's conclusions about MAS.  First, as discussed above, Officer Lutostanski did not have all of the relevant information about the FBI report and the relationship between MAS and the Muslim Brotherhood during the N-400 interview.  Second, her recollection of her questioning during that interview is less than precise in areas where precision makes a great deal of a difference.  For example, during the N-400 interview she asked Mr. Abusamhadaneh, "can you honestly say that you are not a member of any organization."  (Tr. 2009 66:15-16.)  But at trial she stated that she asked him, "can you honestly tell me that you are not a member of *or associated* with any organization." (Tr. II 214:10-11.)  And she testified at trial that "[h]e said that he already answered that question, and that . . . he was not a member of *or associated* with any organization" (Tr. II 214:21-23), when in reality he never said anything about being associated with organizations.  Mr. Abusamhadaneh had explained that although he participates in community activities, he was "not a *member* of any association or any club."[16]  (Tr. 2009 66:17-67:9.)  It appears Officer Lutostanski's recollection of the interview is shaded by an impression that she was asking him about association when she was not.

---

[16] Another example is that Officer Lutostanski thought she asked him if he was "associated with" any parties in Jordan (Tr. II 193:1-5), when in fact she asked him if he "belong[ed] to" any such parties (Tr. 2009 26:16-19).

The Court finds that Mr. Abusamhadaneh credibly testified that he had no issue with disclosing his relationship with MAS at the outset, but decided not to during the initial part of the interview as a result of his interpretation of the term associated and advice from his attorney.  The Court credits Mr. Abusamhadaneh's explanation and finds his answers were not made with intent to deceive in order to obtain an immigration benefit.  Mr. Abusamhadaneh's decision to narrowly construe answers to vague questions in order to comport with his attorney's advice was reasonable.

### iii.  Muslim Brotherhood

The next issue is whether Mr. Abusamhadaneh provided false testimony with an intent to obtain an immigration benefit on the topic of his relationship (or lack thereof) with the Muslim Brotherhood.

### 1. Relationship with the Muslim Brotherhood

Before turning to Mr. Abusamhadaneh's testimony, the Court will first address his relationship with the Muslim Brotherhood.  Mr. Abusamhadaneh credibly testified that he is not, and never has been, a member of the Muslim Brotherhood. (Tr. I 92:19-93:1.)  Not here and not in Jordan.  (*Id.*)  Nor has he ever been associated with the Muslim Brotherhood in any formal way.  Mr. Abusamhadaneh credibly testified that when he lived in Jordan he attended a tutoring class and lectures

40

sponsored by the Muslim Brotherhood by virtue of the fact that in Jordan it is an active political party.  (Tr. I 93:4-25.) And, he credibly testified that here in the United States he possibly comes in contact with people who, unbeknownst to him, consider themselves to be members of the Muslim Brotherhood by virtue of the fact that he lives in a Muslim community.[17] Certainly not all American Muslims who participate in their community and who once attended a few lectures in Jordan can be said to be or have been "associated" with the Muslim Brotherhood.  Mr. Abusamhadaneh's near complete lack of membership in, and association with, the organization is a credible explanation for why he did not mention it in the range of membership and association questions he was asked.

Mr. Abusamhadaneh's credibility is supported by the fact that he reasonably considers the Muslim Brotherhood and the MAS to be two different organizations (Tr. I 103:25-104:3), and there is no evidence establishing that Mr. Abusamhadaneh should have thought his attendance at the Dar al-Hijra mosque made him a member of, or associated with, the Muslim Brotherhood.[18]  Mr.

---

[17] Mr. Abusamhadaneh explained that it is possible that a grocer, doctor, lecturer, or professor might be a member of the Muslim Brotherhood and thus it is possible that he might buy groceries, get physician advice, or attend a lecture by someone who is, unknown to Mr. Abusamhadaneh, a member of the Muslim Brotherhood.  (Tr. I 94:11-95:6.)

[18] Mr. Alamoudi testified that he believed that the Muslim Brotherhood was associated with the mosque.  (Tr. II 120:23-121:1.)  But there is no evidence that this belief was shared with or by Mr. Abusamhadaneh.  And, Mr. Nubani explained that he did not consider the Muslim Brotherhood associated with the mosque because no one here in the United States takes on the mantle of the Muslim Brotherhood.  (Tr. I 254:17-255:6.)

Abusamhadaneh's credibility is also bolstered by the fact that he did not mention it in discussions with Mr. Nubani when preparing to fill out the Application.

Defendants' emphasis on the notion that Mr. Abusamhadaneh subsequently used the word associated to describe his relationship with the Muslim Brotherhood rings hollow.  The record demonstrates that Mr. Abusamhadaneh used the word associated only after explaining the limited nature of his relationship with the organization, and only after adopting Defendants' assertion that the term should be applied to his relationship.  The relevant inquiry is whether Mr. Abusamhadaneh reasonably believed that he was not associated with the organization when he answered Officer Lutostanski's questions. When Mr. Abusamhadaneh returned from the break during the N-400 interview he explained his confusion about the reach of the term associate to Officer Lutostanski and stated that he was not a member of the Muslim Brotherhood.  And during the interview with Officer Williams, he said he was associated with the Muslim Brotherhood, but only insofar as he explained his limited interactions with the organization to her earlier.  (Tr. 2010 64:20-65:3.)

## 2. FBI Report

The underlying issue that eventually led to Officer Lutostanski's confusion is that different people have different

understandings of the relationship between MAS and the Muslim Brotherhood.[19]  (*See* Tr. II 107:20-108:3.)  This was made evident by testimony throughout the immigration proceedings and during the trial.  Mr. Abusamhadaneh reasonably considers the Muslim Brotherhood and MAS to be two different organizations.  (Tr. I 103:25-104:3.)  This is supported by the fact that MAS does not hold itself out as the Muslim Brotherhood and testimony that the Muslim Brotherhood simply no longer exists in the United States. (Tr. II 107:20.)  But because of how the Muslim Brotherhood evolved in the United States and because it shares the same theology as MAS, some consider MAS to effectively be the United States Muslim Brotherhood.[20]

The particular issue in this case is that Mr. Alamoudi has at times understood MAS to be equivalent to what he considers to be the United States Muslim Brotherhood and has discussed them interchangeably.  (Tr. II 135:9-15; 143:5-16.)

---

[19] Not only is there credible disagreement about whether MAS and the Muslim Brotherhood are "associated," but there is also disagreement about whether there are reasonable grounds to believe that American Muslims associated with the Muslim Brotherhood or MAS in the United States are tied to extremist groups that support terrorism and acts of political violence.  (*See* Pl.'s Ex. 7; Def.'s Ex. 2.)  The Court notes, however, that MAS does not appear on any publically available list of extremist or terrorist organizations compiled by the U.S. government.  (*See* Pl.'s Ex. 7.)  And that the Muslim Brotherhood does not appear on the Department of State's list of designated Foreign Terrorist Organizations.  (*See id.*)

[20] There is evidence suggesting that "everyone knows that there's some sort of relationship between MAS and the Muslim Brotherhood."  (Tr. II 47:16-17; 134:1-8.)  There is also testimony from Mr. Alamoudi that "newcomers" to MAS would not know of the history and relationship between the Muslim Brotherhood and MAS.  (Tr. II 107:20-108:3.)  Assuming that Mr. Abusamhadaneh knew of the historical relationship, such knowledge falls well short of establishing that he should have considered himself associated with the Muslim Brotherhood.

The FBI report upon which Officer Lutostanski relied states that
a source (i.e., Mr. Alamoudi) said that Mr. Abusamhadaneh told
him "he was a member of the [Muslim Brotherhood] since his days
in the student movement in Jordan, which is sponsored by the
[Muslim Brotherhood] in Jordan." (Defs.' Ex. 1.)  Yet, Mr.
Alamoudi's testimony at trial effectively impeached that portion
of the report.  He explained that he gave more than 50
interviews, and has been subsequently skeptical of the FBI 302
reports because some of them have contained inaccuracies.  (Tr.
II 130:15-16; 132:5-7.)  He testified that for the particular
report in question, he does not believe that Mr. Abusamhadaneh
would have told him that he was a member of the Muslim
Brotherhood.[21]  (Tr. II 132:13-22.)  Instead, the report reflects
the facts that Mr. Alamoudi thought Mr. Abusamhadaneh was a
member of MAS, and that Mr. Alamoudi referred to MAS and the
Muslim Brotherhood interchangeably.  (Tr. II 134:23-135:15.)

        Officer Lutostanski was unaware that Mr. Alamoudi was
the confidential source in the FBI report and that there were
issues as to the accuracy of the information in the report.  She
simply thought Mr. Abusamhadaneh was a member of the Muslim
Brotherhood and that he was lying by not admitting he was a

---

[21] Mr. Alamoudi also testified that he thought the report was inaccurate when
it states that Mr. Abusamhadaneh "fund raises for MAS in Dar Al-Hjdra
mosque." (Tr. II 1332:13-16.)  Mr. Alamoudi testified that Mr. Abusamhadaneh
is a shy person and he does not believe he would have said that about Mr.
Abusamhadaneh.  (Tr. II 132:13-17.)  The Court notes that the credibility of
Mr. Alamoudi's testimony on this point is bolstered by fact there is no
evidence that Mr. Abusamhadaneh did in fact participate in fund raising.

member.  (Tr. II 184:16-22.)  From her perspective, she was
repeatedly trying to give Mr. Abusamhadaneh an opportunity to
mention his membership in the Muslim Brotherhood.  (Tr. II
192:11-19; 205:3-7; 216:8-19; 217:15-17; 218:7-10.)  And that is
why she persisted in her questions, particularly about
membership.  (Tr. IIIA 32:22-33:12.)  The 2010 Decision states
that "even after [questions by Officer Lutostanski about
membership and associations] and after being confronted about
your membership in the Muslim Brotherhood, you still denied
membership or association with the Muslim Brotherhood."  (JE 11
at 6.)  As previously stated, Officer Lutostanski concedes she
does not know what she would have concluded regarding Mr.
Abusamhadaneh's explanations if she was aware that the FBI
report was unreliable and inaccurate.[22]  (Tr. IIIA 40:3-9.)  Now
with the benefit of all the evidence, the Court concludes that
Mr. Abusamhadaneh was entirely truthful in his testimony
regarding the Muslim Brotherhood.

### 3. N-400 Interview Testimony

Mr. Abusamhadaneh's testimony during the N-400
interview is consistent with his explanation that he did not

---

[22]  Officer Lutostanski's credibility is also shaded by the fact that she used
the internet to try and develop an understanding of the Muslim Brotherhood.
She argues it was not an "independent investigation" or "research," but
rather she "looked it up on the Internet."  (Tr. II 185:1-2; 205:8-24; Tr.
IIIA 34:9-35:8.)   Regardless of how one characterizes her internet
exploration, she testified that as a result of it she came to understand that
the Muslim Brotherhood may have been linked to terrorist organizations, that
some considered it a terrorist organization, and that it "was, to say the
least, controversial."  (Tr. II 205:16-24; Tr. III 34:22-35:21.)

mention the Muslim Brotherhood in response to the general
questions from Officer Lutostanski because he did not believe
himself to be a member of, or associated with, the Muslim
Brotherhood.

Toward the end of the interview before the break, and
relying on the information in the FBI report, Officer
Lutostanski asked, "Is there any reason that other government
agencies have information that you're a member of Muslim
Brotherhood?" (Tr. 2009 72:20-73:1; Tr. II 223:2-6.) Mr.
Abusamhadaneh, confused, stated "[t]hey have information about .
. ." Mr. Nubani then cut in to state, "You know for Jordan any
kid with a beard and a Muslim is a member of the Muslim
Brotherhood." (Tr. 2009 73:2-8.) Officer Lutostanski then
asked, "Well, have you ever admitted to anybody in your Muslim
community that you were a member of the Muslim Brotherhood?"
(Tr. 2009 73:9-12.) Mr. Abusamhadaneh replied, "Not at all."
Officer Lutostanski later asked Mr. Abusamhadaneh, "Do you know
anybody who is a member of an organization like that?" Mr.
Abusamhadaneh asked, "What organization?" She replied, "The
Muslim Brotherhood?," to which he responded "No." (Tr. 2009
73:9-17.) Mr. Nubani then explained that the Muslim Brotherhood
no longer exists in the United States, but that MAS shares the
same theology as the Muslim Brotherhood, and that for some,
their organization can be said to be MAS. (Tr. 2009 74:8-75:3.)

Defendants argue that Mr. Abusamhadaneh should have explained the extent of his associations with the Muslim Brotherhood at this point in the interview.  Officer Lutostanski also concluded that Mr. Abusamhadaneh was not truthful because he did not he did not venture to explain why the FBI thought he was a member of the Muslim Brotherhood.  (Tr. IIIA 25:10-26:15.) And, Officer Williams testified that she concluded that Mr. Abusamhadaneh was not truthful to Officer Lutostanski because he did not explain his "association" resulting from his time in Jordan before the break in the interview.  (Tr. IIIA 97:6-98:18.)  Yet, nothing in Mr. Abusamhadaneh's reaction suggests that his confusion or lack of discussion is unreasonable, much less that it amounts to false testimony.

The Court finds that declining to immediately speculate about the government's information does not equate to intent to deceive, particularly in light of the following facts. First, as already discussed, he was not a member of the Muslim Brotherhood nor was he associated with the Muslim Brotherhood in any meaningful way.  His resulting confusion was reasonable. Second, Mr. Abusamhadaneh was not given the FBI report to inspect and attempt to explain.  The fact that Officer Lutostanski's general description was met with a fairly general response is unsurprising.  Officer Lutostanski testified that her description to Mr. Abusamhadaneh was that the FBI has information that indicates he was active in MAS, a United States

47

Muslim Brotherhood organization.  She testified that was "the main of their information," and so that description sufficed for "inspection."  (Tr. IIIA 45:18-46:12.)  The record is unclear as to whether Officer Lutostanski even provided this description of the report to Mr. Abusamhadaneh.  The DVD recording of the interview shows that Officer Lutostanski asked, "Is there any reason that other government agencies have information that you're a member of Muslim Brotherhood?"  (Tr. 2009 72:20-73:1.) Either way, such description falls far short of capturing the detail of the information in the report and the context of the report.  The Court notes that if Mr. Abusamhadaneh had in fact been presented with the document, it is likely much of this misunderstanding could have been avoided.

Third, before the break Mr. Nubani clarified that having lived in Jordan one might in some sense be associated by default, and Mr. Abusamhadaneh confirmed it answering questions about the ideologically similar MAS.  (Tr. 2009 73:6-75:11.) Fourth, Mr. Abusamhadaneh reasonably considered the Muslim Brotherhood to be a religious organization.[23]  (Tr. I 94:1-3; 204:6-17.)  And, as previously discussed, before the break he relied on the advice of his attorney that he was not supposed to

---

[23] Mr. Nubani testified that some might consider it to be both a religious and political organization, as Muslims do not differentiate between religion and state.  (Tr. I 253:21-254:16.)

discuss religious organizations.  (Tr. I 203:22-204:5.)[24]  Thus, there is no reason to find that because Mr. Abusamhadaneh did not provide detailed speculation about why the FBI might think he was a member of Muslim Brotherhood, he provided false testimony.

Defendants also argue that Mr. Abusamhadaneh provided false testimony in his response because he did not mention that Mr. Alamoudi was a member of the Muslim Brotherhood.[25]  As already discussed, what constitutes being a member of the Muslim Brotherhood in the United States is subject to various interpretations.  And, Mr. Abusamhadaneh credibly testified that he did not know if Mr. Alamoudi was a member of the Muslim Brotherhood.  (Tr. I 206:9-12.)  Mr. Abusamhadaneh's credibility is supported by the fact that he had already disclosed that he knew Mr. Alamoudi and thus, he had little incentive to hide the fact that he knew Mr. Alamoudi.

Moreover, the Court finds that there is no evidence that Mr. Abusamhadaneh's answers were made with intent to deceive to obtain an immigration benefit.  There is no evidence establishing that Mr. Abusamhadaneh thought, or should have

---

[24] Mr. Abusamhadaneh did not discuss the Muslim Brotherhood with Mr. Nubani in preparing the Application.  This fact only confirms the notion that it did not cross Mr. Abusamhadaneh's mind that he might be considered to have a relationship with the Muslim Brotherhood.  And, to the extent that he was "associated" with the organization, it was only by virtue of the fact that he lived in Jordan and participated in MAS activities and the Muslim community - - facts that were disclosed and known to Mr. Nubani.

[25] Mr. Alamoudi testified that he considers himself to be part of the Muslim Brotherhood.  (Tr. II 121:4-6.)

thought, that an association with, much less membership in, the
Muslim Brotherhood would create an immigration hurdle.  And,
when asked if "membership in the Muslim Brotherhood [would] have
on its face precluded Mr. Abusamhadaneh from becoming a citizen
of the United States," Officer Lutostanski responded, "[n]ot
necessarily."  (Tr. II 205:25-206:3.)  Thus, the Court credits
Mr. Abusamhadaneh's explanation.

        Mr. Abusamhadaneh's testimony after the break was
consistent with his explanation at trial about his relationship
with the Muslim Brotherhood.  Officer Lutostanski's notations
from after the break indicate that, "Applicant stated he did not
previously reveal association with Muslim Brotherhood,
parenthesis, Muslim American Society, because he is not a
member."  (JE 5 at 3; Tr. I 103:15-21.)  And later that,
"Applicant did not mention this association before because he is
not a member.  Wanted to clarify the extent of his association
with MAS."  (JE 5 at 4; Tr. I 106:14-20.)  Mr. Abusamhadaneh
initialed both of these.  In addition, Mr. Nubani reaffirmed his
explanation about the Muslim Brotherhood and MAS after the break
in testimony, as Mr. Abusamhadaneh wanted his attorney to
clarify the difference between the two organizations.  (Tr. I
105:10-20; 250:9-19.)  Mr. Nubani explained that people in
Jordan by default interact with the Muslim Brotherhood, as one
might regularly see and talk to people who are members of the
Muslim Brotherhood and so in that sense they might "associate."

And, that type of interaction is different than consciously

associating with someone who is a member of the Muslim

Brotherhood. He explained that if Officer Lutostanski was

saying association means being in contact with people, Mr.

Abusamhadaneh does have some association with the organization.

(Tr. I 251:6-253:17; Tr. II 6:14-16.)

### 4. N-336 Hearing

Mr. Abusamhadaneh's testimony during the N-336 hearing

was consistent and the Court finds Officer Williams' conclusions

lacking in credibility. The 2011 Decision prepared by Officer

Williams suggests that Mr. Abusamhadaneh was not forthcoming

during the N-400 interview because he minimized his relationship

with the Muslim Brotherhood. (JE 13 at 2-4.) Yet, at trial,

Officer Williams testified, "I'm not saying his statement in

regards to Muslim Brotherhood was false." (Tr. IIIA 97:1-2.)

If the alleged "minimizations" were not "false" (putting aside

whether they were said with an intent to obtain an immigration

benefit), then it is hardly clear how Ms. Williams concluded he

lacked good moral character on the basis that he provided false

testimony regarding the Muslim Brotherhood.

Also, Officer Williams was not in a position to

accurately judge Mr. Abusamhadaneh's credibility on this topic.

First, she did not have the FBI report during her interview and

had not read it herself. (Tr. IIIA 92:9-15; 93:15-16.) And,

she initially mistakenly thought that Mr. Abusamhadaneh had

himself given the statement to the FBI.  (Tr. IIIA 93:7-9.)

Without the document, it seems unlikely Officer Williams was in

a position to clear up what was an apparent misunderstanding

about the relationship between MAS and the Muslim Brotherhood

and the FBI report's inaccuracies.  Second, Officer Williams'

testimony about her conclusion that Mr. Abusamhadaneh was a

member of the Muslim Brotherhood is conflicting.  She testified

that she did not rely on the document to determine that he was a

member of the Muslim Brotherhood, but that she believed he was a

member.  (Tr. IIIA 94:8-10.)  She stated she believed he was a

member, not because she had any proof, but because of his

testimony.  (Tr. IIIA 94:11-95:4.)  Yet, he repeatedly testified

that he was *not* a member.  It appears Officer Williams simply

relied on descriptions from the 2010 Decision, as she repeatedly

asked why the FBI would have information stating he was a

member.  This forced Mr. Abusamhadaneh to try and speculate and

create a substantive connection (outside of Mr. Alamoudi), that

in reality was lacking.  (*See* Tr. 2010 31:19-32:19.)

        Mr. Abusamhadaneh's testimony about the Muslim

Brotherhood was consistent and credible in light of all of the

evidence.  The Court credits Mr. Abusamhadaneh's explanation as

to why he did not mention the Muslim Brotherhood in response to

Officer Lutostanski's questions during the N-400 interview and

finds he was under no duty to speculate.  The Court finds no

evidence that Mr. Abusamhadaneh provided false testimony with

intent to obtain an immigration benefit.  With the benefit of
hindsight, it is apparent that USCIS's conclusion was driven by
a mistaken belief that Mr. Abusamhadaneh was a member of the
Muslim Brotherhood.

> E.   Association with Alamoudi

The next topic is whether Mr. Abusamhadaneh provided
false testimony with the intent to obtain an immigration benefit
because he did not detail all of his interactions with Mr.
Alamoudi before the break in testimony.

> 1. N-400 Interview Initial Testimony

During the first part of the interview, Mr.
Abusamhadaneh was asked two questions related to Mr. Alamoudi.
The first: "Tell me a little bit about the American Muslim
Foundation.  Did you know the president personally?"  (Tr. 2009
70:14-17.)  Mr. Abusamhadaneh responded,

> I knew him as like I know my director right
> now.  He's actually – He was a frequent
> traveler.  So truly I would rarely see him
> in the office.  Because most of the time he
> comes a little bit late like when I'm about
> to leave like 3:00 p.m., 3:30 p.m.  He comes
> to the office.  Most of the time he was not
> in the country.  So I don't really know him
> in a way that you could say – He was a very
> nice person to me and to anybody, you know,
> anybody in the office.  That's . . .

(Tr. 2009 70:18-71:6.)  Officer Lutostanski then asked, "Did you
associate with him outside of work?," to which Mr. Abusamhadaneh
replied, "Not really." (Tr. 2009 71:7-9.)  The 2010 Decision
following Mr. Abusamhadaneh's N-400 interview states that Mr.

Abusamhadaneh's response to this question was "not really, no."
(JE 11 at 4.)  The transcript and the video confirm, however,
that Mr. Abusamhadaneh's answer was simply "not really."  (Tr.
2009 71:9.)  Officer Lutostanski did not follow up with any
additional questions seeking detail or asking what Mr.
Abusamhadaneh meant by "not really."

        The Court finds that Mr. Abusamhadaneh provided an
accurate description of his relationship with Mr. Alamoudi and
that "not really" was a reasonable answer given Mr.
Abusamhadaneh's relationship with Mr. Alamoudi.  Mr. Alamoudi
was not Mr. Abusamhadaneh's direct supervisor at AMF.  (Tr. I
40:15-17.)  Mr. Abusamhadaneh credibly testified that he did not
have a personal relationship with Mr. Alamoudi, as it was
instead a typical office relationship.  He explained that as
president of AMF, Mr. Alamoudi was not someone who was involved
in the daily business of AMF and was someone who spent a lot of
time traveling.  (Tr. I 40:11-15.)  Mr. Alamoudi corroborated
this, testifying that he had a normal working relationship with
Mr. Abusamhadaneh, but that he did not have more than a working
relationship with Mr. Abusamhadaneh.  (Tr. II 106:10-14; 115:2-
4.)  And, he confirmed that he traveled often and at length.
(Tr. II 105:7-106:4.)  Mr. Alamoudi also noted that on some
level there "has to be a brotherhood in the religious
relationship," but Mr. Alamoudi never felt like it was a very
close or intimate one.  (Tr. II 124:17-22; 139:8-10.)

Mr. Abusamhadaneh also provided credible testimony as to why he did not really think he associated with Mr. Alamoudi outside of work.  He explained that he had been to Mr. Alamoudi's house a handful of times and noted that he was always one of dozens of people in attendance at events.  (Tr. I 44:1-5.)  And he explained that his attendance at these events was a direct consequence of his employment with the American Muslim Foundation.[26]  (Tr. I 42:1-24.)  Again, Mr. Alamoudi's testimony confirmed that their interactions outside of the office were minimal.  He recalled seeing Mr. Abusamhadaneh at the mosque or at functions.  But he did not recall whether or not he saw Mr. Abusamhadaneh at his home and stated that, if he did, Mr. Abusamhadaneh would have been part of a large group. (Tr. II 106:16-107:16; 123:7-24.)  He noted that he had a function for Mr. Abusamhadaneh's father-in-law as a cultural welcoming, but there is no evidence indicating Mr. Abusamhadaneh attended the function. (Tr. II 144:23-145:9.)  Mr. Alamoudi recalled seeing Mr. Abusamhadaneh at functions for MAS, which included members of MAS, associates of MAS, invitees, and other people generally. (Tr. II 111:3-8; 113:4-9; 119:6-15.)  Finally, other parts of

---

[26] The Court finds that Mr. Abusamhadaneh provided credible testimony that he was not invited personally by Mr. Alamoudi.  (Tr. I 43:6-10.)  His testimony is in some tension with his testimony to Officer Williams, in which he described Mr. Alamoudi making a verbal invitation, but that was in the context of explaining that as an employee of the AMF, if the president has a function, it is a good career decision for an employee to attend if possible. (Tr. 2010 22:12-15.)  The Court's conclusion is bolstered by the strength of Mr. Abusamhadaneh's repeated explanation that for immigration purposes he had no reason to provide false testimony about Mr. Alamoudi.  And, it is bolstered by Mr. Alamoudi's testimony that he never specifically invited Mr. Abusamhadaneh over to his home.  (Tr. II 145:10-12.)

Mr. Alamoudi's testimony generally confirm that the nature of their relationship was limited.  For example, he could not recall Mr. Abusamhadaneh working for the AMF, and instead thought he worked for another organization.  (Tr. II 103:24-104:25.)  Nor did he have a relationship with Mr. Abusamhadaneh's wife or know that Mr. Abusamhadaneh had children.  (Tr. II 145:21-25.)

Thus, the Court finds that Mr. Abusamhadaneh did not provide false testimony related to Mr. Abusamhadaneh.  Before the break, he accurately explained his office relationship with Mr. Alamoudi.  And, "not really" was a reasonable response to the question of whether he associated with Mr. Alamoudi outside of work.

## 2. Testimony After the Break

The Court also finds that Mr. Abusamhadaneh's responses were not provided with any intent to deceive, as Mr. Abusamhadaneh credibly testified that he interpreted the questions related to Mr. Alamoudi to be inquiring about a personal relationship.  Mr. Abusamhadaneh credibly testified that during the break he explained to Mr. Nubani that he thought Officer Lutostanski's questions regarding Mr. Alamoudi were about a personal relationship.  He determined that if Officer Lutostanski was interested in more general association, he should clarify his response because he had attended events outside the office hosted by Mr. Alamoudi and he knew Mr.

Alamoudi as someone who was active in the community.  (Tr. I
137:14-138:23.)  He also determined that he should clarify his
role during the raid on the AMF, as Officer Lutostanski had also
asked about that and Mr. Abusamhadaneh wanted to provide
additional detail to that answer too.  Mr. Abusamhadaneh
credibly testified that Mr. Nubani encouraged him to provide
that clarification to Officer Lutostanski.[27]  (Tr. I 138:25-
139:6.)  As a result, after the break, Mr. Abusamhadaneh
explained to Officer Lutostanski that he had attended several
functions at Mr. Alamoudi's house, including a fundraiser for a
congressperson, and that he may have seen him at the mosque.
(Tr. I 139:18-140:9.)  Mr. Abusamhadaneh also provided details
of the raid on AMF.  (Tr. I 140:1-13.)

        There is no basis for finding that this additional
detail after the break suggests that Mr. Abusamhadaneh's earlier
testimony was either false or intentionally false.  First, the
Court has already reviewed at length the subjectivity inherent
in the word "associate."  And, Mr. Abusamhadaneh credibly
testified that his understanding of the question of whether he
associated with Alamoudi outside of work was that it was
directed at a personal one-to-one relationship, which he
reasonably considered himself not to have.  (Tr. I 190:2-4.)  It

---

[27] Mr. Nubani confirmed that the purpose was to clarify the nature of his
relationship with Mr. Alamoudi and the AMF's illegal activities.  (Tr. II
5:9-6:3.)

was not that he forgot about attending events, but rather that
he did not initially think that such loose interaction was the
type of "association" Officer Lutostanski was asking about.[28]
This is consistent with his interpretation that the word
"associate" implied a more formal relationship.  Also, it is
particularly reasonable in light of the fact that Officer
Lutostanski asked if he knew Mr. Alamoudi personally.  Second,
at least some of the events Mr. Abusamhadaneh attended where Mr.
Alamoudi was present were in a sense within the scope of his
work.  Mr. Abusamhadaneh credibly testified that he often
attended them because he considered them career related.  (Tr. I
42:1-24.)  Third, the response of "not really" implies that
there was *some* association, but that it was minimal.  And that
description reasonably accords with Mr. Abusamhadaneh's
experience with Mr. Alamoudi outside of work.  To the extent
that Defendants misinterpreted Mr. Abusamhadaneh's testimony to
be "not really, no," and base their argument on the notion that
Mr. Abusamhadaneh said "no," they are simply in error.

Mr. Abusamhadaneh's testimony about Mr. Alamoudi
during the N-400 interview was not made with the intent to
obtain an immigration benefit.  Mr. Abusamhadaneh provided
credible testimony that he had nothing to hide about his

---

[28] Thus, the Court disagrees with the 2010 Decision that concluded that "it
does not seem plausible that you would forget about your association with Mr.
Alamoudi outside of work, when you visited his house 'several times.'  It is
also not convincing that you just forgot to mention your attendance at the
fund-raising event sponsored by Alamoudi, when you remembered that a member
of Congress was at that event."  (JE 11 at 7.)

relationship with Mr. Alamoudi.  And, he provided credible

testimony that he expounded upon his relationship with Mr.

Alamoudi and upon the raid of the AMF after the break to ensure

that Officer Lutostanski had all of the details and did not

mistakenly think he was associated with Mr. Alamoudi's illegal

activities.  Mr. Abusamhadaneh explained to Officer Williams

that his relationship with AMF and Mr. Alamoudi was old and

already known to law enforcement.  As a result, Mr.

Abusamhadaneh had nothing to hide about that period of time.

(Tr. 2010 42:18-22.)

     The Court also finds that Mr. Abusamhadaneh did not

provide the additional detail in response to any actual or

imminent exposure of a false statement.  Mr. Abusamhadaneh

credibly testified that it would not make sense for him to try

and disassociate himself from Mr. Alamoudi, as he worked for AMF

for a number of years, they sponsored his green card and H-1b

visa, and Mr. Alamoudi signed his application.  (Tr. I 139:3-

14.)  Rather he wanted to come back and explain the nature of

his limited relationship with Mr. Alamoudi, and his lack of

involvement when AMF was raided, so he would not be "labeled

with" Mr. Alamoudi's illegal activities.  Nothing about Officer

Lutostanski's questions suggests that Mr. Abusamhadaneh was

caught in a lie about his relationship with Mr. Alamoudi.

     Finally, Officer Williams' conclusion that Mr.

Abusamhadaneh was trying to hide his relationship with Mr.

Alamoudi is lacking in credibility.  The Court emphasizes its
concern that she did not conduct a thorough review of the record
below.  For example, she told Mr. Abusamhadaneh that during the
N-400 interview he said that he was "questioned about Mr. Al-
Amoudi for approximately five minutes."  (Tr. 2010 16:11-12.)
Mr. Abusamhadaneh again had to stop her to clarify that he was
never questioned about Mr. Alamoudi.  And, Officer Williams
relied on the 2010 Decision letter's inaccurate description of
Mr. Abusamhadaneh's testimony as "not really, no."  (Tr. 2010
17:15.)  She did not address the fact that his testimony was
"not really" or credit the implication that he had some
relationship with Mr. Alamoudi outside of work.

      The Court finds Mr. Abusamhadaneh provided truthful
responses to the two questions related to Mr. Alamoudi during
the first part of the N-400 interview.  The Court also finds
that Mr. Abusamhadaneh's determination to clarify those answers
by providing additional detail after the break to be just that:
additional detail.  And, the Court credits his explanation after
the break as to why he provided more detail.

      F.   Detentions and Stops by Law Enforcement

      The next topic is whether Mr. Abusamhadaneh provided
false testimony with intent to obtain an immigration benefit
when he did not tell Officer Lutostanski about two incidents
involving law enforcement in Jordan until after the break.

      1. N-400 Interview Initial Testimony

Turning to the questions at issue, Question 16 of the Application asks: "Have you ever been arrested, cited or detained by any law enforcement officer (including USCIS or former INS and military officers) for any reason?"  Mr. Abusamhadaneh answered "yes" and cited an alleged shoplifting incident.  (JE 1 at 8.)  During the N-400 interview, Officer Lutostanski repeated a version of Question 16 when she asked, "Have you ever been arrested or detained by any law enforcement officer?"  (Tr. 2009 29:20-22.)  Consistent with his Application answer, Mr. Abusamhadaneh replied "Yes, once," and explained that it was for alleged shoplifting.  (Tr. 2009 30:1-31:19.)  Officer Lutostanski followed up and asked, "Was that the only time that you were ever stopped by law enforcement?"  Mr. Abusamhadaneh replied, "yes."[29]  (Tr. 2009 31:19-22.)

Later in the interview she asked, "Have you ever been arrested in Jordan?," to which he replied "no." (Tr. 2009 59:21-60:1.)  Again, the 2010 Decision contains a significant error. It incorrectly states that the question Officer Lutostanski asked was, "Have you ever been arrested or detained in Jordan?" (JE 11 at 5.)  In actuality, Officer Lutostanski only asked Mr. Abusamhadaneh if he had been "arrested in Jordan."  Both the N-

_____

[29] Shortly thereafter, Officer Lutostanski also asked, "Have you ever been detained by immigration when you traveled outside of the United States?  Have you ever been stopped at the port of entry when you were coming back to the United States?"  (Tr. 2009 32:1-6.)  Mr. Abusamhadaneh explained that he was stopped one time and proceeded to answer Officer Lutostanski's questions about the stop.  (Tr. 2009 32:7-33:11.)  The truthfulness of this testimony is not contested.

400 hearing transcript and the video make this clear.  This is the second significant error in USCIS' description of the record and it undermines the credibility of USCIS' conclusions.

Officer Lutostanski then followed-up with: "Have you ever been questioned about, excused of or investigated for a crime other than a minor traffic violation?" to which he replied "no," other than the one he had on the application for shoplifting.  (Tr. 2009 60:9-15.)  Finally, Officer Lutostanski also asked, "Have you ever been contacted or interview (sic) by law enforcement agency in the United States or any other country?  That includes FBI, CIA, immigration," and he replied "no."  (Tr. 2009 60:16-21.)

### 2. Testimony After the Break

After the break in testimony, Mr. Abusamhadaneh returned and explained to Officer Lutostanski two incidents involving law enforcement in Jordan.  One occurred after he returned to Jordan from the visit to the United States as a student.  Mr. Abusamhadaneh explained that intelligence officers visited his house and asked him to come in for questioning the next morning.  When he did not because he had an exam, the police stopped the bus he was on and asked him to come in.  (Tr. I 126:4-9.)  Mr. Abusamhadaneh did and answered questions from intelligence officers.  (Tr. I 123:9-125:3.)  The other incident did not involve the questioning of Mr. Abusamhadaneh, but it did again involve a bus being stopped.  Mr. Abusamhadaneh explained

that when he was riding a bus to the university, police stopped it and questioned some of the passengers.  Mr. Abusamhadaneh testified that he was not questioned, but that the bus was stopped for half a day.  (Tr. I 126:12-128:21.)  Mr. Abusamhadaneh explained that nothing came of the incidents and that neither involved crimes.  Officer Lutostanski's notes confirm that these descriptions were provided after the break.  (JE 5 at 2; Tr. I 130:19-6; 133:17-134:3.)  And the testimony was corroborated by Mr. Nubani's testimony at trial.  (Tr. I 247:3-250:6.)  Officer Lutostanski did not ask any follow-up questions.  (Tr. II 238:22-24.)

        Mr. Abusamhadaneh provided credible testimony that he initially failed to recall these two incidents in Jordan.  Mr. Abusamhadaneh testified that when he read Question 16 on the Application he thought about it seriously and interpreted it to be inquiring about any kind of criminal activities.  (Tr. I 59:12-20.)  Thus, he focused on his alleged shoplifting offense because it was the only time he had been arrested, and he simply did not think of the incidents in Jordan.  Mr. Abusamhadaneh's credibility is bolstered by the testimony that he never discussed the incidents with Mr. Nubani in preparing the Application.  And Mr. Nubani did not think Mr. Abusamhadaneh had previously thought about the incidents.  (Tr. II 63:4-64:23.)  And, the notion that incidents from his time in Jordan never crossed his mind when preparing the Application is supported by

the fact that he also did not recall membership in student council organization in Jordan until the interview (which he noted during the interview). (Tr. I 229:12-17.) Defendants argue that his testimony is contradicted by Mr. Alamoudi's recollection of Mr. Abusamhadaneh telling him he had gotten into some trouble in Jordan. (Tr. IIIB 167:13-20.) Not only is Mr. Alamoudi's testimony on this count uncertain and lacking in detail,[30] but it also fails to place the conversation anywhere near the time of Mr. Abusamhadaneh's Application preparation.

When asked a version of Question 16 during the N-400 interview, Mr. Abusamhadaneh provided the same response he provided on the Application, understanding the question the same way he did when he filled out the Application. Defendants argue that it is not credible that one would have a lapse in memory about a twelve to thirteen hour detention "when asked the question five times." (Tr. IIIB 168:12-15.) But again, Defendants' counting is misleading. The first question was the same as Question 16 on the Application, and the second question, although inquiring into "stops," was asked as a follow-up to the Question 16 question. The next two questions - whether he had

---

[30] Mr. Alamoudi recalled that he spoke with Mr. Abusamhadaneh about his activity in the student movement in Jordan. (Tr. II 126:19-128:14.) But he was not sure if it was the Jordanian student movement or Palestinian student movement. And, he testified that it could have been that he was on the student council in Jordan and that after he made trip to United States he was questioned by Jordanian intelligence. (Tr. II 136:1-11.) Mr. Abusamhadaneh testified that he was not sure if he characterized this as being in trouble. (Tr. I 181:4-13.)

ever been arrested in Jordan and whether he had ever been investigated for a crime - confirmed the impression that Officer Lutostanski was interested in crime and arrests.  The Court notes he answered those questions truthfully, as he had never been arrested in Jordan and was not questioned about any crime other than the alleged shoplifting incident.  Instead, it is reasonable to infer that the questioning was aimed at what Mr. Abusamhadaneh interpreted to be Questions 16's purpose: arrest and alleged crimes.

Mr. Abusamhadaneh did not provide intentionally false testimony regarding the incidents in Jordan during the first part of the interview.  He credibly testified that the first time it even crossed his mind that the incidents in Jordan might be pertinent was when Officer Lutostanski asked about arrests in Jordan.  (Tr. I 123:9-14.)  At that point, Mr. Abusamhadaneh credibly testified that he answered "no" to the question of whether he was arrested in Jordan, because he had never been arrested in Jordan.  (Tr. I 178:11-20.)  And, he credibly testified that after that question, while the interview was proceeding, he started to consider whether the two incidents qualified as detentions.  (Tr. I 130:2-7.)  It was clear to Mr. Abusamhadaneh that they were not arrests, but it was not clear whether they constituted detentions.[31]  (Tr. I 134:11-135:22;

---

[31] His confusion about what was responsive is bolstered by the fact that when Mr. Abusamhadaneh explained that he had been stopped by immigration officers

179:6-9.)  Mr. Abusamhadaneh also credibly testified that he was
not sure about the right time during the interview to possibly
disclose the two incidents.  (Tr. I 130:6-7.)  And he credibly
testified that he was unclear about the meaning of detention and
wanted to talk about it with his attorney and did not know the
best time to do so.  (Tr. I 123:11-14; 183:16-25.)  Mr.
Abusamhadaneh credibly testified that he was under the
impression not to stop the interview.  (Tr. I 135:23-136:12.)
This testimony was bolstered by the fact that he did not seek
his attorney's advice on answering questions before the break.[32]
(Tr. I 180:20-24.)

      Finally, there is no evidence that Mr. Abusamhadaneh
withheld information about the incidents during the first part
of the interview to obtain an immigration benefit.  During the
break Mr. Abusamhadaneh mentioned the incidents to Mr. Nubani
and asked for advice about whether he should mention them to
Officer Lutostanski.  (Tr. I 123:13-14.)  Mr. Nubani recommended
disclosing them both to err on the safe side.  (Tr. I 246:8-14.)
This is what Mr. Abusamhadaneh did and the Court finds he
credibly testified that he had no issue with those incidents
being included.  (Tr. I 130:8-11; 136:7-12; 177:6-8.)  The Court
credits his explanation that he did not mention them before the

---

when entering the United States, Officer Lutostanski determined it was a
routine stop that was not considered a detention or arrest, and so she did
not add it to the Application.  (Tr. II 199:4-200:14.)

[32] The only exception was when he was asked for help with pronunciation.

break because the incidents did not initially cross his mind and then when they did, he was not sure if they were responsive and was waiting for the appropriate time to discuss them or obtain his attorney's advice.  That Mr. Abusamhadaneh may have also had a concern about disclosing the incidents because of a fear of Jordanian intelligence, or because we was embarrassed, does not amount to something related to an immigration benefit.[33]  There is no evidence that the incidents in Jordan would have delayed Mr. Abusamhadaneh's application or created any sort of immigration hurdle, much less that Mr. Abusamhadaneh thought that to be the case.  The Court credits his explanation that he came back and discussed them because he believed they were potentially responsive and wanted to provide a full disclosure. (Tr. I 135:20-136:12.)

Mr. Abusamhadaneh's testimony during the N-336 hearing was consistent.  Again, Officer Williams' credibility is hurt by her failure to accurately understand Mr. Abusamhadaneh's N-400 testimony.  For example, she stated that in response to the question, "have you ever been arrested or detained in Jordan, you said no, but then you came back and said you had two arrests in Jordan."  (Tr. 2010 46:7-12.)  The first problem with her description is the fact that the question was "have you ever

---

[33] Mr. Nubani testified that he perceived that one reason Mr. Abusamhadaneh might not have disclosed the incident in Jordan was because it was embarrassing to him.  Mr. Nubani also testified that he did not perceive that Mr. Abusamhadaneh was withholding the information to try and obtain an immigration benefit, noting that it would not have affected his citizenship.

been arrested in Jordan."  Officer Williams' reliance on an
error in the 2010 Decision again suggests that she did not go
back and conduct a studied review of the transcript or video, as
they both made clear that the question did not include the word
detained.  The second problem is the fact that Mr. Abusamhadaneh
never came back and said he had two arrests.  Mr. Abusamhadaneh
described the incidents in Jordan, but never stated that they
were arrests.  He pointed this out to Officer Williams, and said
he did not think it could be considered an "arrest."  Despite
this, Officer Williams persisted in characterizing them as
arrests and confused the interview by repeatedly stating that
Mr. Abusamhadaneh had been arrested in Jordan.  As a result, it
appears Mr. Abusamhadaneh, at points during the N-336 interview,
adopted her conclusion that one or both of the incidents, were
the equivalent to an arrest.  Mr. Abusamhadaneh, however,
consistently explained the details of both of the incidents and
the Court credits his testimony as being consistent,
understanding that Mr. Abusamhadaneh explained that there is no
record of an arrest for him in Jordan.

      Thus, the Court finds Mr. Abusamhadaneh's explanation
that he had a delayed recollection credible.  And, the Court
credits his correction, particularly because there is no
evidence Mr. Abusamhadaneh had any incentive to initially
withhold the information to obtain an immigration benefit.

      G.   Investigations

Finally, the Court takes a moment to address the alleged shoplifting incident and the subsequent investigation by the Fairfax County Police Department (the Department).  In October 2006, Mr. Abusamhadaneh was involved in an alleged shoplifting incident unrelated to his employment at the Fairfax County Police Department.  But because he was arrested, the Department launched an internal investigation and Mr. Abusamhadaneh was put on paid administrative leave.  Mr. Abusamhadaneh resigned from the Department in December 2006. (Tr. I 117:5-11.)  The incident was dismissed by order of *nolle prosequi* and expunged in 2008.  (Tr. I 60:9-15; Pl.'s Ex. 9.)

Mr. Abusamhadaneh disclosed the incident in his Application and answered Officer Lutostanski's questions pertaining to it during the interview.  When Officer Lutostanski asked, "Have you ever been questioned about, excused of or investigated for a crime other than a minor traffic violation," Mr. Abusamhadaneh stated "no" other than the one he had on the application for shoplifting.  (Tr. 2009 60:9-15.)  The Court finds that he was forthcoming about the incident and did not provide any false testimony pertaining to it during the naturalization interview.

At trial, Mr. Abusamhadaneh detailed the investigation by the Fairfax County Police Department that resulted and explained that it had a criminal and an administrative component.  (Tr. I 185:4-10.)  He explained that, while employed

69

by the Fairfax County Police Department, Mr. Abusamhadaneh
worked on the department servers, desktops, and things generally
related to their network at various locations within Fairfax
County.  (Tr. I 46:17-47:4.)  He noted that as part of the
investigation, the police obtained thumb drives and a laptop of
his.  (Tr. I 186:2-24.)  Mr. Abusamhadaneh testified that he was
not aware of any images of suspected terrorists downloaded from
the drives or laptop and that if there were such images, he was
not responsible for them.  (Tr. I 186:7-9; 187:19-25; 188:1-9.)
He testified that he did not have access to personal information
of other employees outside the scope of his work as a network
analyst.  (Tr. I 188:7-9.)  Finally, Mr. Abusamhadaneh testified
that he was never accused by the Department of downloading
images of terrorists or improperly accessing confidential
information.  (Tr. I 187:16-188:6.)  The Court credits this
testimony, as nothing Defendants introduced at trial suggests it
is inaccurate.

        i. <u>Admissibility of Supplemental Investigative</u>
           <u>Reports</u>

      During trial, Defendants attempted to move
supplemental police reports into evidence pursuant to Federal
Rule of Evidence 803(8).  The reports -- contained in
Defendants' Exhibits #4 and #5 -- were prepared by Detective
Comfort who testified as a rebuttal witness for Defendants.
Detective Comfort was assigned to the Criminal Investigations

Division of the Fairfax County Police Department in 2006, where he conducted the criminal side of Mr. Abusamhadaneh's investigation, but not the parallel internal investigation. (Tr. IIIA 109:12-110:6.)  He described his investigation as a "subinvestigation," stating that it was not the primary investigation and that he was not the original reporting officer.  (Tr. IIIB 141:19.)  Plaintiff objected to the admissibility of the reports and the Court took the objection under advisement during the trial.

In civil actions, "factual findings from a legally authorized investigation" are admissible, if "neither the source of information nor other circumstances indicate a lack of trustworthiness."  Fed. R. Ev. 803(8).  The party opposing the admission of such a report bears the burden of establishing its unreliability.  *Ellis v. Int'l Playtex, Inc.*, 745 F.2d 292, 300 (4th Cir. 1984); *Kennedy v. Joy Techs., Inc.*, 269 F. App'x 302, 309-10 (4th Cir. 2008).  In determining admissibility, the court should assess and weigh factors such as: (1) the timeliness of the investigation; (2) the special skill or experience of the investigators; and (3) any possible motivation problems.  *Ellis*, 745 F.2d at 300-01.  Other factors that may be relevant include "unreliability, inadequate investigation, inadequate foundation for conclusions, [and] invasion of the jury's province."  *Distaff, Inc. v. Springfield Contracting Corp.*, 984 F.2d 108, 111 (4th Cir. 1993).  The trial judge has "the discretion, and

indeed the obligation, to exclude an entire report or portions thereof . . . that she determines to be untrustworthy." *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 167 (1988); *see also Distaff,* 984 F.2d at 111 (trustworthiness is properly determined by trial court).

    First, the findings contained in Detective Comfort's reports do not constitute "factual findings" within the meaning of Rule 803(8).  Factual findings must be final statements made at the end of the investigative process. *See United States v. Gray*, 852 F.2d 136 (4th Cir. 1988) (tentative internal IRS report, which did not purport to contain agency factual findings, not admissible); *Brown v. Sierra Nev. Mem. Miners Hosp.*, 849 F.2d 1186 (9th Cir. 1988) (preliminary staff reports and interim reports by outside consultants are not reports containing factual findings because they are not final determinations); *City of N.Y. v. Pullman Inc.,* 662 F.2d 910 (2d Cir. 1981) (report inadmissible because it "did not embody the findings of an agency, but the tentative results of an incomplete staff investigation").  The reports at issue here effectively constitute a log of Detective Comfort's ongoing activity in the investigation.  They largely contain hearsay and information that is preliminary in nature.  They do not appear to contain final conclusions about Mr. Abusamhadaneh's conduct that resulted from a complete investigation.  Moreover, Detective Comfort testified that the reports were "all

supplements" in the case because he was not the "original

reporting officer."  (Tr. IIIB 130:22-131:1.)  He testified that

he did not read the initial report before preparing his

supplements, and that he had never seen the original report.

(Tr. IIIB 131:2-12.)  As a result, the Court finds that such

reports cannot be said to be the final determinations of the

Department's investigation.[34]

Second, assuming the reports did contain "factual

findings" within the meaning of the rule, they are

untrustworthy.  As already discussed, Detective Comfort was not

the original reporting officer and did not review the original

report.  The reports are full of third-party statements and

Plaintiff established at trial that much of the information

contained in the reports does not result from Detective

Comfort's own observations or personal knowledge.  Detective

Comfort's testimony at trial also demonstrated that he did not

have any special skill or experience that positioned him to make

conclusions about violations of information security policies

within the department.  (Tr. IIIB 144:10-147:21.)  In fact, he

testified that he did not "know that much about computers."

(Tr. IIIB 147:10.)  And, Detective Comfort did not know answers

to basic questions like whether Mr. Abusamhadaneh was issued a

_____

[34] The Court also notes that it is questionable whether Detective Comfort's
reports can even be said to be "public," if as Detective Comfort testified ,
a citizen could not access them unless he or she had a court order.  (Tr.
IIIB 130:9-21.)

used or new hard drive, whether the hard drive was wiped clean
before he obtained it, and whether access to the drive had been
limited to Mr. Abusamhadaneh.  (Tr. IIIB 144:6-147:10.)
Finally, the testimony at trial revealed that the investigation
was inadequate and incomplete.  Detective Comfort never spoke
with Mr. Abusamhadaneh and was not fully aware of Mr.
Abusamhadaneh's official duties in the Department.  (Tr. IIIA
122:7-9; 124:4-7.)  For example, Detective Comfort agreed that
depending on what section Mr. Abusamhadaneh was in, images he
thought to be suspicious could have been the Department's
images.  (Tr. IIIB 145:5-10.)  And he agreed that the presence
of IP addresses he found to be suspicious, "could have been part
of [Mr. Abusamhadaneh's] job."  (Tr. IIIA 124:2-7.)

   For the above reasons, the Court finds that Detective
Comfort's reports contained in Defendants' Exhibits #4 and #5
are not admissible as public reports under Federal Rule of Civil
Procedure 803(8).  Finding no other basis for their
admissibility, they are excluded.[35]

## ii. Detective Comfort's Testimony

   The only portion of Detective Comfort's testimony that
arguably impeached Mr. Abusamhadaneh's testimony was hearsay,
and is thus excluded.  Detective Comfort provided a description
of events surrounding Mr. Abusamhadaneh's alleged shoplifting

---

[35] Defendants did not make any argument seeking to have them admitted under
Federal Rule of Civil Procedure 803(6).  The Court finds the Rule to be
inapplicable to the records.

based on the hearsay of other individuals.  It was not a part of the investigation that Officer Comfort personally conducted, nor was it a prior consistent or inconsistent statement by Mr. Abusamhadaneh.  As a result, that testimony is excluded.

Not only did the remainder of Detective Comfort's testimony suffer from serious credibility issues as discussed earlier, but it quite simply failed to contradict or challenge any of the prior testimony the Court heard.  The most glaring issue with the testimony is that fact that Detective Comfort never spoke with Mr. Abusamhadaneh.  Nor did he testify that anyone told Mr. Abusamhadaneh about any of the details of the investigation that Detective Comfort discussed – downloading images of terrorists or improperly accessing confidential information.  Without evidence that Mr. Abusamhadaneh was aware of Detective Comfort's findings, the Court finds Mr. Abusamhadaneh's testimony regarding the alleged shoplifting incident and subsequent investigation credible.

## II.  Conclusions of Law

### A. Jurisdiction

The Court has jurisdiction over this action pursuant to 8 U.S.C. § 1421(c), 28 U.S.C. § 2201, and 28 U.S.C. § 1331. And, venue is proper as Petitioner resides with the Eastern District of Virginia and the events giving rise to this claim arose within this district.

B. Standard of Review

District courts review USCIS's denial of a naturalization Application de novo. *See* 8 U.S.C. § 1421(c); *see also Kai Tung Chan v. Gantner*, 464 F.3d 289, 291 (2d Cir. 2006) ("Judicial review of naturalization denials is always available and is de novo, and is not limited to any administrative record."); *Aparicio v. Blakeway*, 302 F.3d 437, 440 (5th Cir. 2002) ("Rather than conducting an administrative review, the district court reviews the case de novo and makes its own findings of fact and conclusions of law.")  "That system of de novo review for naturalization applications stands in 'sharp contrast' to the more deferential review that courts provide in the context of other immigration appeals: 'whereas judicial review in other immigration contexts, such as removal or asylum, is highly deferential and expressly limited by statute,' in the naturalization context, the Court is not limited to the facts in the administrative record, and in fact is permitted to engage in its own de novo fact finding." *Nesari v. Taylor*, 806 F. Supp. 2d 848, 867 (E.D. Va. 2011) (Brinkema, J.) (quoting *Mobin v. Taylor*, 598 F. Supp. 2d 777, 780 (E.D. Va. 2009) (Ellis, J.)); *see also* 8 U.S.C. § 1421(c).

"[E]ven if the INS is allowed to make the initial decision on a naturalization application, the district court has the final word and does not defer to any of the INS's findings or conclusions." *United States v. Hovsepian*, 359 F.3d 1144,

1162 (9th Cir. 2004) (emphasis omitted).  But courts "have the power to confer citizenship only 'in strict compliance with the terms of an authorizing statute.'"  *Cody v. Caterisano*, 631 F.3d 136, 142 (4th Cir. 2011) (quoting *Pangilinan*, 486 U.S. at 884).

### C. Burden of Proof

An applicant seeking to obtain the privilege of United States citizenship bears the burden of proof to establish that he is eligible for naturalization.  *INS v. Pangilinan*, 486 U.S. 875, 886 (1988) ("it has been universally accepted that the burden is on the alien applicant to show his eligibility for citizenship in every respect") (quoting *Berenyi v. Dist. Dir., INS,* 385 U.S. 630, 637 (1967)).  Any doubts regarding an applicant's eligibility for naturalization "should be resolved in favor of the United States and against the claimant." *Berenyi*, 385 U.S. at 637 (citing *United States v. Macintosh*, 283 U.S. 605, 626 (1931); *see also* 8 C.F.R. § 316.2.

In particular, the applicant has the burden of proving that he is of good moral character.  *See* 8 C.F.R. § 316.10(a)(1) ("[A]n applicant for naturalization bears the burden of demonstrating that, during the statutorily prescribed period, he or she has been and continues to be a person of good moral character.").

Regarding the standard of proof, 8 C.F.R. § 316.2(b) states:

> The applicant shall bear the burden of
> establishing by a preponderance of the
> evidence that he or she meets all of the
> requirements for naturalization, including
> that the applicant was lawfully admitted as
> a permanent resident to the United States,
> in accordance with the immigration laws in
> effect at the time of the applicant's
> initial entry or any subsequent reentry.

As a result, some courts follow the regulation and apply a preponderance of the evidence standard of proof. *See Hovsepian*, 359 F.3d at 1168; *Nesari*, 806 F. Supp. 2d at 867 (preponderance of the evidence).

Despite the regulation, a few courts have concluded that the standard for establishing good moral character is heightened to one of clear and convincing evidence. *See Dicicco v. U.S. Dep't of Justice INS*, 873 F.2d 910, 915 (6th Cir. 1989) (citing *Berenyi*, 385 U.S. at 636-37) (requiring "clear, convincing and unequivocal evidence"); *El-Ali v. Carroll*, 83 F.3d 414 (Table), [published in full-text format at 1996 U.S. App. LEXIS 8747] 1996 WL 192169, at *4 (4th Cir. 1996) (clear and convincing evidence); *Mobin*, 598 F. Supp. 2d at 780 (clear and convincing evidence).

Defendants urge a clear and convincing evidence standard and rely on the following statement by the Supreme Court in *Berenyi*:

> When the Government seeks to strip a person
> of citizenship already acquired, or deport a
> resident alien and send him from our shores,
> it carries the heavy burden of proving its
> case by 'clear, unequivocal, and convincing

> evidence.'  But when an alien seeks to
> obtain the privileges and benefits of
> citizenship, the shoe is on the other foot.
> He is the moving party, affirmatively asking
> the Government to endow him with all the
> advantages of citizenship.  Because that
> status, once granted, cannot lightly be
> taken away, the Government has a strong and
> legitimate interest in ensuring that only
> qualified persons are granted citizenship.
> For these reasons, it has been universally
> accepted that the burden is on the alien
> applicant to show his eligibility for
> citizenship in every respect.  This Court
> has often stated that doubts 'should be
> resolved in favor of the United States and
> against the claimant.

385 U.S. at 636-37 (internal citations omitted) (footnotes

omitted).  A reasonable interpretation of this language is that

the "shoe is on the foot" comment refers not to the clear and

convincing standard of proof, but rather to the fact that the

applicant bears the burden when seeking naturalization.  In

light of this interpretation and the clear wording of the

regulation, this Court finds that preponderance of the evidence

standard is the appropriate standard of proof for an applicant.

Regardless of this dispute though, the Court holds that Mr.

Abusamhadaneh meets his burden of proof by a preponderance of

the evidence and also meets the burden under the heightened

standard of clear and convincing evidence.[36]

D. General Naturalization Requirements

---

[36] The word "unequivocal" was subsequently eliminated from the statute setting
out the "clear, unequivocal, and convincing" evidence standard.  *See Ragbir
v. Holder*, 389 F. App'x 80, 82 (2d Cir. 2010).

Section 1427 of the Immigration and Nationality Act
sets forth the following requirements for naturalization:

> (a) An applicant must have resided
> continuously, as a lawful permanent
> resident, in the United States for five
> years immediately preceding his application
> to naturalize; must have been physically
> present in the United States at least half
> of that time, and; must have resided within
> the state or USCIS district in which he
> filed his application for at least three
> months. 8 U.S.C. § 1427(a)(1); see 8 C.F.R.
> § 316.5.

> (b) An applicant must reside in the United
> States from the time of his application
> until the time of his "admission to
> citizenship." 8 U.S.C. § 1427(a)(2); see 8
> C.F.R. § 316.5.

> (c) An applicant must have been, and remain,
> "a person of good moral character, attached
> to the principles of the Constitution of the
> United States, and well disposed to the good
> order and happiness of the United States." 8
> U.S.C. § 1427(a)(3); see 8 C.F.R. § 316.10-
> 316.11.

E. Good Moral Character Requirement

Turning to the "good moral character" requirement, the
Immigration and Nationality Act and regulations promulgated
thereunder require an applicant to demonstrate that he or she
"has been and still is a person of good moral character" from
five years before filing the application until administration of
the oath of allegiance.  8 U.S.C. § 1427(a)(3); 8 C.F.R. §
316.10(a)(1).  Congress has erected several statutory bars to a
finding that an applicant possesses good moral character.
Relevant here is 8 U.S.C. § 1101(f)(6), which states:

> No person shall be regarded as, or found to
> be, a person of good moral character who,
> during the period for which good moral
> character is required to be established, is,
> or was -- [] one who has given false
> testimony for the purpose of obtaining any
> benefits under this chapter.

8 U.S.C. § 1101(f)(6); *see also* 8 C.F.R. § 316.10(b)(2)(vi).

The Supreme Court has stated that 'testimony' is limited to oral statements made under oath." *Kungys v. United States*, 485 U.S. 759, 780 (1988).[37]  The Supreme Court has also explained that "[l]iterally read, [§ 1101(f)(6)] denominates a person to be of bad moral character on account of having given false testimony if he has told even the most immaterial of lies with the subjective intent of obtaining immigration or naturalization benefits." *Id.* at 764.  Thus, although false statements need not be material to bar a finding of good moral character, they must be made with the subjective intent of obtaining immigration or naturalization benefits. Misrepresentations that are made for other reasons, however — such as "embarrassment, fear, or a desire for privacy" — are not sufficiently culpable to "brand the applicant as someone who lacks good moral character." *Id.* at 780.

## F. Advice of Counsel

The affirmative defense of reliance on professional advice "is designed to refute the government's proof that the

---

[37] The Court addressed Mr. Abusamhadaneh's written answers in case Mr. Abusamhadaneh's swearing under oath during the N-400 interview that his answers were truthful, constitutes testimony as to those answers as well.

defendant intended to commit the offense." *United States v.
Miller*, 658 F.2d 235, 237 (4th Cir. 1981) (citing *United States
v. Smith*, 523 F.2d 771, 778 (5th Cir. 1975)); *see also United
States v. Newport News Shipbuilding, Inc.*, 276 F. Supp. 2d 539,
565 (E.D. Va. 2003) ("[G]ood faith reliance on the advice of
counsel may contradict any suggestion that a contractor
'knowingly' submitted a false claim, or did so with deliberate
ignorance or reckless disregard.").

In the past the Fourth Circuit has explained that to
establish the defense of reliance on professional advice,
defendants must establish that: (i) the advice was sought and
received before taking action, (ii) they in good faith sought
the advice of a professional whom they considered competent,
(iii) the purpose of securing advice was to determine the
lawfulness of future conduct, (iv) a full and accurate report
was made to the professional of all material facts which the
defendants knew and (v) they acted strictly in accordance with
the advice of the professional who had been given a full report.
*See United States v. Polytarides*, 584 F.2d 1350, 1352 (4th Cir.
1978).  More recently, the Fourth Circuit consolidated these
elements.  In order to provide reliance on defense of counsel,
Mr. Abusamhadaneh must prove that he (a) fully disclosed of all
pertinent facts to an expert, and (b) in good faith relied on
the expert's advice.  *See United States v. Butler*, 211 F.3d 826,

833 (4th Cir. 2000); *Miller,* 658 F.2d at 238 (citing *United States v. Cox*, 348 F.2d 294, 296 (6th Cir. 1965)).

Defendants also cite *Smith* for the position that "reliance cannot be in good faith when the affiant has knowledge contrary to the conclusions of his attorney." *See Smith*, 523 F.2d at 778.  In that case, the affiant had knowledge that particular reports contained false information and the CPA he retained failed to catch the irregularities.  The Court explained that the "reliance defense serves the purpose of negating intent to commit an offense," and "[i]t will not avail as a means of shifting criminal responsibility." *Id.*  This example fits squarely within the Fourth Circuit's requirement that there must be full disclosure of all pertinent facts to an expert.

G. Withdrawing False Testimony

The Ninth Circuit has addressed the issue of the effect of a break in testimony, and explained that the effect turns on the applicant's subjective intent for coming back and withdrawing false testimony. *Llanos-Senarillos v. United States*, 177 F.2d 164, 165 (9th Cir. 1949).  The Court explained that "[i]f the witness withdraws the false testimony of his own volition and without delay, the false statement and its withdrawal may be found to constitute one inseparable incident out of which an intention to deceive cannot rightly be drawn." *Id*.  But if the applicant changes testimony "only after he knew

his false testimony would not deceive" then "[t]he reasons given for the false statements amount to confession and avoidance which we cannot consider." *Id*. As explained by other courts, "[a]n alien's timely, voluntary retraction of a false statement may excuse the misrepresentation if it is not made in response to actual or imminent exposure of the false statement." *Mhanna v. United States Dep't of Homeland Sec. Citizenship*, No. 10-292, 2010 U.S. Dist. LEXIS 131784, at *42 n.11 (D. Minn. Dec. 13, 2010).

The inquiry "depends upon the facts of the case," as it is focused on the affiant's subjective intent. *Llanos-Senarillos*, 177 F.2d at 165. For example, courts have also addressed the situation where the affiant reasonably relies on the advice of an attorney not to correct a misstatement, but then provides the correction when confronted with the fact that it was a misstatement. *See Beckanstin v. United States*, 232 F.2d 1, 4 (5th Cir. 1956). There courts have found that the affiants willingness to promptly correct a misstatement when confronted may negate a willful intent to swear falsely. *Id*.

H. <u>Application</u>

1. <u>Mosque & MAS</u>

Mr. Abusamhadaneh did not give intentionally false testimony regarding his relationship with the Dar al-Hijra mosque or the Muslim American Society. First, Mr. Abusamhadaneh provided credible and convincing testimony that he understood

the terms member and associated to have some token of formality.
The fact that definitions were never provided left Officer
Lutostanski's questions open to interpretation and Mr.
Abusamhadaneh's interpretation was reasonable.[38]   Second, Mr.
Abusamhadaneh provided credible and convincing testimony that he
reasonably relied on his attorney's advice that religious
organizations were not responsive to broad questions about
membership and association.  Mr. Abusamhadaneh's relationship
with the mosque and MAS were known to Mr. Nubani and discussed
in preparation of the Application.  And, Mr. Abusamhadaneh
relied on Mr. Nubani's advice about how the system works in good
faith.  As a result, it was reasonable that Mr. Abusamhadaneh
narrowly construed his answers in light of his attorney's
advice.

        If Mr. Abusamhadaneh answered a vaguely worded
question inaccurately, he did not do so with the requisite
intent to obtain immigration benefit.  Mr. Abusamhadaneh
provided credible and convincing testimony that he was willing
to disclose his relationship with religious organizations at the
outset, but did not do so for the reasons just discussed.  Mr.
Abusamhadaneh's credibility is substantially bolstered by the
fact that he answered specific questions truthfully, discussing

---

[38] To be perfectly clear, Officer Lutostanski thought the terms included
informal relationships, and to the extent they did, Mr. Abusamhadaneh
provided false testimony, but not intentionally so.   Mr. Abusamhadaneh
thought the terms referenced more formal relationships, and to the extent
they did, Mr. Abusamhadaneh did not provide false testimony.

his informal relationships with religious organizations.  That
he had heard that being Muslim might delay his Application is
insufficient evidence to overcome Mr. Abusamhadaneh's testimony.
The Court will not simply impute to Mr. Abusamhadaneh everything
he has ever heard, particularly in light of credible testimony
to the contrary.

Finally, Mr. Abusamhadaneh clarified his testimony
regarding his relationship with religious organizations, and the
determination to do so was not made in response to actual or
imminent exposure of a false statement.  Mr. Abusamhadaneh
returned voluntarily and without delay.  And he returned to
clarify his understanding of the term "association" and to
correct for his attorney's mistaken advice.  To the extent that
these clarifications were made in response to Officer
Lutostanski's confrontation about the Muslim Brotherhood, the
Court notes that Mr. Abusamhadaneh was not confronted with the
truth, but rather with an erroneous statement from a mistaken
FBI report.  That he returned to clarify that mistake, and in
doing so provided additional details on other topics in an
attempt to help explain it, does not suggest that he had been
caught in any sort of a lie.  Clarification of inaccuracies –
whether they be Mr. Abusamhadaneh's or the government's – does
not somehow automatically convert testimony into intentionally
false testimony.

## 2. Muslim Brotherhood

Mr. Abusamhadaneh did not give intentionally false testimony regarding his relationship with the Muslim Brotherhood.  Again, Mr. Abusamhadaneh provided credible and convincing testimony that he understood terms membership and associated to have some token of formality.  And, Mr. Abusamhadaneh's responses to Officer Lutostanski's questions are reasonable because his "association" with the Muslim Brotherhood, if existent, is minimal.  The Court finds this a credible explanation for why he did not raise the topic of the Muslim Brotherhood.  The Court also finds that he did not withhold any information about the Muslim Brotherhood to obtain an immigration benefit.  The Court emphasizes that USCIS's decision was based on the mistaken belief that Mr. Abusamhadaneh was a member of the Muslim Brotherhood and subsequent confusion about the relationship between MAS and the Muslim Brotherhood.

Furthermore, Mr. Abusamhadaneh's additional testimony after break regarding the Muslim Brotherhood was not made in response to actual or imminent exposure of a false statement made by Mr. Abusamhadaneh.  Rather, it was made in response to an erroneous statement made by Officer Lutostanski.  And, that Mr. Abusamhadaneh later ventured to guess why the government might think that he was a member of the Muslim Brotherhood does not convert an earlier lack of detail into false testimony.

3. <u>Mr. Alamoudi</u>

Mr. Abusamhadaneh did not give false testimony (or intentionally false testimony) about Mr. Alamoudi during the N-400 interview, as his answers to Officer Lutostanski's questions about his relationship with Mr. Alamoudi were accurate based on all the evidence the Court heard. Mr. Abusamhadaneh's decision to return with additional details about their relationship does not convert his response of "not really" into false testimony. There is no heightened duty of candor to tell the Government every detail of every topic that the applicant could theoretically guess that the Government might possibly be interested in during the interview. In answering specific questions, the applicant has a duty of correctness and truthfulness.

The Court finds that Mr. Abusamhadaneh did not withhold details with the requisite intent to obtain an immigration benefit. The Court credits Mr. Abusamhadaneh's explanation that he interpreted the question to be about a personal relationship and that he was not trying to hide anything about their relationship.

Moreover, Mr. Abusamhadaneh's testimony about Mr. Alamoudi after the break was not made as a result of the disclosure or threat of disclosure of a false statement. The Court credits Mr. Abusamhadaneh's explanation that he provided additional testimony in order to ensure that Officer Lutostanski had a clear understanding the nature of their relationship.

88

4. Incidents in Jordan

Mr. Abusamhadaneh did not give intentionally false testimony regarding the two stops by law enforcement in Jordan. Mr. Abusamhadaneh provided credible and convincing testimony that he did not recall the incidents until the N-400 interview. "A misstatement or inaccurate answer that results from faulty memory or innocent mistake does not constitute an intentionally false statement." *Hovsepian*, 422 F.3d at 888. The delayed recollection of additional facts can be just that; it does not suggest that the initial inability to recall every potential meeting with someone amounts to lying.

And, Mr. Abusamhadaneh did not delay in providing the information with the requisite intent to obtain an immigration benefit. To the extent that he delayed providing the information during the initial part of the interview after he recalled the incidents, he did so out of confusion, embarrassment, and / or fear. He provided credible testimony that he was not sure if the incidents in Jordan were responsive to the questioning and, if so, when he should discuss them. There is no evidence indicating that the incidents in Jordan would have any effect on his naturalization proceedings.

Moreover, Mr. Abusamhadaneh's testimony about the stops after the break was not made as a result of the disclosure or threat of disclosure of a false statement. There was no suggestion that Officer Lutostanski had information about the

89

stops, was about to obtain such information, or that Mr.
Abusamhadaneh thought either of those things.  Rather, the Court
finds that Mr. Abusamhadaneh returned after the break to attempt
to provide all details and clarify his testimony before he left
the building in an overabundance of caution and a desire to
ensure that his testimony was as accurate as possible.

        For these reasons, the Court finds Petitioner Jamal
Abusamhadaneh has the requisite good moral character for
naturalization pursuant to 8 U.S.C. § 1421(c) and is statutorily
eligible for naturalization under the Immigration and
Naturalization Act.

        An appropriate Order will issue.


                              _____/s/_____
June 5, 2012                        James C. Cacheris
Alexandria, Virginia          UNITED STATES DISTRICT COURT JUDGE