IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

JAMAL ABUSAMHADANEH,           )
                               )
        Plaintiff,             )
                               )
        v.                     )    1:11cv939 (JCC/TCB)
                               )
SARAH TAYLOR, *et al.*,        )
                               )
        Defendants.            )

**M E M O R A N D U M   O P I N I O N**

        This matter is before the Court on Plaintiff Jamal
Abusamhadaneh's ("Plaintiff") Motion for Attorney's Fees and
Expenses Pursuant to the Equal Access to Justice Act [Dkt. 84]
(the "Motion").  For the following reasons, this Court will
grant the Motion and adjust the rates and billable hours of
Plaintiff's legal counsel.

**I. Background**

        The instant Motion arises out of this Court's judgment
on Plaintiff's Petition for Review of Denial of Application for
Naturalization Pursuant To 8 U.S.C. § 1421(c) and Request for *De
Novo* Hearing [Dkt. 1] (the "Petition").

    A. Factual Background

        Jamal Abusamhadaneh is a natural born citizen of
Jordan. (March 13, 2012 Tr. [Dkt. 49] ("Tr. I") 29:9.)  He is a

practicing Muslim. (Tr. I 52:19-21; 54:13-21.)  He currently

resides in Falls Church, Virginia.  (Tr. I 29:4-7.)  He lives

with his wife, who obtained citizenship in 2008, and their four

children. (Tr. I 44:17-45:9.)

On February 13, 2008, Mr. Abusamhadaneh submitted his

N-400 Application for Naturalization (the Application) along

with appropriate supporting documentation and the required fee.

(Appl. [Joint Exhibit (JE) 1] at 10; Stipulation of Uncontested

Facts [Dkt. 27] (Stip.) at 1.) In addition to Mr.

Abusamhadaneh's signature, the Application contains the

signature of his attorney, Ashraf Nubani, as the preparer of the

Application. (*Id*.) Mr. Abusamhadaneh retained Mr. Nubani to

assist with preparation of the Application and with the ensuing

naturalization proceedings. (Tr. I 48:24-51:11.)

The processing of Mr. Abusamhadaneh's Application took

much longer than the usual six months, so after contacting

United States Citizenship and Immigration Services (USCIS), Mr.

Abusamhadaneh threatened to file a writ of mandamus. (Tr. I

231:17-232:7.)  On October 5, 2009, Mr. Abusamhadaneh finally

attended his N-400 naturalization interview at the USCIS

Washington District Office in Fairfax, Virginia. (Stip. at 1.)

He was accompanied by Mr. Nubani. (*Id*.) The interview was

conducted by Senior District Adjudications Officer Malgorzata

Lutostanski and a portion of it was videotaped.[1]  Mr.

Abusamhadaneh's testimony was provided in two parts: before and

after a ten to fifteen minute break. During the break, Mr.

Abusamhadaneh and Mr. Nubani conferred outside the presence of

Officer Lutostanski.  The Court recounted the intricacies of the

instant interview in its prior Memorandum Opinion on Jamal

Abusamhadaneh's Petition for Review of Denial of Application for

Naturalization ("Mem. Op.") and familiarity with that opinion is

presumed. (Mem. Op. 3-6.)

On April 30, 2010, USCIS issued a decision denying Mr.

Abusamhadaneh's N-400 Application ("the 2010 Decision"). (JE 11;

*see also* JE 2.) The 2010 Decision concludes Mr. Abusamhadaneh

lacked the "good moral character" required for naturalization

because he provided false testimony for the purpose of obtaining

naturalization. (JE 11 at 2.)

On June 2, 2010, Mr. Abusamhadaneh filed a Request for

a N-336 Hearing on a Decision in Naturalization Proceedings with

USCIS. (Stip. at 2.) In support, he submitted a sworn affidavit

from himself and from Mr. Nubani in order to explain and rebut

the conclusion by USCIS that he provided false testimony during

the N-400 interview. (*Id*.) On December 29, 2010, Mr.

Abusamhadaneh appeared for his N-336 hearing at the USCIS

Washington District Office accompanied by Mr. Nubani. (JE 12.)

---

[1] The DVD used to record the interview only covered the first 60 minutes of the interview. (Tr. II 233:1-3.)

He was interviewed by Senior District Adjudications Officer June Williams and the interview was videotaped. (*Id.*)

On July 28, 2011, USCIS issued a decision affirming the prior denial of his Application ("the 2011 Decision"). (JE 13.) The 2011 Decision, drafted by Officer Williams, concludes that "you have failed to overcome the denial of your application dated April 30, 2010, as it pertains to a finding that you are a person of good moral character." (JE 13 at 5.)

On September 2, 2011, Plaintiff filed their Petition for Review of Denial of Application for Naturalization Pursuant To 8 U.S.C. § 1421(c) and Request for *De Novo* Hearing. A three-day bench trial was held on March 13, 14, and 15, 2012 as to Plaintiff's Petition for Review of Denial of Application for Naturalization. After considering the relevant evidence, including exhibits and witness testimony at trial, the Court found Mr. Abusamhadaneh to be a person of good moral character and that he met the requirements for naturalization set out in the Immigration and Nationality Act. Familiarity with this Court's June 5, 2012, Memorandum Opinion is presumed. [Dkt. 69.]

B. Procedural Background

On September 5, 2012, Plaintiff filed the instant Motion for Attorney's Fees and Expenses, as well as several accompanying exhibits in support. [Dkt. 84.] On September 19, 2012, Defendants filed their Opposition to Plaintiff's Motion

for Attorney's Fees and Expenses [Dkt. 86] ("Opposition" or "Opp'n"), as well as several accompanying exhibits and affidavits in support. On September 27, 2012, Plaintiff filed a Reply in response to Defendants' Opposition [Dkt. 87] ("Reply" or "Rep."), as well as a Supplemental Affidavit of Denyse Sabagh [Dkt. 87, Ex. 1] ("Sabagh's First Supplemental Affidavit"). On October 11, 2012, Plaintiff filed a Supplemental Affidavit in Support of their Motion for Attorney's Fees and Expenses [Dkt. 88] ("Supplemental Affidavit" or "Supp. Aff."), as well as a second Supplemental Affidavit of Denyse Sabagh [Dkt. 88, Ex. 1] ("Sabagh's Second Supplemental Affidavit"). On November 13, 2012, the Government filed a Notice Regarding Plaintiff's Motion for Attorney's Fees and Expenses Pursuant to the Equal Access to Justice Act [Dkt. 91] with an accompanying exhibit [Dkt. 91-1] ("Government's Notice"). On November 26, 2012, Plaintiff filed a Response to the Government's aforementioned Notice. [Dkt. 92.]

## II. Standard of Review

Plaintiff has moved for attorney's fees pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d)(1)(A), which provides that:

> [A] court shall award to a prevailing party
> other than the United States fees and other
> expenses, in addition to any costs awarded
> pursuant to subsection (a), incurred by that
> party in any civil action (other than cases

5

> sounding in tort), including proceedings for
> judicial review of agency action, brought by
> or against the United States in any court
> having jurisdiction of that action, unless
> the court finds that the position of the
> United States was substantially justified or
> that special circumstances make an award
> unjust.

28 U.S.C. § 2412(d)(1)(A).  Thus, in order for the Plaintiff to

become eligible for an award of attorney's fees under the EAJA,

the following conditions must be met:

> (1) that the claimant be a "prevailing
> party"; (2) that the government position was
> not "substantially justified"; (3) that no
> "special circumstances make an award
> unjust"; and, (4) that the fee application
> be submitted to the court within 30 days of
> final judgment and be supported by an
> itemized statement.

*Broaddus v. United States Army Corps of Eng'rs*, 166 (4th Cir.

2004)(quoting *Crawford v. Sullivan*, 935 F.2d 655, 656 (4th Cir.

1991).

In order for Plaintiff to be eligible for an award of

attorney's fees, the Government's position cannot have been

"substantially justified."  The Government's position is

substantially justified if it is "'justified in substance or in

the main' — that is, justified to a degree that could satisfy a

reasonable person." *Pierce v. Underwood*, 487 U.S. 552, 565

(1988).  It is not a requirement that the Government must win in

order to prove its position substantially justified; rather, "it

can be substantially justified if a reasonable person could

6

think it correct, that is, if it has a reasonable basis in law and fact." *Id*. at 566 n. 2.  It should be noted that the Government's "position" includes both the agency level determination and the defense of that agency decision upon review by this court. *See Crawford*, 935 F.2d at 656 (citing *I.N.S. v. Jean*, 496 U.S. 154, 159 (1990)).  When determining whether the position of the United States was substantially justified, courts should avoid an issue-by-issue analysis and should consider the totality of the circumstances.  *Roanoke River Basin Ass'n v. Hudson*, 991 F.2d 132, 138-39 (4th Cir. 1993); *May v. Sullivan*, 936 F.2d 176, 177 (4th Cir. 1991). Courts have uniformly recognized that the burden of establishing that the position of the United States was substantially justified must be shouldered by the Government.  *See Scarborough v. Principi*, 541 U.S. 401, 414 (2004) (citing Supreme Court and circuit case law) (citations omitted).

### III. Analysis

**(1). Was the Position of the United States Substantially Justified?**

      1.  <u>USCIS Decision</u>

          a. <u>Applicable Law</u>

It is axiomatic that the United States Government has a strong and legitimate interest in ensuring that only qualified persons are granted citizenship.  *Berenyi v. Dist. Dir.,*

*Immigration & Naturalization Serv.*, 385 U.S. 630, 637 (1967).

It should be noted that Plaintiff bears the burden of demonstrating their eligibility for citizenship, as "it has been universally acknowledged that the burden is on the alien applicant to show his eligibility for citizenship in every respect." *Cody v. Caterisano*, 631 F.3d 136, 142 (4th Cir. 2011) (quoting *Berenyi*, 385 U.S. at 637). The Supreme Court has "often stated that doubts should be resolved in favor of the United States and against the claimant." *Id*. In essence, Courts have the power to confer citizenship only "in strict compliance with the terms of an authorizing statute." *Id*. (quoting *Immigration & Naturalization Service v. Pangilinan*, 486 U.S. 875, 884 (1988). Regarding the applicable standard of proof, 8 C.F.R. § 316.2(b) states:

> The applicant shall bear the burden of
> establishing by a preponderance of the
> evidence that he or she meets all of the
> requirements for naturalization, including
> that the applicant was lawfully admitted as
> a permanent resident to the United States,
> in accordance with the immigration laws in
> effect at the time of the applicant's
> initial entry or any subsequent reentry.

8 C.F.R. § 316.2(b).

Section 1427 of the Immigration and Nationality Act sets forth the following requirements for naturalization:

> (a) An applicant must have resided
> continuously, as a lawful permanent
> resident, in the United States for five

years immediately preceding his application to naturalize; must have been physically present in the United States at least half of that time, and; must have resided within the state or USCIS district in which he filed his application for at least three months. 8 U.S.C. § 1427(a)(1); see 8 C.F.R. § 316.5.

(b) An applicant must reside in the United States from the time of his application until the time of his "admission to citizenship." 8 U.S.C. § 1427(a)(2); see 8 C.F.R. § 316.5.

(c) An applicant must have been, and remain, "a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States." 8 U.S.C. § 1427(a)(3); see 8 C.F.R. § 316.10–316.11.

Of particular relevance to the instant case, the applicant has the burden of proving that he is of good moral character from five years before filing the application until administration of the oath of allegiance. *See* 8 U.S.C. § 1427(a)(3); 8 C.F.R. § 316.10(a)(1) ("[A]n applicant for naturalization bears the burden of demonstrating that, during the statutorily prescribed period, he or she has been and continues to be a person of good moral character."). Congress has erected several statutory bars to a finding that an applicant possesses good moral character. Relevant here is 8 U.S.C. § 1101(f)(6), which states:

No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is,

or was -- [] one who has given false
testimony for the purpose of obtaining any
benefits under this chapter.

8 U.S.C. § 1101(f)(6); *see also* 8 C.F.R. §
316.10(b)(2)(vi).

Plaintiff argues that the Government action giving
rise to the litigation was not substantially justified, nor was
the Government's litigation position substantially justified.
From a practical standpoint, the present inquiry necessitates
examination of the facts and proceedings of this case from a
perspective that differs from that adopted by the Court in
deciding Plaintiff's Petition on the merits.

A. The Government's Position Prior to Litigation

Plaintiff contends that the decision to deny Mr.
Abusamhadaneh's N-400 application for reasons relating to his
purported inability to fulfill the good moral character
requirement for naturalization was unreasonable and not
substantially justified.

Defendants argue "viewing the totality of the
circumstances from the perspective of Officers Lutostanski and
Williams, and without the benefit of hindsight, USCIS was
substantially justified in denying Mr. Abusamhadaneh's
application for naturalization." (Opp'n 6.) In essence, the
Government asserts that Officer Lutostanski's reliance on
erroneous information in the FBI report and Mr. Abusamhadaneh's

reliance on his counsel's misguidance "created confusion" during the naturalization interview and that, coupling Plaintiff's burden to prove eligibility for citizenship with what Officer Lutostanski knew at the time she denied his application, the position of USCIS was substantially justified. (Opp'n 6-7.)

Regarding Officer Lutostanski's reliance on the FBI report, the Government reiterates that the information contained therein was a "significant factor" in Officer Lutostanski's decision to deny Mr. Abusamhadaneh's application for naturalization. (Opp'n 6.) The Government argues that Officer Lutostanski did not know the source named in the FBI report at the time, and she was unaware that the FBI report contained inaccuracies. (*Id*.) While it is conceded that she did not present the physical report to Mr. Abusamhadaneh for inspection, it is argued that she gave him "opportunities to explain his testimony based on the conflicting information before her." (*Id*.) The Government contends that this Court "made its decision with the benefit of information that was not before the agency and was not fully disclosed until trial," which represents a degree of information greater than what "Officer Lutostanski knew at the time she denied the application for naturalization." Therefore, as it is Mr. Abusamhadaneh's burden to prove eligibility to become a citizen of the United States,

the Government reasons that the decision was substantially justified. (Opp'n 7.)

Regarding the N-336 hearing on Mr. Abusamhadaneh's Application conducted by Officer Williams, the Government contends that "she did not have the benefit of knowing that this Court would find Question 8(a) 'open-ended' and 'vague' or that the Court would credit Mr. Abusamhadaneh's explanations because it found Officer Lutostanski's questions 'vague.'" (*Id.*) The Government argues that, in Officer Williams's judgment after having reviewed the record of the prior interview as well as Mr. Abusamhadaneh's testimony, "she believed that Mr. Abusamhadaneh had given false testimony in his naturalization interview." (*Id.*)

As the Government bears the burden of showing that the position of the United States was substantially justified, and the only membership position expressly addressed by the Government in detail is their position regarding Mr. Abusamhadaneh's membership in the Muslim Brotherhood, this Court will dispense with that issue first.

1. FBI Report

To address an issue of considerable import to this Court's decision, the Court will touch upon the Government's reliance upon the inaccurate FBI report to the extent that it has not been addressed elsewhere by the Court. Regarding the

information contained in the FBI report, the Government concedes that the report contained inaccuracies. (Opp'n 6.) The Government seemingly argues that neither Officer Lutostanski, nor Officer Williams, nor NSCIS itself should be faulted for their reliance upon the incorrect information contained in the FBI report pertaining to Mr. Abusamhadaneh's supposed membership in the Muslim Brotherhood. By the Government's logic, their reliance on a concededly inaccurate report does not preclude the position of USCIS from having been substantially justified. (Opp'n 6-7.) Although the Government concedes that Officer Lutostanski failed to present the physical report to Mr. Abusamhadaneh for inspection, the Government asserts that he was provided with "opportunities to explain his testimony based on the conflicting information before her." (Opp'n 6.) In the Government's estimation, it was Mr. Abusamhadaneh's burden to prove his eligibility for citizenship and that, viewing this case from what Officer Lutostanski knew at the time she denied the application for naturalization, the decision of USCIS was substantially justified. (Opp'n 7.)

It is incontrovertible that Officer Lutostanski relied on information in a FBI report that has been discredited as inaccurate. Mr. Abusamhadaneh's first employer in the United States, the American Muslim Foundation, is no longer in existence. (Tr. I 38:11-39:13.) It was dissolved in 2004 after

its president, Abdurahman Alamoudi, was convicted of various

crimes. Subsequently, Mr. Alamoudi gave numerous interviews

with the FBI, which resulted in "302 reports" prepared by FBI

agents. (Tr. II 130:9-133:1.) The FBI report upon which NSCIS

relied credits a confidential human source (*i.e.*, Mr. Alamoudi)

as having provided information regarding Mr. Abusamhadaneh

during an interview with FBI special agents on January 22, 2008.

The document includes the following relevant information:

> Source was given a photo ... and asked if
> source recognized the person. Source
> identified the person in the phot (sic) as
> JAMAL ABU SAMHADANEH (sic), who is a
> Jordanian Palestinian who lives in the
> Washington, DC area. SAMHADANEH (sic) is a
> computer engineer, and used to work at the
> American Muslim Foundation (AMF) and the
> SUCCESS FOUNDATION, where he worked with
> MOHAMED OMEISH.
>
> Source stated that SAMHADANEH (sic) told the
> source that he was a member of the Muslim
> Brotherhood since his days in the student
> movement in Jordan, which is sponsored by
> the MB in Jordan.
>
> Source also stated that SAMHADANEH is active
> in the MUSLIM AMERICAN SOCIETY (MAS), as
> (sic) US MB organization, and fund raises
> (sic) for MAS in Dar-Al-Hjara mosque, which
> is a MB controlled mosque in Falls Church,
> VA.

(Defendant Exhibit (Def. Ex.) 1.) During the trial, Mr.

Alamoudi credibly testified that some of the information in the

report was inaccurate, particularly the statement that Mr.

Abusamhadaneh told Mr. Alamoudi that he was a member of the
Muslim Brotherhood. (Tr. II 132:13-22; 142:19-143:16.)

As this Court has already held, Mr. Abusamhadaneh
bears not the least bit of fault for the fact that NSCIS
continually relied on the inaccurate FBI report that created
confusion during the interview process and contributed to a
perception that he was not forthcoming. (Mem. Op. 8.) It is
conceded by the Government that Officer Lutostanski was unaware
of the identity of the confidential source in the FBI report and
unaware that there were issues as to the accuracy of the
information in the report. (Opp'n 6.) She simply thought Mr.
Abusamhadaneh was a member of the Muslim Brotherhood and that he
was therefore lying by not admitting his membership. (Tr. II
184:16-22.) From her perspective, Officer Lutostanski was
trying to give Mr. Abusamhadaneh an opportunity to mention his
membership in the Muslim Brotherhood. (Tr. II 192:11-19; 205:3-
7; 216:8-19; 217:15-17; 218:7-10.) That is why she persisted in
her questions, particularly those relating to organizational
membership. (Tr. IIIA 32:22-33:12.) Officer Lutostanski herself
testified that the information from the FBI report was a
significant factor in her decision to deny Mr. Abusamhadaneh's
application.[2] (Tr. IIIA 45:13-17.) Indeed, Officer Lutostanki

---

[2] The Court notes that Officer Lutostanski obtained the FBI report prior to Mr. Abusamhadaneh's
N-400 interview and relied on it as the basis for her questioning. (Tr. II 185:3-5; 222:4-13;
223:4-6.)

concedes she does not know what she would have concluded regarding Mr. Abusamhadaneh's explanations if she had been aware that the FBI report was unreliable and inaccurate. (Tr. IIIA 40:3-9.)

It is the belief of this Court that Mr. Abusamhadaneh was not afforded a meaningful opportunity to rebut or clarify the information contained in the FBI report. The Court believes this to be an especially significant consideration in this case, where the erroneous information contained in the report was undeniably critical to the underlying negative decision. Although Officer Lutostanski may have been unaware that the information contained in the report was inaccurate, her efforts to weigh its credibility were substandard. Officer Lutostanski never presented the report, a document that is not classified, to Mr. Abusamhadaneh for inspection.[3] (Tr. II 183:11-184:22; 215:3-8; Tr. IIIA 43:6-9.) Mr. Abusamhadaneh's interview was the first time Officer Lutostanski handled a case with this type of "positive name check" from the FBI. (Tr. IIIA 5:1-7:1; 22-24.) She explained that she did not have much experience with such an atypical case, and was not aware if there were different procedures she should follow. (Tr. IIIA 5:25-8:21.) However, it has been repeatedly asserted, as recently as the

---

[3] This Court once again notes that this problem was further compounded by the fact that Officer Williams subsequently failed to produce the FBI report to Mr. Abusamhadaneh for inspection as well. (Tr. IIIA 92:12-15; 93:13-14.)

Government's Opposition to Plaintiff's Motion for Attorney's Fees, that Officer Lutostanski's generalized description of the information in the report sufficed for "inspection." (Opp'n 6.) In fact, the record is unclear as to whether Officer Lutostanski even provided such a description of the information. In any event, as this Court has previously stated, Officer Lutostanki's description of "the main of their information" contained in the report "fell far short of capturing the details and context of the report."[4] (Mem. Op. 9.) Furthermore, Officer Lutostanki's failure to allow for Mr. Abusamhadaneh's inspection also fell short of the standards promulgated by Section 11.5 of the Adjudicator's Field Manual, requiring that a petitioner must be afforded an opportunity to inspect and rebut adverse information.

The Government having relied on inaccurate information regarding Mr. Abusamhadaneh contained in an FBI report and thereafter holding Mr. Abusamhadaneh responsible for his inability to speculate upon or endorse those inaccuracies, all while withholding the FBI report from him for inspection, simply does not represent a reasonable or justifiable position. To be sure, the Government's reliance on the report cannot be said to

---

[4] Officer Lutostanski testified that her description to Mr. Abusamhadaneh was that the FBI possessed information that indicates he was active in MAS, a United States Muslim Brotherhood organization. She testified that was "the main of their information," and so that description sufficed for "inspection." (Tr. IIIA 45:18-46:12.) As this Court has noted, however, not only was Mr. Abusamhadaneh not a member of the Muslim Brotherhood as a distinct organization, he was not a formal member of MAS, not on the national level, not on the chapter level, and not as an affiliate member. (Tr. I 57:11-58:4; Tr. II 152:16-153:14.)

add meaningful support their argument that the position of USCIS was substantially justified.

## 2. Relationship with the Muslim Brotherhood

In essence, Officer Lutostanski thought Mr. Abusamhadaneh was a member of the Muslim Brotherhood and that he was therefore lying by not admitting his membership. (Tr. II 184:16-22.) She concluded that Mr. Abusamhadaneh was not truthful because he did not he did not venture to explain why the FBI thought he was a member of the Muslim Brotherhood. (Tr. IIIA 25:10-26:15.) The 2010 Decision relating to Mr. Abusamhadaneh's Application for Naturalization stated that "even after [questions by Officer Lutostanski about membership and associations] and after being confronted about your membership in the Muslim Brotherhood, you still denied membership or association with the Muslim Brotherhood." (JE 11 at 6.)

Regarding Mr. Abusamhadaneh's actual relationship with the Muslim Brotherhood (or, rather, lack thereof), this Court decided this issue for the purposes of his eligibility for naturalization. Indeed, this Court found that Mr. Abusamhadaneh has never been associated with the Muslim Brotherhood in any formal way. At trial, Mr. Abusamhadaneh credibly testified that he is not, and never has been, a member of the Muslim Brotherhood either in Jordan or in the United States. (Tr. I 92:19-93:1.) He credibly testified that, when he was living in

Jordan, he attended a tutoring class and lectures sponsored by the Muslim Brotherhood by virtue of the fact that it is an active political party in Jordan. (Tr. I 93:4-25.) Mr. Abusamhadaneh also credibly testified that, by virtue of the fact that he lives in a Muslim community in the United States, he has possibly come into contact with people who, unbeknownst to him, consider themselves to be members of the Muslim Brotherhood. (Tr. I 94:11-95:6.) To be sure, not all American Muslims who have participated in their community and who once attended a few lectures in Jordan can be said to be or have been "associated" with the Muslim Brotherhood. It is unreasonable to assert otherwise.

Furthermore, this Court has held that there is no evidence Mr. Abusamhadaneh's answers were made with intent to deceive or withhold information in order to obtain an immigration benefit. (Mem. Op. 49, 87.) Indeed, there is no evidence establishing that Mr. Abusamhadaneh thought, or should have thought, that an association with, much less membership in, the Muslim Brotherhood would create an immigration hurdle. (Mem. Op. 49-50.) This Court emphasizes that USCIS's decision was based on the mistaken belief that Mr. Abusamhadaneh was a member of the Muslim Brotherhood and confusion about the relationship between MAS and the Muslim Brotherhood. When asked if "membership in the Muslim Brotherhood [would] have on its

face precluded Mr. Abusamhadaneh from becoming a citizen of the United States," Officer Lutostanski responded, "[n]ot necessarily." (Tr. II 205:25-206:3.)

This Court found that Mr. Abusamhadaneh's credibility to have been supported by the fact that he reasonably considers the Muslim Brotherhood and the Muslim American Society ("MAS") to be two different organizations. (Tr. I 103:25-104:3.) This is supported by the fact that MAS does not hold itself out as or purport to be the Muslim Brotherhood and testimony that the Muslim Brotherhood simply no longer exists in the United States. (Tr. II 107:20.) Furthermore, there is no evidence establishing that Mr. Abusamhadaneh should have thought his attendance at the Dar al-Hijra mosque made him a member of, or associated with, the Muslim Brotherhood. This Court also found that Mr. Abusamhadaneh's credibility is bolstered by the fact that he did not mention any such membership in discussions with Mr. Nubani when preparing to fill out the Application. In short, this Court has found Mr. Abusamhadaneh's near complete lack of membership in, and association with, the organization to be a credible explanation for why he did not mention it during the series of membership and association questions he was asked.

a. Interview with Officer Lutostanski

In essence, because Officer Lutostanski believed that Mr. Abusamhadaneh was a member of the Muslim Brotherhood, she

was therefore under the mistaken impression that Mr. Abusamhadaneh was attempting to deceive her when he did not mention the Muslim Brotherhood during the interview and repeatedly denied being a member. Officer Lutostanski's failure to appreciate that different people maintain different understandings of the relationship between MAS and the Muslim Brotherhood eventually led to Officer Lutostanski's perception that Mr. Abusamhadaneh was a member of the Muslim Brotherhood proper.[5] (*See* Tr. II 107:20-108:3.)

Mr. Abusamhadaneh's testimony during the N-400 interview is consistent with his explanation that he did not mention the Muslim Brotherhood in response to the general questions from Officer Lutostanski because he did not believe himself to be a member of, or associated with, the Muslim Brotherhood. Toward the end of the interview and before the break, relying on the information in the FBI report, Officer Lutostanski asked, "Is there any reason that other government agencies have information that you're a member of Muslim Brotherhood?"[6] (Tr. 2009 72:20-73:1; Tr. II 223:2-6.) Mr. Abusamhadaneh, confused, stated "[t]hey have information about .

---

[5] As this Court has noted, not only is there credible disagreement about whether MAS and the Muslim Brotherhood are "associated," but there is also disagreement about whether there are reasonable grounds to believe that American Muslims associated with the Muslim Brotherhood or MAS in the United States are tied to extremist groups that support terrorism and acts of political violence. (*See* Pl.'s Ex. 7; Def.'s Ex. 2.) The Court notes, however, that MAS does not appear on any publically available list of extremist or terrorist organizations compiled by the U.S. government. (*See* Pl.'s Ex. 7.) Furthermore, the Muslim Brotherhood does not appear on the Department of State's list of designated Foreign Terrorist Organizations. (*See id.*)

[6] Mr. Abusamhadaneh's testimony was provided in two parts: before and after a ten to fifteen minute break. During the break, Mr. Abusamhadaneh and Mr. Nubani conferred outside the presence of Officer Lutostanski.

. ." Mr. Nubani then cut in to state, "You know for Jordan any kid with a beard and a Muslim is a member of the Muslim Brotherhood." (Tr. 2009 73:2-8.) Officer Lutostanski then asked, "Well, have you ever admitted to anybody in your Muslim community that you were a member of the Muslim Brotherhood?" (Tr. 2009 73:9-12.) Mr. Abusamhadaneh replied, "Not at all." Officer Lutostanski later asked Mr. Abusamhadaneh, "Do you know anybody who is a member of an organization like that?" Mr. Abusamhadaneh asked, "What organization?" Officer Lutostanski replied, "The Muslim Brotherhood?," to which Mr. Abusamhadaneh responded "No." (Tr. 2009 73:9-17.) Mr. Nubani then explained that the Muslim Brotherhood no longer exists in the United States, but that MAS shares the same theology as the Muslim Brotherhood, and that for some, their organization can be said to be MAS. (Tr. 2009 74:8-75:3.)

Officer Lutostanski did not fully credit Mr. Abusamhadaneh's testimony after the break. She disputes whether the additional testimony operated as "clarification," arguing it was really "partial clarification or expansion on previous testimony" and "additional testimony." (Tr. IIIA 27:14-29:17.) Regardless, it is clear that the testimony was given by Mr. Abusamhadaneh promptly and voluntarily. (*See* Tr. IIIA 52:15-19.) As this Court found in its prior decision, Mr. Abusamhadaneh's

testimony after the break was consistent with, and bolstered, his earlier testimony.

Officer Lutostanski concluded that Mr. Abusamhadaneh was not truthful because he did not he did not venture to explain why the FBI thought he was a member of the Muslim Brotherhood. (Tr. IIIA 25:10-26:15.)  However, this Court has found that declining or failing to speculate does not equate to intent to deceive.  Indeed, this Court has held previously that nothing in Mr. Abusamhadaneh's reaction suggested that his confusion or lack of discussion was unreasonable or amounted to false testimony.  First, Mr. Abusamhadaneh has never been associated with the Muslim Brotherhood in any formal way.  It is unreasonable to expect Mr. Abusamhadaneh to speculate as to why or how the Government might have come upon the false notion that he was associated with a group with which he has no association. Second, as this Court has previously discussed at length, Mr. Abusamhadaneh was not even given the FBI report to inspect and afforded a meaningful attempt to explain the information contained therein.  Indeed, the fact that Officer Lutostanski's general description was met with a fairly general response from Mr. Abusamhadaneh is not surprising.  Officer Lutostanski testified that her description to Mr. Abusamhadaneh was that the FBI possessed information that indicated he was active in MAS, a United States Muslim Brotherhood organization.  She testified

that was "the main of their information," and so that description sufficed for "inspection." (Tr. IIIA 45:18-46:12.) In fact, the record is unclear as to whether Officer Lutostanski even provided this description of the report to Mr. Abusamhadaneh. The DVD recording of the interview shows that Officer Lutostanski asked, "Is there any reason that other government agencies have information that you're a member of Muslim Brotherhood?" (Tr. 2009 72:20-73:1.) In either event, such description falls far short of capturing the detail of the information in the FBI report and its context. This Court reiterates that if Mr. Abusamhadaneh had been actually presented with the document, in accordance with the tenets of the agency's own procedural guidance, it is likely much of this misunderstanding could have been avoided. Third, before the break Mr. Nubani clarified that simply having lived in Jordan one might in some sense be associated by default, and Mr. Abusamhadaneh confirmed this in answering questions about the ideologically similar MAS. (Tr. 2009 73:6-75:11.) Fourth, Mr. Abusamhadaneh reasonably considered the Muslim Brotherhood to be a religious organization. Question 8(a) does not specify religious organizations as subject to disclosure, and before the break Mr. Abusamhadaneh relied on the advice of his attorney that he was not supposed to discuss religious organizations. (Tr. I 203:22-204:5.) In summation, there was there was no

basis upon which to find that Mr. Abusamhadaneh provided false testimony because he did not provide detailed speculation about why the FBI might think he was a member of Muslim Brotherhood.

Officer Lutostanski's notations from after the break state that, "[a]pplicant stated he did not previously reveal association with Muslim Brotherhood, parenthesis, Muslim American Society, because he is not a member." (JE 5 at 3; Tr. I 103:15-21.) "Applicant did not mention this association before because he is not a member. Wanted to clarify the extent of his association with MAS." (JE 5 at 4; Tr. I 106:14-20.) Mr. Abusamhadaneh initialed both of these. In addition, Mr. Nubani reaffirmed his explanation about the Muslim Brotherhood and MAS after the break in testimony, as Mr. Abusamhadaneh wanted his attorney to clarify the difference between the two organizations. (Tr. I 105:10-20; 250:9-19.) Mr. Nubani explained that people in Jordan interact with the Muslim Brotherhood in the course of their daily lives, as one might regularly see and talk to people who are members of the Muslim Brotherhood and so in that sense they might "associate." He also explained that this type of interaction is different than consciously associating with someone who is a member of the Muslim Brotherhood. He explained that if Officer Lutostanski was saying association means being in contact with people, Mr.

Abusamhadaneh does have some association with the organization.
(Tr. I 251:6-253:17; Tr. II 6:14-16.)

This Court believes that Officer Lutostanski's failure to appreciate the national, cultural, and religious intricacies attending this particular case contributed significantly to the ultimate finding that Mr. Abusamhadaneh had provided false testimony.  Indeed, Officer Lutostanski's testimony demonstrated that her understanding of the Muslim Brotherhood itself was superficial at best.  This colored Officer Lutostanski's perception of the legitimate answers and explanations provided by Mr. Abusamhadaneh in response to her vague and circuitous questions during the interview.  The record demonstrates that Officer Lutostanski was inexperienced as to how to properly conduct such an interview, as Mr. Abusamhadaneh's interview was the first time she had handled a case with this type of "positive name check" from the FBI. (Tr. IIIA 5:1-7:1; 22-24.) In essence, it is the estimation of this Court that rather than having been held at fault for the actual content of his responses, Mr. Abusamhadaneh was adversely affected by Officer Lutostanski's misunderstanding of their significance.

b. <u>Interview with Officer Williams</u>

The 2011 Decision prepared by Officer Williams suggests that Mr. Abusamhadaneh was not forthcoming during the N-400 interview because he minimized his relationship with the

Muslim Brotherhood. (JE 13 at 2-4.) In its Opposition, the
Government argues that "[i]n Officer Williams's judgment after
reviewing the record and Mr. Abusamhadaneh's testimony, she
believed that Mr. Abusamhadaneh had given false testimony in his
naturalization interview on October 5, 2009." (Opp'n 7.) To be
sure, this Court has previously found that Officer Williams'
conclusions to be lacking in credibility. This Court has
already held that Officer Williams' repeated
mischaracterizations of Mr. Abusamhadaneh's testimony during the
N-400 interview and mistakes regarding the record, which forms
the basis for her conclusion that Mr. Abusamhadaneh provided
false testimony to Officer Lutostanski, demonstrate that Officer
Williams did not undertake a thorough and careful review of the
essential record. (Mem. Op. 26.)

        In addition, this Court found that Officer Williams
was not in a position to judge accurately Mr. Abusamhadaneh's
credibility on this topic. First, she did not have the FBI
report during her interview and had not read it herself. (Tr.
IIIA 92:9-15; 93:15-16.) In fact, she initially mistakenly
thought that Mr. Abusamhadaneh had himself given the statement
to the FBI. (Tr. IIIA 93:7-9.) Given Officer Williams' lack of
possession of the FBI report, this Court believes that it is
unlikely that has in a position to discern the inaccuracies
contained in the report, much less ameliorate the apparent

misunderstanding regarding the relationship between MAS and the
Muslim Brotherhood.

Furthermore, this Court found Mr. Abusamhadaneh's
testimony about the Muslim Brotherhood was consistent and
credible.  In its previous Memorandum Opinion, the Court
credited Mr. Abusamhadaneh's explanation as to why he did not
mention the Muslim Brotherhood in response to Officer
Lutostanski's questions during the N-400 interview and found
that he was under no duty to speculate.  (Mem. Op. 52.)

### c. Advice of Attorney

As to the advice of Mr. Abusamhadaneh's attorney, the
Government seemingly asserts that the misguidance of Mr. Nubani
"created confusion."  It has been established that Mr.
Abusamhadaneh's attorney, Mr. Nubani, advised Mr. Abusamhadaneh
not to disclose his relationship with religious organizations.
However, touching upon an issue that the Court will fully
address in the forgoing, despite the misleading advice of Mr.
Nubani, Mr. Abusamhadaneh's testimony was, as this Court found
in its Memorandum Opinion, ultimately forthcoming about his
associations with various organizations.

Although the Government would like shift
responsibility for the collective misunderstanding to Mr.
Abusamhadaneh and his attorney, such a position is significantly
undermined by the litany of mistakes, omissions, disingenuous

actions made on behalf of USCIS and its agents. To the extent that Mr. Abusamhadaneh relied on any misleading advice of his attorney in his initial answers in the interview with Officer Lutostanski before the break, Mr. Abusamhadaneh returned to continue his testimony in order to fully explain the nature of his relationship with religious organizations, to ensure that Officer Lutostanski understood that he was not linked to Mr. Alamoudi's illegal activities during his time at the AMF, and to provide additional examples of things he had only recently thought out. However the testimony was characterized by Officer Lutostanski at trial, it is clear that Mr. Abusamhadaneh's testimony after the break was made on his own volition and sought to clarify any misunderstanding. Officer Lutostanski did not fully credit his testimony provided after the break, as her perception was shaded by the belief that Mr. Abusamhadaneh had already intentionally provided false testimony by attempting to hide his relationship with the Muslim Brotherhood, *i.e.*, a relationship that was in fact nonexistent. This Court found that Mr. Abusamhadaneh's testimony after the break was consistent with, and bolstered, his earlier testimony. Consequently, this Court believes that the advice of Mr. Nubani, although not without any effect, does not in itself represent a significant factor bearing upon the justification of the Government's position.

d. Conclusion

The Government bears the burden of showing that the position of the United States was substantially justified, and this Court notes that the breadth of the Government's arguments defending the position of the USCIS with regard to Mr. Abusamhadaneh's case amounts to no more than a page and a half in length.  Having considered the circumstances of these proceedings, this Court finds that the position of the United States was not substantially justified.

**(2). Does Plaintiff's Arrangement with Counsel Allow for the Recovery of Attorney Fees and Costs?**

1. Applicable Law to the EAJA

The EAJA provides that a district court "shall award to a prevailing party ... fees and other expenses ... incurred by that party in any civil action" against the United States "unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A).  The Supreme Court has "long held that the term 'prevailing party' in fee statutes is a "term of art" that refers to the prevailing litigant" and that "[n]othing in EAJA supports a different reading." *Astrue v. Ratliff*, 130 S. Ct. 2521, 2525 (2010).

It is axiomatic "that an award of attorney['] s fees [under EAJA] is not necessarily contingent upon an obligation to

pay counsel.... The presence of an attorney-client relationship
suffices to entitle prevailing litigants to receive fee awards."
*Ed A. Wilson, Inc., v. GSA*, 126 F.3d 1406, 1409 (11th Cir.
1997). Representation "by counsel on a *pro bono* basis does not
preclude an award of fees under the EAJA." *Cornella v.
Schweiker*, 728 F.2d 978, 987 (8th Cir. 1984). "[T]o be
'incurred' within the meaning of a fee shifting statute, there
must also be an express or implied agreement that the fee award
will be paid over to the legal representative. The statute does
not contemplate that a fee award may be made to a party to be
retained." *Phillips v. General Servs. Admin.*, 924 F.2d 1577
(Fed. Cir. 1991)(referring to the EAJA specifically).

        The Government not dispute that Plaintiff is the
"prevailing party" in this matter, and this Court is satisfied
that Plaintiff has fulfilled the prong in the relevant test for
attorney's fees that pertains to Mr. Abusamhadneh's net worth.
The Court will forego protracted analysis of these elements.

        In its Opposition, the Government questions whether
Plaintiff "incurred" the fees specified. (Opp'n 12.) They
argue that Mr. Abusamhadaneh has failed to demonstrated that "he
actually owes his attorneys the amount of fees requested" and
therefore has "foreclosed the Court's ability to determine
whether the fees he requested were truly 'incurred' or
reasonable in nature. (*Id.*) The Government asserts that "[i]n

the absence of a fee agreement, or some other evidence that Mr. Abusamhadaneh actually incurred the fees he is seeking ... the Court should deny the request for fees." (*Id.* at 13-14.) Plaintiff argues that even though such a requirement does not exist, Plaintiff has indeed demonstrated the existence of a fee agreement between Mr. Abusamhadaneh and counsel "in the Supplemental Affidavit of Denyse Sabagh, attached...as Exhibit 1." (Rep. 9.) The Court has examined the memoranda relating the fee agreement, which has been submitted by counsel, and believes that it demonstrates Mr. Abusamhadaneh's intention to remit to his attorneys any fees awarded pursuant to the fee petition. (Supp. Sabagh Aff. [Dkt. 87-1] Ex. A.) The Court will construe the arrangement between Mr. Abusamhadaneh and his counsel to indicate that if an award of attorney fees is obtained on his behalf, he is then obligated to turn it over to his attorney. In this sense, Mr. Abusamhadaneh incurs the attorney fees that may be awarded him. On the other hand, if no fee award is made to him, he does not have any obligation to pay any further fees to his counsel from his own resources. *See Phillips*, 924 F.2d at 1582 (citing *American Ass'n of Retired Persons v. EEOC*, 873 F.2d 402, 406 (D.C. Cir. 1989). The Court is satisfied that Plaintiff has "incurred" those fees and expenses within the meaning of the statute.

**(3). Do "Special Circumstances" Make an Award of Attorney Fees Unjust?**

The Fourth Circuit has held that an award of attorneys' fees to a prevailing party is mandatory unless the Government can demonstrate that its position was "substantially justified" or that "special circumstances" make an award unjust. *Hyatt v. Barnhart*, 315 F.3d 239, 244 (4th Cir. 2002).

Congress designed the "special circumstances" exception to the mandatory award of fees and expenses to prevailing parties as a "safety valve" that would "insure that the Government is not deterred from advancing in good faith the novel but credible extensions and interpretations of law that often underlie vigorous enforcement efforts" and that would provide district courts with "discretion to deny awards where equitable considerations dictate an award should not be made." *Nken v. Holder*, 385 Fed.Appx. 299, 302 (4th Cir. 2010) (quoting H.R.Rep. No. 96-1418, at 11, 1980 U.S.C.C.A.N. 4984, 4990 (1980)).

The Government has not made the requisite showing that special circumstances make an award unjust, and the Court does not believe that there are any "special circumstances" that would make an award of attorney fees unjust in this case.

**(4). Having Determined Plaintiff's Eligibility for Attorney Fees, What Billing Rates are Applicable to Plaintiff's Legal Team?**

## 1. Attorney Fee Calculation

Once the district court determines that a plaintiff has met the threshold conditions for an award of fees and costs under the EAJA, the district court must undertake the task of determining what fee is reasonable. *Jean*, 496 U.S. at 161. "A request for attorney's fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). "Where settlement is not possible, the fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended." *Id*.

### a. Reasonable Amount of Attorney's Fees

In this case, Plaintiff requests a consolidated total of $223,138.08 in fees and $9,342.38 in costs, having submitted an "itemized statement" to the Court detailing as much. Their request includes $223,138.08 in fees payable to multiple attorneys and a paralegal, and in every case the rate requested by the individual member of the legal team exceeds the $125 per hour statutory cap, which has not been adjusted for cost of living. Plaintiff has also requested $9,342.38 in costs.

**2011 – Duane Morris LLP**

| Name | Hours Requested | Rate Request | Fee Request |
|------|-----------------|--------------|-------------|
| Denyse Sabagh | 5.00 | $555.00 | $2775.00 |
| Jennifer D. Cook | 22.50 | $182.52 | $4106.70 |
| Joseph Ferretti | .80 | $182.52 | $146.02 |
| Thomas Ragland | 20.90 | $465.00 | $9718.50 |
| Cyndy Ramirez Clark | .20 | $166.00 | $33.20 |
| *Total:* | 49.40 | | $16779.42 |

**2012 – Duane Morris LLP**

| Name | Hours Requested | Rate Request | Fee Request |
|------|-----------------|--------------|-------------|
| Denyse Sabagh | 127.70 | $575.00 | $73427.50 |
| Jennifer D. Cook | 100.50 | $182.52 | $18353.26 |
| Robert H. Dietrick | 33.20 | $182.52 | $6059.66 |
| Joseph Ferretti | 84.80 | $182.52 | $15477.70 |
| Thomas Ragland | 183.20 | $465.00 | $85188.00 |
| Cyndy Ramirez Clark | 5.60 | $166.00 | $929.60 |
| *Total:* | 535.00 | | $199425.72 |

**2012 – Benach Ragland**

| Name | Hours Requested | Rate Request | Fee Request |
|------|-----------------|--------------|-------------|
| Cyndy Ramirez Clark | 1.30 | $166.00 | $215.80 |
| Jennifer D. Cook | 3.50 | $182.52 | $638.82 |
| Thomas Ragland | 14.50 | $450.00 | $6525.00 |
| *Total:* | 19.30 | | $7379.62 |

## i. Applicable Law

"[A] district court will always retain substantial discretion in fixing the amount of an EAJA award. Exorbitant, unfounded, or procedurally defective fee applications ... are matters that the district court can recognize and discount." *Hyatt v. North Carolina Dep't of Human Res.*, 315 F.3d 239, 254 (4th Cir. 2002) (citing *Jean*, 496 U.S. at 163). Under the EAJA, the term "fees and other expenses" is defined to include:

> reasonable expenses of expert witnesses, the
> reasonable cost of any study, analysis,
> engineering report, test, or project which
> is found by the court to be necessary for
> the preparation of the party's case, and
> reasonable attorney fees (The amount of fees
> awarded under this subsection shall be based

> upon prevailing market rates for the kind
> and quality of the services furnished,
> except that ... (ii) attorney fees shall not
> be awarded in excess of $125 per hour unless
> the court determines that an increase in the
> cost of living or a special factor, such as
> the limited availability of qualified
> attorneys for the proceedings involved,
> justifies a higher fee.)

28 U.S.C. § 2412(d)(2)(A). Thus, it is clear that the amount of attorneys' fees and costs awarded under EAJA must be reasonable. *See* 28 U.S.C. § 2412(d)(1)(A), (2)(A).

Under § 2412(d)(2)(A)(ii), an award of attorneys' fees may not exceed the lower of the prevailing market rate or the statutory cap, except in very limited circumstances. *See Pierce*, 487 U.S. at 571-72. Reiterating a point of particular importance to the instant case, the EAJA provides that fees may be awarded based upon prevailing market rates for the kind and quality of the services that have been furnished, except that attorney fees shall not be awarded in excess of $125 per hour unless the court determines that there is justification for a higher fee, such as an increase in the cost of living or another special factor, such as the limited availability of qualified attorneys for the proceedings involved. *See* 28 U.S.C. § 2412(d)(2)(A).

The statutory exception for limited availability of qualified attorneys "refers to attorneys having some distinctive knowledge or specialized skill needful for the litigation in question — as opposed to an extraordinary level of the general

lawyerly knowledge and ability useful in all litigation."
*Pierce v. Underwood*, 487 U.S. 552, 572 (1988).  Examples of the
requisite "distinctive knowledge or specialized skill" cited by
the *Pierce* Court include "an identifiable practice specialty
such as patent law, or knowledge of foreign law or language."
*Id*. at 572.  The Court also expressly rejected several examples
of purported "special factors," including "[t]he novelty and
difficulty of the issues, the undesirability of the case, the
work and ability of counsel, and the results obtained," all of
which the Court considered to be "little more than routine
reasons why market rates are what they are."  *Id*. at 573.  The
"customary fees and awards in other cases" was also rejected as
a special factor.  *Id*.

## ii. "Special Factor" Analysis

Plaintiff asserts that the "special factor" exception
applies in the cases of attorneys Denyse Sabagh and Thomas
Ragland and that, therefore, they should be able to recover fees
at a rate higher than the statutory cap of their services.

For the 2011 year, Ms. Sabagh requests recovery of
fees for 5.00 work hours at a rate of $555.00 per hour.  For the
2012 year, Ms. Sabagh requests recovery of fees for 127.70 hours
at a rate of $575.00 per hour.  For the 2011 year, Mr. Ragland
requests recovery of fees for 20.90 work hours at a rate of
$465.00 per hour.  For the 2012 year, Mr. Ragland requests

recovery of fees for 183.20 work hours at a rate of $465.00 per hour, and a rate of $450.00 per hour for 14.50 hours of work.

Plaintiff argues that Ms. Sabagh and Mr. Ragland are entitled to enhanced fees based upon their experience, reputation, and expertise in matters of immigration law, and the lack of availability of attorneys of comparable stature and skill. Plaintiff's counsel further argues that their level of skill was necessary in this case and not available at the EAJA statutory rate. (Mot. 15.)

In applying the "special factor" formulation of *Pierce*, Courts have noted its narrow application, although the Fourth Circuit has noted that "views as to exactly how narrow [the application of the *Pierce* formulation] should be have varied somewhat." *Hyatt*, 315 F.3d at 249. In *Hyatt*, wherein attorneys sought fees and costs relating to a social security class action suit, while the Fourth Circuit acknowledged that while courts nationwide offer somewhat different interpretations as to what the *Pierce* "special factor" formulation precisely contemplates, the Court found that it was not necessary to determine "whether *Pierce* contemplates *either* an identifiable practice specialty not easily acquired by a reasonably competent attorney *or* a specialty requiring technical or other education *outside* the field of American law" because "under either interpretation ... the expertise of plaintiffs' attorneys

brought to bear in this case is insufficient." *Hyatt*, 315 F.3d

at 251 (emphasis in original). This Court believes that this

case presents a similar scenario and justification for denying

enhanced fees.

This Court does not see how counsel's "knowledge of

immigration and naturalization law," "special experience in

litigating immigration cases," and "understanding of the

complexities of the issues raised by the USCIS decision" is

different from simply a specialized expertise in that area of

the law and a proficiency in its practice. (Sabagh Aff. 3.) As

the Fourth Circuit noted in *Hyatt*:

> To the extent plaintiffs' counsel rely upon
> their ability to maneuver through the more
> informal or even unwritten protocols
> established with the agency, we are also
> unpersuaded. Practice specialties in the
> administrative arena will all involved this
> ability, which of course will be unique to
> the specialty but still acquired from the
> practice of it.

*Hyatt*, 315 F.3d at 252. Furthermore, Plaintiff's counsel has

not offered proof of having undertaken any specialized education

or training that is beyond the diligent study and practice

required of any practice specialty. *Id*. This Court notes that

while it does not doubt the acumen or experience of Plaintiff's

counsel, the "ability of counsel" is not a factor warranting

enhanced fees. *Pierce*, 487 U.S. at 573.

Furthermore, rather than requiring research into complex or little-known areas of immigration law, in these proceedings Plaintiff's counsel was faced with a case that largely turned upon straight-forward determinations of credibility, ultimately representing a very basic legal issue, particularly so within this area of practice. Even if the Court were to assume that Plaintiff's counsel is capable of establishing "a distinctive knowledge or specialized skill," there has not been a satisfactory showing that such expertise was necessary to handle the dispute that actually gave rise to the award of attorneys' fees and costs currently at issue. *Hyatt*, 315 F.3d at 252.

Having taken into account the foregoing considerations, this Court believes that this case does not present the sort of circumstances capable of justifying an award of enhanced fees. The Court will limit Plaintiff's counsel to the statutory cap, adjusted for cost of living.

### iii. Cost of Living Adjustments

Plaintiff in this case is seeking to recover an adjusted statutory rate for the time spent by Mr. Dietrick, Ms. Cook, and Mr. Ferretti. Plaintiff argues that there has been "[a] significant increase in the cost of living since 1996, when the $125 limit was implemented" and that such an increase "justifies an adjustment for cost of living to $182.52 per

hour." (Pl. Mot. 18.) Resistance to a cost of living increase
is seemingly absent from the Government's Opposition.

"[T]he EAJA requires careful consideration of a
prevailing party's request for an increase in the hourly rate to
compensate for the effects of inflation." *Payne v. Sullivan*,
977 F.2d 900, 902 (4th Cir. 1992). "[W]hile the statute clearly
allows an adjustment for changes in the cost of living, it does
not absolutely require it." *Baker v. Bowen*, 839 F.2d 1075, 1084
(5th Cir. 1988). "Almost every court that has applied [§
2412(d)(2)(A)] has held ... that 'cost of living' has th[e]
ordinary meaning [of costs of food, shelter, clothing and other
basic goods and services] and is properly measured by the
Consumer Price Index." *Harris v. Sullivan*, 968 F.2d 263, 265
(2nd Cir.1992) (collecting cases); *Sullivan v. Sullivan*, 958
F.2d 574 (4th Cir.1992) (a general cost of living index such as
the United States Department of Labor's Consumer Price Index for
all urban consumers is the appropriate measure by which to
calculate a cost of living enhancement to a statutory fee).

The Court notes that Plaintiff requests uniformly the
application of the cost of living adjustment appropriate for the
2012 year. This Court notes, however, that a significant amount
of work undertaken in this case took place during the 2011 year.
The hourly rate pursuant to EAJA, therefore, "should only be
increased by the corresponding Consumer Price Index for each

year in which the legal work was performed." *Kerin v. U.S. Postal Service*, 218 F.3d 185, 194 (2nd Cir. 2000).

> 28 U.S.C. § 2412(d) does not authorize indexing attorney's fees awards at current rates. If a cost of living adjustment is applied, it must be calculated with regard to when the services were performed, not on the basis of when the award is made. Thus, fees incurred in a particular year must be indexed using the cost of living multiplier applicable to that year, and so on for each year in which fees were incurred.

*Marcus v. Shalala*, 17 F.3d 1033, 1040 (7th Cir. 1994); *Kerin*, 218 F.3d at 194 ("Using a single cap reflecting the cost of living in [2011] for all nine years to calculate the amount of attorney's fees would result in a de facto award of pre-judgment interest, which would constitute an abuse of discretion.")

Though the Court accepts the Plaintiff's request for a cost of living adjustment to $182.52 for the 2012 year, having determined that different cost of living adjustment applicable for the 2011 year, the Court must now determine what that adjustment would be. Utilizing the CPI Inflation Calculator provided by the Bureau of Labor and Statistics, this Court finds that, for the 2011 year, the statutory cap should be adjusted to $179.21. The Court will utilize this rate in calculating fees for the 2011 year.

iv. <u>Paralegal Rate</u>

Plaintiff seeks to recover paralegal fees for time expended by Ms. Cyndy Ramirez Clark on this case at a rate of $166 per hour. The Government has objected to the application of this rate, arguing that the "paralegal fee exceeds the statutory rate." (Gov. Opp. Ex. 5 at 2.)

Although fees for paralegal time may be recoverable under the EAJA, such fees are only recoverable to the extent they reflect tasks traditionally performed by an attorney and for which the attorney would customarily charge the client. See *Jean*, 863 F.2d at 778 ("[P]aralegal time is recoverable as part of a prevailing party's award for attorney's fees and expenses, [but] only to the extent that the paralegal performs work traditionally done by an attorney.") (internal quotation marks omitted) (alterations in original); *Allen v. United States Steel Corp.*, 665 F.2d 689, 697 (5th Cir. 1982) ("Paralegal expenses are separately recoverable only as part of a prevailing party's award for attorney's fees and expenses, and even then only to the extent that the paralegal performs work traditionally performed by an attorney. Otherwise, paralegal expenses are separately unrecoverable overhead expenses.").

The Supreme Court's ruling in *Richlin Security Service Co. v. Chertoff*, which overruled the Federal Circuit's decision in *Richlin Security Service Co. v. Chertoff*, 472 F.3d 1370 (Fed. Cir. 2006), held that under the EAJA, Richlin was entitled to

recover fees for paralegal services at the market rate it paid for such services. "[The] EAJA, like § 1988, must be interpreted as using the term 'attorney ... fees' to reach fees for paralegal services as well as compensation for the attorney's personal labor." *Richlin Sec. Serv. Co. v. Chertoff*, 553 U.S. 571, 581 (2008)(citing *Missouri v. Jenkins*, 491 U.S. 274 (1989)). The Supreme Court found that "it would be anomalous to measure cost from the perspective of the attorney rather than the client." *Id*. at 579. The Court determined that the relevant inquiry is whether it is market practice to bill the services separately, thus providing a "prevailing market rate" metric. *Id*. at 585. The Supreme Court ultimately found that "a prevailing party that satisfies EAJA's other requirements may recover its paralegal fees from the Government at prevailing market rates." *Id*. at 590. However, this case presents the question of, in a situation where the Court has limited attorney fees to the statutory cap, adjusted for cost of living, whether paralegal fees may exceed the statutory cap and rise to the level of the prevailing market rate where that rate exceeds the aforementioned statutory cap.

The Court believes that the overarching logic of *Richlin* should prevail here. In *Richlin*, the Supreme Court held that, as a general proposition, attorneys and paralegals should be treated similarly with regard to the relevant metric upon

which to predicate recovery.  This Court believes that such logic should be similarly employed, lest an inflexible reading of the *Richlin*'s ultimate holding lead to a disingenuous result here by restricting attorneys to the statutory cap while allowing a paralegal to recover at the prevailing market rate in excess of the statutory cap.  The Court believes that a nuanced reading of *Richlin* supports this proposition.  *Id*. at 587-88.

The Court will therefore limit Ms. Clark's rate to the statutory cap.  However, as the Court has found that a cost of living adjustment is appropriate for Plaintiff's attorneys, the Court believes that it is only just to allow Ms. Clark the same cost of living adjustment to her rate.  Although she has been limited to the EAJA statutory cap, because the Court has enacted an adjustment for the increased cost of living, Ms. Clark will recover at a rate that exceeds the rate that has been requested by Plaintiff.  The Court realizes that this is a somewhat peculiar outcome in light of the positions of the parties as to this matter.  Nevertheless, the Court believes that this represents a fair result, particularly so when the effect upon Plaintiff's ultimate fee recovery is minimal.

## VI. Were the Hours Billed by Plaintiff's Counsel Reasonable?

The Court must determine whether Plaintiff met his burden of establishing the reasonableness of the number of hours for which he seeks recovery of fees.  The Court notes that it

has been mindful of Plaintiff's duty to exercise billing judgment and paid careful attention to identify hours that appear excessive, redundant, or unnecessary. *See Hensley*, 461 U.S. at 437 ("The applicant should exercise 'billing judgment' with respect to hours worked."); *Rum Creek*, 31 F.3d at 174-75. In determining the amount of attorneys' fees, the "most useful starting point ... is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley*, 461 U.S. 424, 433 (1983). The product of the hourly rate and the hours expended is known as the lodestar figure. Subsumed in the calculation of the lodestar are several factors originally set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). These factors include: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson*, 488 F.2d at 717-19; *see Barber v.*

*Kimbrell's, Inc.*, 577 F.2d 216, 226 (4th Cir. 1978) (adopting the twelve factors set forth in *Johnson*). The Court need not address all twelve factors independently. *Signature Flight Support Corp. v. Landow Aviation Ltd. P'ship*, 730 F.Supp.2d 513, 520 (E.D.Va. 2010) *aff'd sub nom. Signature Flight Support Cor. v. Landow Aviation Ltd. P'ship*, 442 F.App'x 776 (4th Cir. 2011).

The Court will now engage in an analysis of Plaintiff's billing using the *Johnson/Kimbrell* analytic framework. Prior to engaging in an examination of the hours for which counsel billed, however, the Court will briefly note that the billing practices of Plaintiff's counsel were inadequate for a number of documentary reasons that the Court will discuss in its subsequent analysis.

1. Factor (1): Time and Labor Expended

The first *Johnson/Kimbrell's* factor relates to the time and labor required in a case. In support, Plaintiff has provided timesheet entries of the number of hours billed, by which attorneys they were billed, and the nature of the work that was completed during the time period billed. [Dkt. 84-3.] Plaintiff asserts that the hours charged are reasonable. (Pl. Mot. 12.) Ms. Sabagh, counsel for Mr. Abusamhadaneh, states in her affidavit that she and her co-counsel Mr. Ragland reviewed and monitored the billing records for legal fees and paralegal fees in the time sheet entries on a monthly basis and again in

preparation for the present EAJA application. (Sabagh Aff. [Dkt. 84-3] at 4.) She states that it appears to her that accurate, contemporaneous time records were kept. (*Id*.) Mr. Ragland corroborates this account of their having reviewed the billing records. (Ragland Aff. [Dkt. 84-4] at 4.) He states that it appears to him that accurate, contemporaneous time records were kept. (*Id*.) Plaintiff assures the Court that they excluded any hours that may have been duplicative, hours that was not adequately described in their billing records, time that was spent on clerical or secretarial tasks, time that was spent on tasks not directly in support of litigation, and time that could otherwise be construed an inessential. (Pl. Mot. 13.)

In their Opposition, the Government asserts generally that "examination of the billing records attached to the motion shows numerous entries that are duplicative, excessive, unnecessary, and representative of overstaffing and overbilling, and therefore *per se* unreasonable." (Opp'n 18.) The Government has submitted an extensive audit of the billing entries submitted on behalf of Plaintiff's legal team, making myriad line-item objections where they have considered it appropriate. The Government's objections are numerous, and the Court notes that the Government has made copious objections both generally and to specific billing entries.

The Court has reviewed both the billing entries of Plaintiff's counsel as well as the Government's objections. Both have been taken into consideration in making the respective determinations as to the propriety of counsel's billing practices and the reasonableness of the hours for which counsel billed in this case. Although the Court will not expressly address every billing entry or every objection in its subsequent analysis, as doing so would represent an excessive tax to the Court's limited resources, they have been taken into consideration and have been factored into the Court's ultimate determinations.

### a. Block Billing

In its Opposition, the Government argues that the billing practices of Plaintiff's attorneys were improper:

> Mr. Abusamhadaneh's attorneys fail on a significant number of entries to provide an adequate description of the task, which prevents Defendants from properly evaluating whether such tasks are appropriately billed. Additionally, they consistently lump several tasks together making it almost impossible to evaluate the time spent on each task. In those instances when they have failed to provide an adequate description or when they lump tasks together, any EAJA award should be appropriately reduced.

(Opp'n 18-19.)

"Proper documentation is the key to ascertaining the number of hours reasonably spent on legal tasks." *EEOC v.*

*Nutri/System, Inc.*, 685 F. Supp. 568, 573 (E.D. Va. 1988).

While counsel may not need to record their time in "great detail," numerous courts in this circuit and elsewhere have found that block billing, "the practice of group, or 'lumping,' several tasks together under a single entry, without specifying the amount of time spent on each particular task" results in inadequate documentation. *Project Vote/Voting for America, Inc. v. Long*, 2012 WL 3638546 (E.D.Va. August 22, 2012) (*quoting Guidry v. Clare*, 442 F. Supp. 2d 282, 294 (E.D. Va. 2006); *see also Wolfe v. Green*, 2010 WL 3809857 (S.D. W. Va. September 24, 2010) (collecting cases).  Such a practice is insufficient "to permit the court to weigh the hours claimed and exclude hours that were not 'reasonably expended.'" *Guidry*, 442 F. Supp. 2d. at 294 (quoting *Hensley*, 461 U.S. at 433).  Inadequate documentation practices like block billing or lumping are "a proper basis for reducing a fee because they prevent an accurate determination of the reasonableness of the time expended in a case." *Guidry*, 442 F. Supp. 2d at 294; *see also Hensley*, 461 U.S. at 433 ("The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed.  Where the documentation of hours is inadequate, the district court may reduce the award accordingly.").  As a result, when encountering such a practice, many courts have applied a percentage reduction.  *See Nutri/System*, 685 F. Supp. At 577 (applying a

25% reduction in fees); *Wolfe v. Green*, 2010 WL 3809857 (S.D. W. Va. September 24, 2010) (applying 10% reduction; collecting cases applying fee reductions for block billing ranging from 10% to 15%).

While "[i]t is not necessary to know the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney," *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 167 (3d Cir. 1973), the Court agrees with the general proposition of the Government that many of Plaintiff's time entries lack "some fairly definite information as to the hours devoted to various general activities, *e.g.*, pretrial discovery, settlement negotiations ... the court cannot know the nature of the services for which compensation is sought." *Id*.

The block billing practices of Plaintiff's counsel have imbued the Court's analysis of this factor of the *Johnson/Kimbrell's* framework with considerable difficulty. Each individual member of Mr. Abusamhadaneh's legal team listed the totality of their daily task in a single compound entry. In most cases, each entry contains a number of distinct, disparate tasks with no temporal division having been made between the periods of time spent of each respective task. To take a single

example, Mr. Ragland billed 3.5 hours on January 31, 2012 for tasks compiled in one omnibus entry:

> COMMUNICATE WITH DOJ ATTORNEYS RE:
> DEPOSITIONS, ADDITIONAL WITNESSES, REVIEW
> SUPPLEMENTAL DISCLOSURES, NOTICES OF
> DEPOSITION. COMMUNICATE WITH CLIENT. PREPARE
> FOR DEPOSITIONS. INTERNAL DISCUSSION WITH
> DENYSE SABAGH, JEN COOK, CHRIS MAHONEY.
> REVIEW, EDIT NOTICES OF DEPOSITION, SEND TO
> OPPOSING PARTY. ARRANGE FOR DEPOSITIONS.

(Sabagh Aff. Ex. B at 14.) This sort of vague, compound "block billing" is not exclusive to Mr. Ragland's entries. Indeed, it is fair to state that the practice is typical of the ledger of billable hours for Mr. Abusamhadaneh's legal team. Addressing another example, Ms. Cook's January 10, 2012 entry bills five hours for a range of tasks described in a single compound entry as:

> PREPARING ALL WRITTEN RESPONSES TO
> INTERROGATORIES, REQUESTS FOR DOCUMENTS.
> COMPILING, VERIFYING AND PREPARING ALL
> DOCUMENTS FOR EXCHANGE: FINANCIALS, LEASES,
> EMPLOYMENT HISTORY, MEMBERSHIP EVIDENCE,
> ADMIN FILE, TAX RETURNS, ETC.

(*Id*. at 8.) This sort of generalized entry combining tasks is simply not sufficient, proper documentation. In many cases, there is no natural or logical way to categorize uniformly the diverse tasks that have been grouped together. Addressing another example, Mr. Ragland's January 13, 2012 entry bills three hours for work described as:

> REVIEW, REVISE RESPONSES TO FIRST SET OF
> INTERROGATORIES. REVIEW, REVISE RESPONSES TO
> REQUEST FOR PRODUCTION OF DOCUMENTS. LEGAL
> RESEARCH ON MOTION FOR PROTECTIVE ORDER,
> MOTION FOR LEAVE TO FILE OBJECTIONS, MOTION
> IN LIMINE. INTERNAL DISCUSSION WITH DENYSE
> SABAGH, JEN COOK, CHRIS MAHONEY, JOE
> FERRETTI.

(*Id.* at 9.)  This Court will not undertake the futile task of

separating plaintiffs' block entries into their constituent

tasks and apportioning a random amount of time to each.  There

is simply no method that the Court may employ that would result

in an accurate assessment.  Rather, the Court will take the lack

of specificity and delineation into account, and it will

exercise the discretion accorded it by the *Hensley* Court in

enacting a reduction from the total billable hours of counsel.

### b. Insufficient Descriptive Documentation

Compounding the difficulty attending a determination

of the reasonableness of the hours billed by Plaintiff's

counsel, the Court has found that many of counsel's billing

entries are so descriptively vague that the Court cannot

determine with any certainty whether the activities they purport

to describe were necessary or reasonable within the context of

the litigation.  For instance, a component of the work for which

billed on November 21, 2011 is simply described as "LEGAL

RESEARCH." (*Id.* at 3.)  Indeed, some of the billing entries make

"no mention ... of the subject matter of a meeting, telephone

conference or the work performed during hours billed." *In re Meese*, 907 F.2d 1192, 1204 (D.C. Cir. 1990). For instance, Mr. Ragland frequently billed for work simply described as "INTERNAL DISCUSSION" with various members of the legal team or their client without further describing the purpose of their conversation or the work to which the discussion relates. In another instance, Mr. Dietrick's entry for July 5, 2012, bills 0.2 hours for work described as "ADDRESS ISSUES WITH RESPONDING TO GOVERNMENT'S" with no additional information having been provided in the entry. (Sabagh Aff. Ex. B at 26.)

The Court's role is not to labor to dissect every individual entry to hypothesize if the different tasks in the same entry could reasonably result in the requested time. Instead, due to inability of the Court to properly assess the reasonableness of the billed time, and its unwillingness to undertake the futile task of deciphering the billing entries of Plaintiff's counsel, the Court will consider the insufficient descriptive documentation when determining the percentage reduction to assess.

c. Possible Overstaffing/Duplicative Billing

The Government objects to the reasonableness of "duplicative" hours wherein members of Plaintiff's legal team recorded distinct billable hours for what appears to be duplicative effort by each attorney. The Government has made

numerous objections to the specific billable hours on the basis
that they should be considered duplicative or indicative of
overstaffing.  In the Government's Opposition to Plaintiff's
Motion, the Government charges:

> that on multiple occasions more than one
> attorney billed time to jointly prepare
> witnesses, draft and discuss discovery, and
> jointly attend depositions, pre-trial
> conferences, motion hearings and trial.
> Multiple attorneys researched the same
> issue.  The billing records reveal that
> sometimes up to four attorneys, and two of
> whom are lawyers seeking enhanced fees, are
> billing for simultaneous tasks.

(Opp'n 19-20.)  In addition, the Government has submitted an
extensive audit of the billing entries of Plaintiff's legal
team, noting each entry that they consider duplicative or
indicative of overstaffing.  In their Reply, Plaintiff argues
generally, with regard to the Government's aforementioned line-
item objections, that "[t]he [G]overnment again overreaches."
(Pl. Rep. at 13.)

As a general matter, "[t]he court must necessarily
exclude any hours that are ... not reasonably expended on the
litigation.  *Lilienthal v. City of Suffolk*, 322 F.Supp.2d 667,
670 (4th Cir. 2004). "[The Fourth Circuit has] been sensitive to
the need to avoid use of multiple counsel for task where such
use is not justified by the contributions of each attorney." *Rum
Creek*, 31 F.3d at 180.  Although multiple representation can be

productive, there is also the danger of duplication, a waste of resources which is difficult to measure. *Coulter v. State of Tenn.*, 805 F.2d 146, 152 (6th Cir. 1986). As such, the court will "award fees for the time of one attorney when an issue does not require the attention of multiple lawyers." *Cox v. Reliance Std. Life Ins. Co.*, 179 F.Supp.2d 630, 636 (E.D.Va. 2001). The Court notes, however, that the work of more than one attorney on the same litigation task does not automatically mean overstaffing has occurred. *See, e.g., In Re Segal*, 145 F.3d 1348 (D.C. Cir. 1998); *New York State Assn. for Retarded Children v. Carey*, 711 F.2d 1136, 1146 (2d Cir. 1983); *Bowman v. Pulaski County Special School District*, 723 F.2d 640, 646 (8th Cir. 1983).

It bears mentioning that Plaintiff's block billing practices and insufficient descriptive documentation of their billing have hindered the Court's analysis of this issue considerably. The Court notes from the outset that there are a great many instances of billing entries so descriptively vague that it is difficult for this Court to ascertain the precise nature of the work undertaken for that day, and whether it differs from work that has been performed previously either by that attorney or another member of the legal team. This gives the impression that some of the entries appear to be duplicative or excessively staffed.

Furthermore, due to the lack of temporal delineation between the tasks for which counsel have billed in a given entry, there is simply no way for the Court to determine whether work performed is duplicative of work that has been previously performed, either by that attorney or another member of the legal team, or simply a continuation of work that was only briefly addressed on a previous occasion and then fully addressed or completed upon a later occasion. In many cases, it is not possible to determine with any accuracy the amount of time that a given member of Plaintiff's legal team actually spent on a singular task, particularly so if that task was performed over the span of several days with separate billing entries. As previously stated, the Court's role is not to labor to dissect every individual entry to hypothesize if the different tasks in the same entry could reasonably result in the requested time.

The Court believes that the foregoing considerations weigh in favor of the Government's position, and Plaintiff has not provided sufficient substantive clarification of their individualized billing entries in their Reply to the Government's Opposition. The Court does not necessarily endorse every instance cited by the Government as duplicative or indicative of overstaffing, though must be reiterated that the Court's evaluative efforts have been considerably hampered by

the documentary practices of Plaintiff's counsel. Consequently,
the Court will address the issue in enacting a percentage
adjustment.

### d. Specific Objections

The Court will now address specific objections that
have been made by the Government.  The Court will not address
separately every objection made by the Government, particularly
those that are similar or nearly identical.  Such objections
have been noted and, although the Court will not expressly
address them here, they will be factored into the Court's
percentage adjustment.  The Court once again notes that its
analysis of Plaintiff's billing ledger has been hampered by
insufficient documentary practices of Plaintiff's counsel.  In
some instances, this has precluded the Court from engaging in an
analysis of each of the Government's objections on the merits of
that specific objection.  In instances where the Court is unable
to evaluate an objection of the Government due to the
insufficient task description or lack of temporal delineation
between tasks, the Court will consider the subject entry in
determining the percentage adjustment it will make.

However, the Court also notes that there are instances
where the Government's objections themselves have been
insufficiently expounded.  The Government has made line-item
objections within the context of a spreadsheet that adopts the

form of Plaintiff's billing ledger.  While this may have been beneficial from an organizational standpoint, such a form has seemingly limited the breadth and substance of the Government's objections.  Where an objection made by the Government itself suffers from a deficiency so as to preclude proper evaluation, the Court has made note.  It bears mentioning that, as a general matter, the Government has not cited substantive statutory or case law within their line-item spreadsheet, nor have rules of practice and procedure been cited in the Government's objections.  The Court also suspects that there are instances of the Government having simply copied a previous objection into the objection field to a subsequent billing entry.  The Court has also noted conclusory objections where the Government has not expounded upon or provided a sufficient factual foundation for their objection.

### i. <u>Unfiled Motions or Unscheduled Business</u>

The Government has objected to the hours billed in several billing entries on the basis that "[t]he attorneys ... billed for motions that they did not file."  (Opp'n 20.)  The Court has evaluated the Government's line-item objections and has made the following findings.

#### 1. <u>Review of "Gov't Reply Brief" and "Upcoming Hearigs" (sic)</u>

The Government objects to Mr. Ragland's November 1, 2011 billing entry in which he block billed 0.5 hours for a variety of tasks. Among the tasks for which Mr. Ragland billed is "REVIEW OF GOV'T REPLY BRIEF." (Sabagh Aff. Ex. B at 1.) The Government argues that "[t]his is erroneous to the extent that no government reply brief was filed." (Gov. Opp. Ex. 5 at 2.) The Court believes that given the stage of the proceedings, as well as the entries of Mr. Ragland's co-counsel during the same period, that the billing entry simply adopted the wrong vocabulary in referring to the Government's Answer, which was filed on the same day. [Dkt. 15.] The Court will not adjust this entry based upon the preceding Government objection, as it is clear from the record the filing to which the billing entry refers.

The Government objects to the same entry based upon its inclusion of the task "REVIEW MATERIALS TO PREPARE FOR UPCOMING HEARIGS (sic)" in its description of the work for which Mr. Ragland billed. (Sabagh Aff. Ex. B at 1.) The Government argues that "[t]his is erroneous to the extent there were no upcoming hearings scheduled." (Gov. Opp. Ex. 5 at 2.) The Court notes that, given the stage of the proceedings, as well as the fact that a Scheduling Order was entered on the same day, that the billing entry simply adopted the wrong vocabulary in referring to the Initial Pretrial Conference that was set for

November 30, 2011.  The Court will not adjust this entry based upon the preceding Government objection.

## 2. Review of "Standing Order"

The Government has objected to Mr. Ragland's November 2, 2011 entry, which bills 0.4 hours various tasks within a block billing entry.  Among the work for which Mr. Ragland billed upon that day is a task described as "REVIEW JUDGE'S STANDING ORDER, SCHEDULING ORDER."  (Sabagh Aff. Ex. B at 1.) The Government objects to this entry, arguing that "[t]he description 'Review Judge's Standing Order' is erroneous because there was no standing order issued." (Gov. Opp. Ex. 5 at 3.) The Court has reviewed the background surrounding this entry, noting the stage of the proceedings and record up to that point. The Court is not certain what specific "Standing Order" to which this entry makes reference.  Natural and logical inclination would seemingly suggest that the entry is referring the Scheduling Order entered by the Court on the previous day, although that possibility is undermined by the fact that the same entry seemingly distinguishes the indeterminate Standing Order and Scheduling Order as separate filings.  There is also the possibility that the two signifiers are intended to serve as a compound description of the Scheduling Order.  Nevertheless, in light of the dearth of available information or clarification from the Plaintiff from which to elucidate the entry, the Court

simply cannot evaluate what is meant by that portion of the entry.  In any event, it has been combined with other legal tasks into a block billing entry and, even if adjustment of the billable time were proper, the Court cannot determine with any accuracy the amount of time counsel spent on each of the tasks described.  The Court will consider the billed time when assessing the reduction the Court applies.

### 3. <u>Motion for a Protective Order (January)</u>

The Government makes various objections to the billing entries of Plaintiff's legal team relating to work that performed upon an unspecified protective order in January of 2012.  Mr. Ragland, Ms. Cook, and Mr. Ferretti each block bill for work performed on an unspecified protective order, and no temporal delineation has been made between the respective tasks. The billing entries touching upon this unfiled protective begin on January 13 and run through January 17.

From the outset, due in part to the insufficient documentary practices that are systemic to Plaintiff's billing records, it is unclear the precise protective order that is being referenced by the January entries refer and, in spite of the Government's objections, Plaintiff did not offer additional clarification in their Reply to the Government's Opposition. The Court has attempted to determine if the entries make reference to any filing made on behalf the Plaintiff and has not

been able to do so with sufficient certainty.  The Court will not assume that the billing entries simply refer to any of the number of motions for a protective order that were filed in this case, as "the fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended." *Hensley*, 461 U.S. at 437.  However, in spite of the foregoing, even if the Court were to conclude that an adjustment or excision of billable hours were appropriate for the related work upon the protective order, the Court cannot determine with any accuracy the amount of time counsel spent on the task as it has been combined with other legal tasks into a block billing. The Court will not assign a random amount of time to the task from the total hours billed for each entry, and will simply consider the billed time when assessing the reduction the Court applies.

### 4. Motion for Leave to File Objections

The Government has made various objections to Mr. Ragland's January 13, 17, and 17 billing entries to in part because they relate to work that performed upon an unspecified motion for leave to file objections.  The Court notes that it is not aware of the described motion having been filed, and Plaintiff's counsel has not offered any clarification in spite of the Government's objections.  However, even if the Court were to conclude that an adjustment or excision of billable hours

were appropriate for the related work upon an unfiled motion, or because the motion was the product of attorney error, the Court cannot determine with any accuracy the amount of time counsel spent on this task because it has been combined with other legal tasks in a block billing entry.  The Court will not assign a random amount of time to the task from the total hours billed for each entry, and will simply consider the billed time when assessing the reduction that the Court applies.

5. <u>Motion for an Extension/Enlargement of Time</u>

The Government has objected to the billing entries of Plaintiff's legal team that refer to work having been performed upon seemingly unfiled motions seeking an extension or enlargement of time.  It is not clear whether the entries, which employ the terms "extension" and "enlargement" interchangeably, constitute a single proposed filing.  As there is little substantive information surrounding the unfiled motion or motions, the Court cannot definitively determine whether the filings were intended to be distinct.  In any event, there is no record of either motion having been filed.

Though the Court notes that it is not aware of the described motions having been filed, even if the Court were to conclude that an adjustment or excision of billable hours were appropriate for the related work upon an unfiled motions, or

because the motions were the product of attorney error, the Court cannot determine with any accuracy the amount of time counsel spent on these tasks as they have been combined with other legal tasks in block billing entries. The Court will not assign a random amount of time to the tasks from the total hours billed for each entry, and will simply consider the billed time when determining the reduction the Court assesses.[7]

### 6. Motion *in Limine*

The Government has objected to Mr. Ragland's February 3, 2012 billing entry in which he bills four hours for a variety of activities. Specifically, the Government objects to Mr. Ragland having performed work described as "DRAFT MOTION IN LIMINE UNDER DAUBERT." (Sabagh Aff. Ex. B at 15.) Aside from arguing that the day's work performed on the motion is duplicative of work that was performed by himself and others previously, a class of objection that this Court has already addressed, the Government argues that "[i]t is also unreasonable

---

[7]As a consequence of the systemic insufficiency of Plaintiff's billing records, particularly with regard to temporal delineation between tasks, the Court has not been able to ascertain whether the work was performed upon was properly billed by Plaintiff's counsel. The Court has raised the possibility that work performed upon those motions may not be compensable, though declined to make a definite determination as to compensability due to the Court's inability to delineate the block billing hours into periods of time to account for each constituent task. The Court notes that the totality of the work performed by Mr. Ferretti on January 16 and January 17, 2012 pertains to motions about which the Court has made that determination. However, rather than excising that time, the Court again notes that it has not made a determination as to compensability, having found the entries and tasks to have been insufficiently documented, and declines to excise Mr. Ferretti's billed time outright. The Court will consider the billed time in assessing the percentage reduction the Court applies.

to bill for time spent drafting the motion in limine because it was never filed." (Gov. Opp. Ex. 5 at 37.)

The Court notes that it is not aware of the described motion *in limine* having been filed in this case. To the extent that the billing entries refer to a motion *in limine* that was at one point proposed, it is not clear what material Plaintiff sought to exclude. While the Court agrees that time spent working on the unfiled motion should be deducted, in reviewing the time entries for the relevant dates, the Court finds that Plaintiff's counsel has indicated a number of activities on the dates in question other than just the motion *in limine*. Once again, the Court notes that it will not undertake the futile task of separating counsel's block entries into their constituent tasks and apportioning a random amount of time to each. Rather, the Court will simply consider the billed time when assessing the percentage reduction the Court applies.

### 7. Appeal of Denial of Motion for Protective Order

The Government has objected to Mr. Dietrick's June 7, 2012 billing entry that block bills 1.2 hours for several tasks, including a task described as "RESEARCH APPELLATE REVIEW FOR DENIAL OF MOTION FOR PROTECTIVE ORDER." (Sabagh Aff. Ex. B at 25.) The Government argues that "[a]n appeal of the denied motion for protective order was never filed; billing for this

activity is unreasonable." (Gov. Opp. Ex. 5 at 60.) Though the
Court notes that it is not aware of the described appeal having
been made, even if the Court were to conclude that an adjustment
or excision of billable hours were appropriate for the related
work upon an unfiled appeal, the Court cannot determine with any
accuracy the amount of time counsel spent on the task, as it has
been combined with other legal tasks in a block billing entry.
Once again, the Court notes that it will not assign a random
amount of time to the task from the total hours billed for each
entry, and will simply consider the billed time when assessing
the reduction the Court applies.

ii. <u>Consent Motion to Present Evidence</u>

The Government objects to the fact that the billable
hours of Plaintiff's legal team include time spent working upon
their Consent Motion to Use Document Camera and Trial
Presentation Software. [Dkt. 35] ("the Consent Motion"). The
Consent Motion was filed on March 7, 2012. The Government
argues that "[i]t is unreasonable to bill for preparing the
consent motion to present evidence because it was necessitated
by attorney error; the defendants offered to file a joint
motion." (Sabagh Aff. Ex. B at 48-51.) While the Consent Motion
was admittedly necessitated by "a communication error between
the parties" and this motion would not have been necessary had a
joint motion been filed, this Court is not willing to ascribe

sole responsibility for a miscommunication between the parties to Plaintiff's legal team. (Consent Motion at 1.) The Court will not make any adjustment to the time billed by Ms. Clark or Mr. Ragland for their work upon the Consent Motion, though it bears mentioning that, like all improperly documented entries, Mr. Ragland's compound billing entry will be scrutinized by the Court when it assesses the percentage reduction the Court applies for insufficient documentation to the extent that the entry demonstrates improper temporal delineation between the tasks performed that day.

### iii. Work Related to Experts and Expert Disclosures

The Government has made several objections to the manner in which Plaintiff's attorneys billed for work performed related to expert witnesses and associated documentation. The Government argues that "[Plaintiff's attorneys] improperly billed for preparing expert reports, which under the federal rules of civil procedure are prepared by the expert, not attorneys. They billed for this preparation while they were still seeking to engage potential experts." (Opp'n 20.) The Court has reviewed the billing entries to which the Government objects.

The Government has objected to the three January 20, 2012 billing entries for Ms. Sabagh, Ms. Cook, and Mr. Ragland.

Ms. Cook billed five hours for "PREPARING ALL DOCUMENTATION FOR EXPERT WITNESS DISCLOSURE; RESEARCH ON EXPERTISE AND PUBLICATIONS OF EXPERTS." (Sabagh Aff. Ex. B at 12.) The Government objects to this entry based on their assertion that "[p]reparing all documentation for expert witness disclosure is unnecessary; experts writes (sic) their own disclosure." (Gov. Opp. Ex. 5 at 32.) Ms. Sabagh's billing entry for that day, in which she billed one hour, reads "TELEPHONE CALLS WITH POTENTIAL/EXPERT (sic) WITNESSES CONFER W/J. COOK RE: STATEMENT." (Sabagh Aff. Ex. B at 12.) The Government argues that this "entry is conflicting. Ms. Cook on the same day is preparing an expert witness disclosure, yet one has not yet been selected." (Gov. Opp. Ex. 5 at 32.) Mr. Ragland block billed one hour for work that included "PREPARE DISCLOSURES OF EXPERT WITNESSES. LEGAL RESEARCH RE: 26(A)(1) DISCLOSURES." (Sabagh Aff. Ex. B at 12.) The Government has objected in a similar fashion, calling the entry "conflicting, confusing and duplicative because Ms. Sabagh was still attempting to select an expert witness ... while Ms[.] Cook is also creating expert disclosures ..." (Gov. Opp. Ex. 5 at 32.)

In addition, the Government has objected to Mr. Ragland's January 23, 2012 billing entry. Mr. Ragland block billed four hours for work that included a task described as "PREPARE, REVISE RULE 26(A)(2) EXPERT DISCLOSURES." (Sabagh Aff.

Ex. B at 13.)  The Government has argued that "[p]reparing and revising the expert disclosures is unnecessary, because this is a task the expert completes, and duplicative and unreasonable...." (Gov. Opp. Ex. 5 at 33.)

The Government has also objected to Ms. Sabagh's January 24, 2012 billing entry in which she billed 0.3 hours for several tasks.  Among the tasks for which Ms. Sabagh billed is "EMAILS TO POTENTIAL EXPERT WITNESS[.]" (Sabagh Aff. Ex. B at 13.)  The Government argues that "[e-]mailing a potential expert witness is conflicting, confusing, and unnecessary, as the expert witness disclosures have already be (sic) created...." (Gov. Opp. Ex. 5 at 34.)

The Court notes that it is not privy to any special insight into Plaintiff's selection of expert witnesses or special insight into the attendant procedural intricacies counsel employed.  It appears from the billing entries of the legal team that they sought to engage multiple experts during this period of time, and the Court believes that Plaintiff's legal team should be able to bill for the legal time that they actually spent engaging expert witnesses.  Regarding Plaintiff's counsel seemingly having performed work related to the creation of expert reports, while attorneys may not author expert reports "Rule 26(a)(2)(B) does not preclude counsel from providing assistance to experts in preparing the reports[.]" Fed.R.Civ.P.

26(a)(2)(B) (advisory committee's note to 1993

amendments); *Sharpe v. United States*, 230 F.R.D. 452, 462

(E.D.Va. 2005).

Nevertheless, the aforementioned billing entries

suffer from similar documentary defects that appear throughout

Plaintiff's billing records, namely descriptive vagueness and

lack of temporal delineation.  The Court believes that it

suffices to consider these entries in considering the percentage

the reduction the Court applies.

iv. *Ex Parte* Communications

The Government has argued that, as a general matter,

"[t]he billing records also show entries for *ex parte*

communications with the Court and an improper communication with

USCIS." (Opp'n 20.)  The Court makes the following findings as

to the various objections of the Government that relate to

communications that were made by Plaintiff's legal team.

1. Communications with USCIS

The Government asserts that "[t]he billing records

also show entries for *ex parte* communications with the Court and

an improper communication with USCIS." (Opp'n 20.)  To address a

threshold issue, this Court is not wholly certain of the precise

meaning of the Government's designation of the communications

with USCIS as improper.  To the extent that the Government may

believe there to have been genuinely improper *ex parte*

communications in this case, the Court would require more briefing on the issue. However, the Court will not presume that there has been improper communications merely based upon the objections of the Government to the payment of attorney fees.

## 2. Communications with the Court

The Government has objected to Mr. Ragland's November 28, 2011 entry that block bills 0.5 hours for a variety of tasks, including a task described as "COMMUNICATE WITH FED. CT. RE: SCHEDULING CONFERENCE." (Sabagh Aff. Ex. B at 3.) The Government has objected to this entry, arguing that "[c]ommunicating with the Federal Court should not be billed because it is inappropriate ex parte communication." (Gov. Opp. Ex. 5 at 8.) The Government's objection strikes a somewhat accusatory tone. A mere phone call to the Court does not constitute an improper *ex parte* communication. This Court emphasizes that it does not engage in improper or unethical *ex parte* communications with parties or their counsel on the merits of cases. The Government suffered no prejudice from the call. *See Brady v. Marks*, 7 F. Supp. 2d 247, 255 (W.D.N.Y. 1998). The Court finds that the contention of the Government that the communication constituted inappropriate *ex parte* lacks sufficient factual foundation. The Court finds this entry to have been sufficiently documented and it will not make an adjustment here to the billed hours.

The Government has also objected to Ms. Cook's February 6, 2012 billing entry in which she bills three hours for a variety of tasks including "FOLLOW UP QUESTIONS TO CLERK FOR BUCHANAN (RE MOTIONS IN LIMINE) ..." (Sabagh Aff. Ex. B at 16.) In addition to their objections relating to Plaintiff's counsel having billed for work performed upon an unfiled motion *in limine*, the Government argues that it is inappropriate to bill for ex parte communication." (Gov. Opp. Ex. 5 at 38.) The Court reiterates that it does not engage in improper or unethical *ex parte* with parties or their counsel on the merits of cases and notes that the Government has not cited any authority to support its assertion that Plaintiff's counsel may not bill for a mere phone call to chambers. In spite of the foregoing, further evaluation of the Government's argument is not necessary because the Court has already stated in its preceding analysis that it will consider entries that contain work related to the unfiled motion *in limine* when assessing the percentage reduction the Court applies.

The Government has objected to Ms. Clark's March 7, 2012 billing entry, which bills 0.1 hours for a task described as "TELEPHONE CONFERENCE WITH JUDGE CACHERIS' CLERK." (Sabagh Aff. Ex. B at 20.) The Government has asserted that the conversation constitutes "ex parte communication; this activity is inappropriate and billing for it is unreasonable and

inappropriate." (Gov. Opp. Ex. 5 at 50.)  Though the task description does not reveal the topic of the phone call, the Court once again reiterates that it does not engage in improper or unethical *ex parte* with parties or their counsel on the merits of cases under any circumstances. The Court finds that the contention of the Government that the communication constituted inappropriate *ex parte* communication lacks sufficient factual foundation.  However, the Court finds that, while the telephone call may have been necessary, the documentation of the call was insufficient.  The Court will consider the billed time when assessing the percentage reduction the Court applies.

The Government has further objected to Ms. Sabagh's June 28, 2012 entry, which bills 1.2 hours for three phone calls.  Specifically, the Government objects to the activity described as "TELEPHONE CALL W/JUDGE'S CLERK," (Sabagh Aff. Ex. B at 26), arguing this constitutes "ex parte communication and billing for this activity is not appropriate." (Gov. Opp. Ex. 5 at 63.)  Though the itemization does not reveal the nature or substance of that phone call, or any of the phone calls, this Court again emphasizes that it has not engaged in improper *ex parte* communications with either party.  However, the Court finds that, while the telephone call may have been necessary, its documentation was insufficient.  The Court will consider the

billed time when assessing the percentage reduction the Court
applies.

### 3. Communications with Opposing Counsel

The Government has objected to Mr. Ragland's October
20, 2011 entry which, while billing for multiple tasks, lists
the tasks "COMMUNICATE WITH ASST. US ATTORNEY" and "COMMUNICATE
WITH DOJ ATTORNEY." (Sabagh Aff. Ex. B at 1.) The Government
argues that calling both attorneys "is duplicative and
unnecessary." (Gov. Opp. Ex. 5 at 1.) Realistically, this
Court has no way of evaluating the substance of conversations,
thereby precluding a proper evaluation of whether having
conducted two separate conversations was "duplicative and
unnecessary" billing. The Court will not attempt to divine from
the dearth of available information whether it would have been
proper to have simply conducted a single phone call. The Court
will simply consider the billed time when determining the
reduction it assesses.

The Government has also objected to both Mr. Ragland
and Ms. Sabagh having participated in a November 14, 2011
conference call with a Department of Justice attorney that, as
this Court is best capable of determining, seemingly related to
discovery. (Sabagh Aff. Ex. B at 2.) The Government describes
the communication as a "routine 26(f) conference call" and that
both Mr. Ragland and Ms. Sabagh billed for their participation

is "duplicative given the experience of the attorneys." (Gov. Opp. Ex. 5 at 5.) The Court notes that the time counsel spent participating in the call has been combined with other tasks, and that even if the Court determined that an adjustment would be appropriate, it is not possible to ascribe a definite amount of time to the communication. The Court will not attempt to estimate the length of the call or assign a random amount of time to it from the hours that were billed in the absence of clarification from either party. The Court will consider the billed time when assessing the reduction it assesses.

The Government has objected to Mr. Ragland's November 22, 2011 billing entry in which he block bills 0.1 hours for a variety of tasks, including a task described as "COMMUNICATE WITH AUSA." (Sabagh Aff. Ex. B at 3.) The Government objects to this entry as "erroneous," arguing that "all communications should be with the Department of Justice attorney." (Gov. Opp. Ex. 5 at 7.) The Court notes that an Assistant United States Attorney ("AUSA"), Mr. Bernard Kim, is listed as a member of the Government's legal team and it thus appears to be conceivable that such a task could have been properly performed in this case.

The Court is not certain how the Government's objection should be construed. Under one interpretation, the Government could be objecting based upon the contention that all

communications for which Mr. Ragland could properly bill should
have been with an attorney for the Department of Justice and
that, therefore, having billed for a conversation with an AUSA
is improper.  In another interpretation, the Government could be
objecting based upon the contention that the subject
conversation, rather than having taken place between Mr. Ragland
and an AUSA, actually took place between Mr. Ragland and an
attorney for the Department of Justice, meaning that Mr. Ragland
utilized the wrong vocabulary and recorded the title of the
person with which he communicated incorrectly.  Regardless, the
Court cannot ascertain the precise nature of the Government's
objection and will not make an adjustment to the billed hours
here.

        The Government has also objected to both Mr. Ragland
and Ms. Sabagh having billed for separate communications with
their client, Mr. Nubani, and a Department of Justice attorney
on February 23.   The Court notes that Ms. Sabagh's entry
suggests that, despite employing the wrong vocabulary in
referring to him as an "AUSA," that the Department of Justice
attorney was Mr. Chris Dempsey and that the telephone call was a
conference call.  (Sabagh Aff. Ex. B at 23.)  The Court is
unable to ascertain the length of the respective conversations,
as delineated from the other work described in the entries.
Further, the descriptive vagueness of the entries renders the

Court unable to determine whether the nature of the work being discussed required multiple attorneys.  The Court will not attempt to divine the precise subject matter of each where from the dearth of substantive information.  Further, because the time expended upon those activities has not been delineated within the block billing entries, the Court declines to ascribe a random amount of time to each.  Consequently, the Court believes that it suffices to consider the billed time when assessing the percentage reduction the Court assesses.

　　　　The Government has leveled a similar objection to the February 27, 2012 billing entries for Ms. Sabagh and Ms. Cook wherein they both bill for a telephone conversation with a Department of Justice attorney.  Ms. Sabagh again specifies Mr. Dempsey as that attorney with whom she spoke.  Both entries reference the subject matter of the telephone call as being related to objections and joint discovery. (Sabagh Aff. Ex. B at 18.)　However, the time expended upon those activities has not been delineated within the block billing entries, which also describe other tasks as having been undertaken during the time that was billed.  Even if this Court were to determine that overstaffing or duplicative billing had occurred in this case, it would not be able to excise that time from the whole of time that was billed with any accuracy, as neither Ms. Sabagh nor Ms. Cook specify the length of the conversation.  The Court believes

that it suffices to consider the billed time when assessing the
reduction the Court assesses.

    v. <u>Naturalization Ceremony</u>

    The Government objects to the fact that "[Plaintiff's
attorneys] billed four hours for attending [Mr. Abusamhadaneh's]
naturalization ceremony." (Opp'n 20.) The July 26, 2012 entry
of Ms. Sabagh bills four hours for work described as "MEET W/
JAMAL AT ED COURTHOUSE FOR PRE- NATURALIZATION AND
NATURALIZATION CEREMONY; TRAVEL." (Sabagh Aff. Ex. B at 28.)
The Government argues that "[b]illing for attending the
naturalization ceremony is unreasonable as the attorney was
present at this ceremony as a guest." (Gov. Opp. Ex. 5 at 66.)
The Court agrees that this entry constitutes the sort of
unnecessary billing that should be excised in the exercise of
"billing judgment." *See Hensley*, 461 U.S. at 437. The Court
will excise the hours that were billed here.

    The Government has also objected to the July 23, 2012
billing entry of Ms. Sabagh, wherein she has block billed 0.5
hours for multiple tasks, which includes an activity described
as "TELEPHONE CALL WITH CIS RE: NATURALIZATION OATH CEREMONY."
(Sabagh Aff. Ex. B at 27.) The Government argues that the
"telephone call with USCIS is improper communication with a
represented client; billing for this activity is
inappropriate." (Gov. Opp. Ex. 5 at 66.) It is unnecessary to

address that aspect of the Government's argument, as the Court
finds that Ms. Sabagh having billed for work related to an
ordinary naturalization ceremony to have been inappropriate and
unnecessary.  Because it is not possible to determine the amount
of time spent on the activity, the Court will consider the entry
in determining the percentage reduction it will assess.

vi. <u>Travel Time</u>

The Government has objected to certain hours billed by
members of Plaintiff's legal team for travel.  "[Plaintiff's
attorneys] also billed full rate for travel which they combined
with other legal tasks.  They should not recover regular billing
rates for travel to and from the District of Columbia."  (Opp'n
19.)  Plaintiff has not raised any argument in rebuttal within
their Reply to the Government's Opposition.

The Court notes that it appears from the billing
records of Plaintiff's counsel that some time spent travelling
to and from oral argument for their Second Motion for a
Protective Order [Dkt. 63] has been incorporated into the time
for which they have billed at a full rate.  In *Priestly v.
Astrue*, the Fourth Circuit held that it was not an abuse of the
district court's discretion to have reduced the rate at which a
member of Plaintiff's legal was compensated to adjust for travel
time.  *See Priestley v. Astrue*, 651 F.3d 410, 419 (4th Cir.
2011); *see also Cooper v. United States R.R. Retirement Bd.*, 24

F.3d 1414, 1417 (D.C. Cir. 1994) (compensating travel time at a reduced rate).

In this case, the Court believes that regardless of the propriety of reducing the rates at which counsel billed or modifying the hours billed in order to adjust for time spent travelling, to do so would is not possible because the Court cannot determine with any accuracy the amount of time that counsel actually spent traveling. The Court will consider the entry in determining the percentage reduction it will assess.

The June 1, 2012 entry for Ms. Sabagh, which bills for 3.5 hours, entails a work description reading "ARGUE MOTION FOR PROTECTIVE ORDER IN FEDERAL DISTRICT COURT, ALEXANDRIA, VA; TRAVEL." (Sabagh Aff. Ex. B at 25.) The Government has argued that "[i]t is unreasonable billing to charge full attorney's fees for travel time." (Gov. Opp. Ex. 5 at 59.) The record reflects that the actual hearing upon the Motion for Protective Order lasted approximately fifteen minutes. [Dkt. 68.] In the logs submitted, the travel entry has been combined with other legal tasks, *i.e.*, the time counsel expended that related to the hearing. This generalized entry combining tasks is simply not sufficient, proper documentation and the Court suspects that travel time has been included in the hours that were billed. The Court cannot determine with sufficient accuracy the amount of time that Plaintiff's counsel actually spent traveling, as

counsel has not expressly delineated that time. This Court does not believe that it is proper to simply assume that the excess time was spent travelling. The Court has already expressed its unwillingness engage in ascription of time to constituent tasks for which Plaintiff's counsel has block billed, as there is no assurance that such an endeavor would result in an accurate ascription of time to the respective tasks.

The Government has also objected to Mr. Dietrick's June 1, 2012 entry, which bills 2.5 hours for work described as "PREPARE FOR HEARING REGARDING MOTION FOR PROTECTIVE ORDER; HEARING; MEET WITH CLIENT AS D. SABAGH; RETURN TRAVEL." (Sabagh Aff. Ex. B at 25.) The Government asserts that "[i]t is unreasonable billing to charge full attorney's fees for travel time." (Gov. Opp. Ex. 5 at 60.) Again, this sort of generalized entry combining tasks is simply not sufficient, proper documentation, particularly so when the block billing entry seemingly envelopes travel time. Indeed, the purported travel time would have been combined with other legal tasks in the logs submitted. The Court simply has no means of determining with sufficient certainty the amount of time that counsel spent travelling.

In summation, because the Court cannot determine with any accuracy the amount of time that counsel actually spent traveling, which is itself in large part a consequence of the

insufficient documentary practices of Plaintiff's counsel, the Court will consider the billed time when assessing the reduction that the Court will apply.[8]

### vii. Pre-trial Conferences

The Government has objected to the manner in which Plaintiff's counsel has billed for their attendance at the pre-trial conference in this case on February 16, 2012. The record demonstrates that the pre-trial conference lasted approximately ten minutes. [Dkt. 28.] Mr. Ragland, Ms. Cook, and Ms. Sabagh all billed disparate amounts of time for their participation in this conference. Mr. Ragland billed 2.5 hours in a billing entry with the accompanying description "PRE-TRIAL CONFERENCE IN US DISTRICT CT FOR ED VA (sic)." (Sabagh Aff. Ex. B at 17.) Ms. Cook billed three hours for "PREPARATION FOR AND ATTENDANCE AT FINAL PRETRIAL CONFERENCE W/ J CACHERIS (sic)." (*Id.*) Ms. Sabagh billed two hours in a billing entry with the accompanying description "ATTEND STATUS CONFERENCE AT U.S. DISTRICT COURT, ALEXANDRIA, VA." (*Id.*)

The Court agrees that this entry constitutes the sort of unnecessary billing that should be subject to adjustment in the exercise of "billing judgment." *See Hensley*, 461 U.S. at 437. If the aforementioned billing entries incorporate travel

---

[8] The Court notes that it has previously excised the time for which Ms. Sabagh billed that was related to the naturalization ceremony. It is therefore unnecessary to address the propriety of billing for any associated travel.

time, it has not been included in the task description and can only be considered as having been insufficiently documented. To the extent that Ms. Cook or any of her co-counsel have included time spent preparing for the conference in the time for which they have billed, it has been insufficiently documented or delineated within their billing entries. The Court will consider the billed time in determining the percentage reduction it will assess.

### viii. Ms. Cook's Deposition Work

The Government objects to Ms. Cook having billed 3.5 hours on January 31, 2012 for work described as "REVIEWING INTERVIEWS ON DVD AND PREPARING DEPOSITION QUESTIONS FOR LUSTOSTANSKI AND WILLIAMS." (Sabagh Aff. Ex. B at 14.) The Government argues that "Ms. Cook prepared for the depositions, but she did not take or defendant any of the depositions or actively particiapate (sic) in trial. This represents overstaffing and duplicative efforts." (Gov. Opp. Ex. 5 at 36.) The Government has made a similar objection to Ms. Cook' February 1, 2012 billing entry, which bills six hours for "PREPARING DEPOSITION QUESTIONS FOR LUSTOSTANSKI AND WILLIAMS. PREPARING JAMAL AND ASHRAF FOR DEPOSITIONS." (Sabagh Aff. Ex. B at 14.) The Government argues that "Mr. Ragland took these depositions." (*Id.*) The Government has not cited any authority that embraces the notion that only those attorneys that actually

take depositions or actively participate in trial are permitted to prepare deposition questions, and the Court is not aware of any authority that states as much.  The Court does not find these entries to be unreasonable even in light of the Government's objections.  The Court will not make any adjustment here.

Relatedly, the Government has objected to Ms. Cook's presence at the deposition of Mr. Abusamhadaneh on February 3 and February 6, a deposition that Mr. Ragland and Ms. Sabagh also attended, as indicative of overstaffing.  The Government has also objected to the "NOTE-TAKING" component of Ms. Cook's billing entries from the deposition on February 3 and February 6. (Sabagh Aff. Ex. B at 15.)  Indeed, the Government made the same objection to both entries based upon the note-taking component of the activity description: "[n]ote-taking during the deposition was unnecessary because the transcript was order from the court reporter. It is also a clerical task."  (Gov. Opp. Ex. 5 at 38.)  To address a threshold issue upon which the Government's objections touch, the Court's analysis of the Government's objections to various entries based on the argument that they consider certain tasks "clerical" in nature is dealt with elsewhere in this opinion.  The Court will simply address the argument made by the Government that Ms. Cook's presence was unnecessary and indicative of overstaffing.

The Court believes it was reasonable for more than one attorney to have provided assistance at the deposition, particularly so given that it was the deposition of their client, and the Court will not make any adjustment to the hours billed predicated upon overstaffing.

### ix. Ms. Cook's Attendance at Trial

The Government has also objected to Ms. Cook's March 13, 14, and 15, 2012 billing entries in which she has billed for her attendance at trial. The Government argues that "[i]t is duplicative and unreasonable for Ms. Cook to bill for attending the trial; she did not participate." (Gov. Opp. Ex. 5 at 53-54.) Plaintiff has countered with the argument that "despite the fact that the government had at least three attorneys attend the trial, the government argues that it is 'duplicative and unreasonable' for Ms. Cook (who was Mr. Abusamhadaneh's third chair attorney at trial) to bill for attending the trial. Surely the government would not contend that it wasted government funds by having multiple government attorneys present at depositions and trial." (Pl. Rep. at 14.) The Court has evaluated the Government's objection, as well as the rebuttal of Plaintiff's counsel, and finds that it was reasonable for Ms. Cook to have billed for her attendance at trial. This Court will not make any adjustment to the hours that Ms. Cook billed for her presence at trial.

## x.  Research on Rules of Procedure

The Government argues that Plaintiff's attorneys spent an excessive amount of time billing for unnecessary legal research.  "Mr. Abusamhadaneh asserts that his attorneys are 'nationally recognized' litigators with experience in federal courts, yet they spent an excessive amount of time researching the local rules and procedures, and the federal rules of civil procedure."  (Opp'n 19.)

The Court notes that, while the Plaintiff's legal team has billed for time that included research upon rules of procedure, the billing practices of Plaintiff's counsel once again imbue some difficulty into precisely delineating the amount of time spent on each respective task within a single billing entry.  Consequently, it is difficult to determine what amount of time was actually spent on researching rules of procedure.  This temporal uncertainty has imbued further difficulty into making a determination of the reasonableness of the time that was spent.  The Court reiterates that it will not undertake the futile task of separating block entries into their constituent tasks and apportioning a random amount of time to each.  The Court feels that any ambiguity in exactly how long this research took is covered by the Court's percentage reduction of fees.  Therefore, because it is not possible to determine the amount of time spent on such research, the Court

will consider the entries in determining the percentage reduction it will assess.

xi. <u>Motion for Protective Order (May)</u>

The Government has objected to the hours billed by Plaintiff's counsel during the month of May in 2012 relating to a protective order sought in this case. Though multiple motions of this variety were made in this case, it seems evident that the time billed here relates to the May 25, 2012 Motion for Protective Order [Dkt. 63] and the May 31, 2012 Reply Memorandum in Support [Dkt. 67] that were filed by Plaintiff's legal team. The Government argues that "[Plaintiff's attorneys] also billed for filing an unnecessary and overly expansive motion to seal certain portions of the public transcripts. They filed these motions several times and did not excise the excess from the billing." (Opp'n 20.) The Government has also argued through its line-item objections to Plaintiff's billing ledger that "[t]he motion to seal the record was denied." (Gov. Opp. Ex. 5 at 55-59.)

Simply because a motion was denied does not necessarily mean that counsel may not bill for the time expended upon it. The Court notes that although it "must consider the overall result of the litigation in terms of the moving party's success, no authority exists which persuades the Court to reduce the fee award for reasonable, but unsuccessful tactics within

the litigation. The Court's inquiry is simply whether the time was reasonably expended." *Cnty Sch. Bd. of York Cnty, Va. V. A.L.*, 2007 WL 756586 (E.D.Va. Mar. 6, 2007); *see also Jaffee v. Redmond*, 142 F.3d 409, 414 (7th Cir. 1998) (noting "a losing argument in support of a successful claim for relief is fully compensable time"). The Court finds that, given the subject matter of this action, it was reasonable for Plaintiff to make this Motion for Protective Order. Further, contrary to assertion of the Government, Plaintiff's Motion for Protective Order was not wholly denied. Indeed, this Court's June 5, 2012 order demonstrates that it was granted in part and denied in part. [Dkt. 72.] Consequently, this Court will not excise the relevant hours for which Plaintiff's legal team billed.

Despite having found the time that was billed to be compensable, having examined the related billing records, the Court believes that the total amount of time spent by three separate attorneys expended on a simple motion to seal trial transcripts is unreasonable and excessive billing. However, several of the entries are interspersed with tasks that are not ostensibly related to a protective order or insufficiently described for the Court to ascribe definitively to work upon a protective order. However, despite the Court's inability to ascertain with certainty the total number of hours spent upon the motion the seal due to several instances of insufficient, it

is clear from the remaining entries that an excessive amount of billing occurred related to this task.  The Court will consider the billed time when assessing the reduction that the Court assesses.

xii. <u>Motion for EAJA Attorney Fees</u>

The Government has repeatedly objected to the amount of time for which Plaintiff's counsel has billed related to the instant for Attorney's Fees and Expenses Pursuant to the Equal Access to Justice Act, arguing that the amount of time expended on the Motion and related pleadings is excessive and duplicative.  (Gov. Opp. Ex. 5 at 60-62, 67-71.)  According to the billing records of Plaintiff's legal team, billing began on June 20, 2012 for work related to their EAJA application and related filings.  The breadth of the time for which counsel billed for work related to fees took place in August and September of 2012. (Sabagh Aff. Ex. B at 25-30; Second Sabagh Supp. Aff. Ex. B at 1-2.)  Though Plaintiff's billing records contain instances of block billing and insufficient temporal delineation in several of the billing entries that relate to work touching upon EAJA attorney fees, thereby precluding a definitive determination of the total time counsel spent billing for related work, the Court believes that the records nevertheless provide sufficient indication that the amount of time for which counsel billed is excessive.  The Court will

consider the billed time when determining the reduction that the Court assesses.

2. Factor 2: Novelty and Difficulty of the Questions

The second *Johnson/Kimbrell's* factor relates to the novelty and difficulty of the questions. The Court finds that this factor does not weigh in favor of Plaintiff and believes the issues presented by this case were not especially difficult or novel. This case entailed a petition for review of denial of application for naturalization. This sort of proceeding is not novel or uncommon within the field of immigration law. Although Mr. Abusamhadaneh's case did involve confusion surrounding a "positive name check," the disposition of this case ultimately hinged upon questions of credibility and thereby represented a very basic legal inquiry.

To be sure, the Court appreciates the challenge in obtaining the reversal of the decision denying Mr. Abusamhadaneh's application for naturalization, particularly so when a "positive name check" is a factor in the application's denial. Plaintiff's counsel successfully alleviated the confusion surrounding Mr. Abusamhadaneh's application, thereby helping secure a reversal of the application's denial. The importance of having succeeded in this regard should not be minimized or understated. However, in spite of this success, the Court feels that neither the complexity the issues nor the

difficulty of the proceeding entailed a special degree of difficulty, particularly so in light of the competence, experience, and numerical multiplicity of Plaintiff's legal team.

3. Factor 3: Skill Required to Properly Perform the Legal Services Rendered

The third *Johnson/Kimbrell's* factor relates to the skill required to properly perform the legal services rendered. This Court has already touched on this issue in discussing counsel's request for enhanced fees beyond the EAJA statutory cap. Although the Court believes that Mr. Abusamhadaneh's case was indeed challenging in some respects, and that the proceedings required reasonably competent legal representation, the attendant issues did not entail a degree of complexity that would render an award of enhanced fees appropriate in this case. However, it bears reiteration that the Court feels that the proceedings required a reasonably competent attorney. It is evident that Mr. Abusamhadaneh had several such attorneys working on his behalf.

However, the Government has raised several objections as to the nature of the work performed by Plaintiff's counsel. Through their line-item objections, the Government has identified several billing entries that they assert entail, at least in part, clerical work for which counsel billed at their

full attorney rate.  While mindful of the fact that Plaintiff's counsel has been limited to the statutory cap in this case, the Court will address the objections of the Government as they relate the hours billed as follows.

### a. Clerical Tasks

The Government asserts that the rate at which Plaintiff's attorneys billed for tasks that they characterize as "clerical" should be reduced. "[N]umerous billing records include clerical tasks that should not be billed at an attorney's rate. Such administrative and clerical expenses should be billed at a reduced administrative rate."  (Opp'n 19.) In their Reply, Plaintiff argues that "the [G]overnment casts too wide of a net in identifying what it believes to be clerical work."  (Pl. Rep. at 13.)

Purely clerical activities, regardless of who performs them, are considered overhead and are not compensable as EAJA attorney fees. *See Missouri v. Jenkins by Agyei*, 491 U.S. 274, 288 n. 10 (1989); *In re General Motors Corp.*, 110 F.3d 1003, 1024 (4th Cir. 1997). However, there are many activities which fall into the "gray area" of tasks which may appropriately be performed by either an attorney or a paralegal. *See Jenkins*, 491 U.S. at 288 n. 10.  The Fourth Circuit has upheld compensation at the full attorney rate for certain tasks in the gray area on the basis that there is no single, correct way to staff every

lawsuit and, sometimes, it is more economical and efficient for attorneys to do "non-legal" work. *See Spell v. McDaniel*, 824 F.2d 1380, 1401-02 (4th Cir. 1987).

The Court has reviewed the specific objections of the Government and makes the following findings:

1. Mr. Ragland's November 4, 2011 entry billed for, among other tasks, "ORGANIZ[ING] PLEADINGS BINDER." (Sabagh Aff. Ex. B at 1.) The Government asserts that this is a clerical task. This Court agrees. However, due to the entry's lack of temporal delineation, the task is indivisible from the non-clerical work performed on that day, as the Court recognizes that the task at issue was only one among several tasks listed within the block billing entry. The Court has stated in its foregoing analysis that it is loath to assign a random amount of time to each task within compound billing entries. The Court will consider the billed time when assessing the reduction the Court applies.

2. Ms. Cook's January 10, 2012 entry billed five hours for work described in part as "COMPILING, VERIFYING AND PREPARING ALL DOCUMENTS FOR EXCHANGE: FINANCIALS, LEASES, EMPLOYMENT HISTORY, MEMBERSHIP EVIDENCE, ADMIN FILE, TAX RETURNS, ETC." (Sabagh Aff. Ex. B at 8.) The Government asserts that this is a clerical task. The Court once again notes that this task comprises only one of the tasks listed for that day. Although the Court agrees that this task is clerical, due to the entry's lack of temporal delineation, the task is indivisible from the other work performed on that day. The Court will consider the billed time when assessing the reduction the Court applies.

3. Ms. Cook's January 13 entry billed six hours for work described in part as "COMPILING AND PREPARING ALL DOCUMENTS FOR EXCHANGE: FINANCIALS, LEASES, EMPLOYMENT HISTORY, MEMBERSHIP EVIDENCE, ADMIN FILE, TAX RETURNS, ETC.." (Sabagh Aff. Ex.

B at 9-10.) The Government asserts that this is a
clerical task.  The Court once again notes that
this task comprises only one of the tasks listed
for that day.  Although the Court agrees that
this task is clerical, due to the entry's lack of
temporal delineation, the task is indivisible
from the other work performed on that day.  The
Court will consider the billed time when
assessing the reduction the Court applies.

4. Ms. Cook's January 17 entry billed four hours for
   work described in part as "COMPILING AND
   PREPARING (BATE STAMPING, ORGANIZING, INSERTS,
   PAGE NUMBERING, VERIFYING) ALL DOCUMENTS FOR
   EXCHANGE: FINANCIALS, LEASES, EMPLOYMENT HISTORY,
   MEMBERSHIP EVIDENCE, ADMIN FILE, TAX RETURNS,
   ETC.." as among the work undertaken that day.
   (Sabagh Aff. Ex. B at 11.)  The Government
   asserts that this is a clerical task.  The Court
   once again notes that this task comprises only
   one of the tasks listed for that day.  Although
   the Court agrees that this task is clerical, due
   to the entry's lack of temporal delineation, the
   task is indivisible from the other work performed
   on that day.  The Court will consider the billed
   time when assessing the reduction the Court
   applies.

5. Ms. Cook's January 25 entry billed one hour for
   work described  "PREPARING ALL REMAINING CALENDER
   ENTRIES FOR PRE-TRIAL: DESPOSITIONS (DATE AND
   TIME AND WHO), MOTION IN LIMINE TO EXCLUDE EXPERT
   WITNESS LEVITT, ETC.." (Sabagh Aff. Ex. B at 13.)
   The Government asserts that this is a clerical
   task. The Court believes that although it is
   likely that some of this time was spent on non-
   clerical tasks, the lack of descriptive nuance
   renders it difficult to ascertain and evaluate
   the precise work that was performed that day.
   Furthermore, the entry suffers from lack of
   temporal delineation between tasks.  The Court
   believes that it suffices to consider the billed
   time when assessing the percentage reduction the
   Court applies due to insufficient documentation.

6. Mr. Ragland's January 30 entry billed 3.5 hours
   for work described in part as "ARRANGE FOR

DEPOSITIONS." (Sabagh Aff. Ex. B at 14.)  The Government asserts that this is a clerical task. The Court once again notes that this task comprises only part of the tasks listed as having been performed that, and due to the entry's lack of temporal delineation, the task is indivisible from the other work performed during that billing session.  The Court is not able to ascertain what precise work this task entails, as the lack of descriptive nuance renders it difficult to ascertain and evaluate whether it may properly be classified as clerical. In any event, there has not been any temporal delineation between this task and the other undertaken during that billing session. The Court believes that it suffices to consider the billed time when assessing the percentage reduction the Court applies due to insufficient documentation.

7. Ms. Cook's January 30 entry billed three hours for work described in part as "PREPARING NOTICES OF DEPOSITION." (Sabagh Aff. Ex. B at 14.) The Government asserts that this is a clerical task. The Court once again notes that this task comprises only part of the tasks listed as having been performed.  The Court agrees that this is a clerical task, but due to the billing entry's lack of temporal delineation, the task is indivisible from the other work performed during that billing session.  The Court will consider the billed time when assessing the reduction the Court applies.

8. Mr. Ragland's January 31 entry billed one for a variety of work and including "ORGANZ[ING] DEPOSITION DETAILS." (Sabagh Aff. Ex. B at 14.) The Government asserts that this is a clerical task.  Though it appears that this task may have been clerical based on the description provided, the Court cannot determine with any accuracy whether the task untaken was actually clerical in nature.  Furthermore, the Court is unable to the amount of time that counsel actually spent on the task. The Court will consider the billed time when assessing the reduction it applies due to insufficient documentation.

9. Ms. Cook's February 3 and February 6 entries that billed for a variety of tasks related to the deposition of Mr. Abusamhadaneh and include "NOTE-TAKING" as a component of the tasks billed for upon those days. (Sabagh Aff. Ex. B at 15.) The Government asserts that "note-taking during the deposition was unnecessary because the transcript was ordered from the court reporter. It is also a clerical task." The Court believes that it is reasonable for an attorney to take notes during the deposition of their client, particularly so when the note-taking occurs concurrently with taking a client's deposition. The Court will not make any adjustment here.

### 4. Factor 7: Time Limitations Imposed by the Client or Circumstances

The seventh *Johnson/Kimbrell's* factor relates to time limitations imposed by the client or circumstances. It does not appear that there were any significant time limitations imposed either by this action, proceeding, or by the client. The Court does not believe that time limitations in this case warrant special consideration as "[a]ll litigants are pushed to trial in this Court." *Signature Flight*, 730 F. Supp. 2d at 525 (quoting *Niccoli v. Runyon*, 1995 WL 811946,*2 (E.D. Va. 1995)). Thus, the Court will not take this factor into consideration.

### 5. Factor 8: Amount in Controversy and the Results Obtained

The eighth *Johnson/Kimbrell's* factor relates to the amount in controversy and the results obtained. At stake in this controversy was Mr. Abusamhadaneh's ability to become an American citizen, "the highest hope of civilized men."

*Schneiderman v. United States*, 320 U.S. 118, 122 (1943).  This
Court ultimately found that Mr. Abusamhadaneh to be person of
good moral character and that he met the requirements for
naturalization set out in the Immigration and Nationality Act.
Such a holding overturned the position of USCIS and allowed Mr.
Abusamhadaneh to become naturalized as an American citizen.  The
Court finds that this factor weighs in favor of the Plaintiff
and his legal team, as the results of this proceeding cannot be
considered anything but a success from their perspective.

      6. <u>Factor 9: Experience, Reputation and Ability of the
Attorneys</u>

      The ninth *Johnson/Kimbrell's* factor relates to the
experience, reputation, and ability of the attorneys.  Counsel
has submitted multiple affidavits that touch on this particular
factor as they relate to Ms. Sabagh and Mr. Ragland.  Both Ms.
Sabagh and Mr. Ragland have submitted affidavit detailing their
own experience, reputation, and ability.  Various affidavits
were submitted in support of Plaintiff's counsel as well.  The
Court has reviewed the affidavit submitted by Thomas A. Elliot.
[Dkt. 84-5.]  In addition, the Court has reviewed the affidavit
submitted by Ira J. Kurzban.  [Dkt. 84-6.]  Finally, the Court
has reviewed the affidavit submitted by Robert H. Gibbs.  [Dkt.
84-7.]  The Court is satisfied that every member of Plaintiff's
legal team is an able, respected practitioner of considerable

experience and acumen.  Ms. Sabagh has appeared before this Court on previous occasions and the Court has found her to be an attorney of considerable skill and competence.  Though this Court has limited Plaintiff's legal team to the EAJA statutory cap for attorney fees, they will nevertheless receive the maximum allowable rate under the statutory regime, further adjusted for cost of living.

### 7. Factor 12: Attorney Fees Awards in Similar Cases

The twelfth *Johnson/Kimbrell's* factor relates to attorney fees award in similar cases.  The Court reiterates that counsel has been limited to the EAJA statutory cap in this case, adjusted for cost of living, and thus will not engage in a protracted inquiry into the reasonableness of the rates charged by Plaintiff's legal team.

Regarding the hours billed in similar cases, the Court neither party has cited cases of sufficient similarity to the facts and posture of the present proceeding, and the Court itself has not found a case that could be considered reasonably analogous to warrant consideration.  Consequently, the Court does not believe this factor warrants protracted consideration.

### 8. Additional Factors

The Court does not believe that the following factors warrant special consideration in this case: the attorneys' opportunity costs in pressing the instant litigation, customary

fee for like work, attorney's expectations at the outset of the litigation, the undesirability of the case within the legal community in which the suit arose, and the nature and length of the professional relationship between attorney and client.

9. Conclusion

The Court has weighed carefully the myriad arguments, objections, and rebuttals made on behalf of each of the parties. The Court believes that the number of hours Plaintiff's counsel spent on improperly delineated tasks, reviewing documents, and discovery tasks are excessively high and that the total hours billed by the Plaintiff is unreasonable in light of excessive resources committed to this case. *See Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1360 (4th Cir. 1995). The billing records of Plaintiff's counsel demonstrate gross deficiencies with regard to billing documentation. Indeed, excessive block billing, lack of descriptive specificity, and the absence of temporal delineation of tasks limited the Court's ability to scrutinize the time billed by Plaintiff's counsel.

The Court is also concerned that this proceeding entailed an excessive amount of billing by a multiplicity of attorneys, though the Plaintiff's billing practices have rendered a thorough analysis of counsel's billed hours impracticable. The Court has noted that there are a great many instances of billing entries so descriptively vague that it is

difficult for this Court to ascertain the precise nature of the
work undertaken for that day, and whether it differs from work
that has been performed previously either by that attorney or
another member of the legal team.  In short, the Court has found
that individualized determination of whether some of the billed
hours were duplicative or excessive is impracticable.

**2011 – Duane Morris LLP**

| Name | Hours | Rate | Fee |
|---|---|---|---|
| Denyse Sabagh | 4.500 | $179.21 | $806.45 |
| Jennifer D. Cook | 20.250 | $179.21 | $3629.00 |
| Joseph Ferretti | .720 | $179.21 | $129.03 |
| Thomas Ragland | 18.810 | $179.21 | $3370.94 |
| Cyndy Ramirez Clark | .180 | $179.21 | $32.26 |
| *Total:* | *44.460* | | *$7967.68* |

**2012 – Duane Morris LLP**

| Name | Hours | Rate | Fee |
|---|---|---|---|
| Denyse Sabagh | 111.330 | $182.52 | $20319.95 |
| Jennifer D. Cook | 90.450 | $182.52 | $16508.93 |
| Robert H. Dietrick | 29.880 | $182.52 | $5453.70 |
| Joseph Ferretti | 76.320 | $182.52 | $13929.93 |
| Thomas Ragland | 164.880 | $182.52 | $30093.90 |
| Cyndy Ramirez Clark | 5.040 | $182.52 | $919.90 |
| *Total:* | *477.900* | | *$87226.31* |

**2012 – Benach Ragland**

| Name | Hours | Rate | Fee |
|---|---|---|---|
| Cyndy Ramirez Clark | 1.170 | $182.52 | $213.55 |
| Jennifer D. Cook | 3.150 | $182.52 | $574.94 |
| Thomas Ragland | 13.050 | $182.52 | $2381.89 |
| *Total:* | *17.370* | | *$3170.38* |

| | | | |
|---|---|---|---|
| ***Total Fees:*** | | | **$98364.36** |

The Court, as a consequence of its examination of
Plaintiff's billing ledger, has determined that assessing a
percentage adjustment to the total hours billed is appropriate
in this case.  In addition to the special adjustments that the
Court has made in its foregoing analysis, the Court will assess
a 10% reduction to the billed hours for each calendar year.  The

Court feels that such an adjustment constitutes a sufficient penalty for the pervasive insufficiency of counsel's billing practices. Indeed, such documentary impropriety was a considerable hindrance to the Court's ability to evaluate the necessity and reasonableness of the Plaintiff's billable hours, particularly so in light of the Government's objections. Aside from the four hours deducted from Ms. Sabagh billed time during the 2012 year which the Court has deemed non-compensable, the Court believes that the billing practices of Plaintiff's legal team have rendered further line-item adjustments impracticable.

The Court will first address the 2011 year.[9] The 49.40 hours that were billed will be adjusted downward by 10%, resulting in 44.46 hours. As previously discussed, the Court has limited the recovery rate of Plaintiff's counsel to the statutory cap which, adjusted for cost of living, is $179.21 for 2011. This results in a fee of $7,967.68 for the 2011 year.[10]

The Court will next address the 2012 year. Plaintiff's legal team billed 554.30 hours. The Court has deemed four hours to be non-compensable, resulting in a total of

---

[9] From the outset, the Court notes that the fees of the constituent members of Plaintiff's legal team have been calculated utilizing the aforementioned adjusted fee rates and compensable hours for each the respective year. In addition, there has been a further organizational distinction that accounts for the time billed by Mr. Ragland, Ms. Cook, and Ms. Cook as members of both Duane Morris LLP and Benach Ragland, respectively. Such form has been adopted from the submissions of Plaintiff. (*See* Ragland Aff. Ex. A.)

[10] In the interest of clarity, the Court has rounded the yearly fee payable to the respective members of Plaintiff's legal team to the second decimal place, *i.e.*, the hundredths place, in order to avoid awarding fractions of a cent.

550.30 hours. This will be adjusted downward by 10%. This results in 495.27 billable hours for that year. As previously discussed, the Court has limited the recovery rate of Plaintiff's counsel the statutory cap plus the requested cost of living adjustment, which results in a rate of $182.52 for the 2012 year. In total, Plaintiff's legal fees for the year are $90,396.69.[11]

In total, the Court finds that fees in the amount of $98,364.37 are appropriately recoverable in this case.

**(5). Government's Notice to Court Regarding Plaintiff's Compensation**

On November 13, 2012, the Government filed a Notice Regarding Plaintiff's Motion for Attorney's Fees and Expenses Pursuant to the Equal Access to Justice Act [Dkt. 91] ("the Notice"). In the Motion, the Government stated that it came to the attention of counsel for Defendants that a website for the Muslim Legal Fund of America ("MLFA") stated that MLFA had "funded" at least a portion of Mr. Abusamhadaneh's legal fees and costs. (Not. at 1.) Included with the Government's Notice was a copy of the subject article that appeared in the MLFA

---

[11] In calculating the respective fees payable to each of the members of Plaintiff's legal team that belonged to the firm Benach Ragland during 2012, the Court notes that the result of rounding to the nearest cent the fee payable to each of those members is an award that collectively exceeds by one cent the award that would result through rote multiplication of the 17.37 hours billed by the firm by the $182.52 rate. The Court believes that continuing to round each person's award to the nearest cent is appropriate in the interests of fairness, clarity, and consistency and the Court will allow the recovery of that one cent.

website.  [Dkt. 91-1.]  In their Response to the Government's
Notice [Dkt. 92] ("the Response"), Plaintiff's counsel concedes
that the "MLFA has paid $60,000 directly to Duane Morris LLP
towards the legal fees charged by Duane Morris LLP to Mr.
Abusamhadaneh." (Resp. at 1.)

In evaluating the reasonableness of the fee request by
Plaintiff's counsel, the Court has been guided by the principle
that "a reasonable attorney's fee is one that is adequate to
attract competent counsel, but that does not produce windfalls
to attorneys." *Leroy v. City of Houston*, 906 F.2d 1068, 1078-79
(5th Cir. 1990) (quoting *Blum v. Stenson*, 465 U.S. 886, 104
(1984)).  As Plaintiff's counsel has already recovered that
portion of their attorney's fees from a third party, the Court
does not believe it proper that they should be able to recover
that portion of their fee once again.  The Court will credit
Plaintiff's recovery of fees with the payment made on behalf of
Mr. Abusamhadaneh by the MLFA, resulting in a fee award of
$38,364.37

**(6). What are Plaintiff's Costs?**

This Court has carefully reviewed the bill of costs
and the supplemental bill of costs submitted by counsel in this
action, as well as the various Opposition of the Government.
Plaintiff's counsel seeks $9,342.38 in costs related to this
case.  (Pl. Ex. 3 at 42.)  These costs are described by counsel

as relating to internal copy and duplication of documents, as well as the purchase of deposition and trial transcripts. (*Id.*) The Government, while not objecting to the recovery of costs related to transcripts, argues that counsel "should not be able to recover" "his attorneys' unexplained printing costs." (Opp'n 21.)

Section 2412(a)(1) provides that costs enumerated in Section 1920 may be awarded to a prevailing party in litigation against the United States. *See* 28 U.S.C. § 2412(a)(1) (1994). It explicitly excludes attorneys' fees and expenses, which are separately addressed in Section 2412(d)(1)(A). Section 1920 specifically enumerates six categories of costs that may be awarded and states that:

> A judge or clerk of any court of the United States may tax as costs the following:
>
> (1) Fees of the clerk and marshal;
>
> (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
>
> (3) Fees and disbursements for printing and witnesses;
>
> (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
>
> (5) Docket fees under section 1923 of this title;

> (6) Compensation of court appointed experts,
> compensation of interpreters, and salaries,
> fees, expenses, and costs of special
> interpretation services under section 1828
> of this title.

28 U.S.C.A. § 1920.  As the Government does not challenges Plaintiff's costs related to transcripts, the Court will proceed and address the other items enumerated on Defendant's bill of costs.

Counsel seeks costs related to the duplication of documents.  Courts have allowed costs for photocopies only when the photocopies were necessary. *Studiengesellschaft v. Eastman Kodak*, 713 F.2d 128, 133 (5th Cir. 1983).  Owing to the similar lack of documentary specificity inherent to the Plaintiff's bill of costs, this Court cannot make a determination of portion of the stated costs are comprised of photocopying (as opposed to printing).  In addition, the Court cannot make the further determination of whether such copies were necessary.  The Court will take this lack of specificity into account when makings its ultimate determination as to costs.

Counsel seeks costs related to printing.  It is unclear, despite having been grouped together in the individual billing entries, whether the printing is related to the copying in the sense that it is related to duplication.  Again, this owing the lack of specificity as to counsel's billing entries.

Due to the difficulty of discerning the nature of counsel's costs, a consequence of their billing practices, the Court will apply a 10% downward adjustment to the requested $1294.20 in costs associated with entries described as "PRINTING & DUPLICATING – INTERNAL," resulting in an award of $1,164.78 in costs for those expenses.  This results in a total cost recovery of $9,212.96.

## IV. Conclusion

For the foregoing reasons, Plaintiff's Motion for Attorney's Fees and Expenses Pursuant to the Equal Access to Justice Act is granted.  The Court finds that the position of the Government was not substantially justified.  The Court finds that Plaintiff is eligible for an award of attorney fees and will award to Plaintiff's legal team $38,364.37 in fees and $9,212.96 in costs, which results in a total award of $47,577.33 in fees and costs.

An appropriate Order will issue.

/s/

January 17, 2013                          James C. Cacheris
Alexandria, Virginia          UNITED STATES DISTRICT COURT JUDGE